## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

**Paul C. Barens,**               **Case No. 1:22CV00103**

        **Plaintiff,**

        **-vs-**

                              **JUDGE PAMELA A. BARKER**

**Parma City School District, et al.,**

        **Defendants.**          **MEMORANDUM OPINION & ORDER**

Currently pending are the following: (1) the Motion for Summary Judgment of Defendants Parma City School District ("PCSD"), Charles Smialek, John Schweitzer, Steven Vaughn, Cynthia Lee Bratz, Amanda Karpus, Jack Krise, Jr., and Patrick Hoy (hereinafter referred to collectively as "the PCSD Defendants") (Doc. No. 50); and (2) the Motion for Summary Judgment of Defendant Joseph Ridgley (Doc. No. 51.)  Plaintiff Paul C. Barens (hereinafter "Plaintiff" or "Barens") filed a combined Brief in Opposition to both Motions on April 29, 2024, which the Court later permitted him to correct and resubmit on May 8, 2024.  (Doc. No. 65.)  The PCSD Defendants and Defendant Ridgley filed Reply Briefs in support of their Motions for Summary Judgment, on May 30 and May 31, 2024, respectively.  (Doc. Nos. 66, 68.)

In addition, on May 31, 2024, the PCSD Defendants and Defendant Ridgley filed a "Joint Objections and Motion to Strike" certain Exhibits attached to Plaintiff's Brief in Opposition to Defendants' Motions for Summary Judgment.  (Doc. No. 67.)  Plaintiff filed a Brief in Opposition on June 14, 2024, to which the PCSD Defendants and Defendant Ridgley replied on June 21, 2024.  (Doc. Nos. 71, 72.)  Lastly, on June 3, 2014, Plaintiff filed a "Motion for Leave to File a Legible

Copy of Plaintiff's Exhibit 12." (Doc. No. 69.)  The PCSD Defendants and Defendant Ridgley filed a Brief in Opposition on June 4, 2024, to which Plaintiff did not reply.  (Doc. No. 70.)

For the following reasons, Plaintiff's Motion for Leave to File a Legible Copy of Plaintiff's Exhibit 12" (Doc. No. 69) is DENIED.  The PCSD Defendants' and Defendant Ridgley's "Joint Objections and Motion to Strike" (Doc. No. 67) is GRANTED IN PART and DENIED IN PART, as set forth herein.  The PCSD Defendants' Motion for Summary Judgment (Doc. No. 50) is GRANTED.  And, lastly, Defendant Ridgley's Motion for Summary Judgment (Doc. No. 51) is GRANTED IN PART and DENIED IN PART, as set forth herein.

## I.    Facts[1]

### A.    Barens is hired by the PCSD and subsequently becomes Interim Supervisor of the PCSD Safety & Security Department

Barens was hired by the PCSD on September 9, 2014 to work in its Safety & Security Department.[2]  (Barens Depo. Vol I (Doc. No. 47-1) at Tr. 39.)  Barens identified his title at the time of his hire as "investigator/school resource officer" and "police officer investigator."  (*Id.* at Tr. 40, 42; Doc. No. 47-2 at PageID# 1055.)

In March 2018, Defendant Smialek was appointed as Superintendent of the PCSD, with a start date of August 1, 2018.  (Smialek Depo. (Doc. No. 47-3) at Tr. 10.)  Smialek had previously worked at the Euclid City School District ("ECSD") for nineteen (19) years, including as Superintendent of

---

[1] In setting forth the Facts, the Court does not rely on any materials or exhibits that the Court excluded as part of its consideration of Defendants' Joint Objections and Motion to Strike (Doc. No. 67).  *See, infra*, Section III.

[2] According to his resume and deposition testimony, Barens attended the Cuyahoga Community College Police Academy and received his Ohio Peace Officer Training Academy Certification in 2003.  (Doc. No. 47-1 at PageID# 804.)  Prior to his employment at the PCSD, he worked as a police officer for the Greater Cleveland Regional Transit Authority, Cleveland State University, and the Cleveland Metropolitan School District.  (*Id.*)  *See also* Doc. No. 47-2 at PageID#s 1054-1056.  *See also* Barens Depo. Vol. I at Tr. 15-16, 56-59.

the ECSD for the two years prior to coming to the PCSD.  (*Id*. at Tr. 8.)  While employed at the ECSD, Smialek worked with Defendant Ridgley, who was employed as ECSD foreman of security.  (*Id*. at Tr. 8-10.)  *See also* Ridgley Depo. (Doc. No. 47-5) at Tr. 16.  Smialek testified that he knew Ridgley from their shared time together at the ECSD for fifteen (15) years, i.e., from 2003 to 2018.  (Smialek Depo. at Tr. 9-10; Ridgley Depo. at Tr. 18.)  When Smialek left ECSD to become Superintendent of the PCSD, Ridgley was still working as security foreman at the ECSD.  (Smialek Depo. at Tr. 10.)

At some point in the fall of 2018, the position of Interim Supervisor of the PCSD Safety & Security Department became available.  (Barens. Depo. Vol. I. at Tr. 42-43.)  On September 7, 2018, Barens applied for the position.  (Doc. No. 47-2 at PageID#s 1052-1053.)  On October 24, 2018, Barens was offered the Interim Supervisor position for the term October 29, 2018 to January 1, 2019.  (Barens Depo. Vol. I at Tr. 43; Doc. No. 47-1 at PageID# 810.)  Barens accepted.  (Barens Depo. Vol. I at Tr. 43.)  As a result of this promotion, Barens testified that he was "in charge" of the PCSD Safety & Security Department and that his salary increased from approximately $50,000-"ish" to $69,000, plus benefits.[3]  (*Id*. at Tr. 44-45.)

At some point in late 2018 or early 2019, the PCSD posted the position of Supervisor of the Safety & Security Department.  (Smialek Depo. at Tr. 13-14.)  Both Barens and Ridgley applied and were selected for interviews.

**B.     Barens files a lawsuit and request for emergency injunctive relief in 2019**

---

[3] In his Answers to Defendants' First Set of Interrogatories, Barens states that his salary as Interim Supervisor was $72,000 "plus BOE 100% paid health benefits and retirement contributions and a take home district vehicle."  (Doc. No. 47-2 at PageID# 1058.)

3

On February 28, 2019, Barens filed a Verified Complaint in this Court against the PCSD, Smialek, Schweitzer, Vaughn, and PCSD Board Members Karen Dendorfer, Amanda Karpus, John Tenerowicz, and William Greene. *See Barens v. Parma City School District, et al.*, Case No. 1:19cv00451 (N.D. Ohio) (hereinafter referred to as "*Barens I*"). Therein, Barens alleged that he had been "informed verbally by Greene, within the week that he would be let go" from his position of Interim Supervisor of the Safety & Security Department. (*Id.* at Doc. No. 1, ¶ 32.) Barens alleged that Defendants had engaged in secret negotiations to instead hire an unidentified "substantially less qualified and substantially less prepared candidate" that was currently employed by the ECSD. (*Id.* at Doc. No. 1, ¶¶ 37, 42.) Barens alleged that he had not been provided notice or a hearing, and that "his claims were predicated on an anticipated unconstitutional governmental action exercised under color of state law to end the public employment of the plaintiff based [on Defendants'] intentional disregard of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States." (*Id.* at Doc. No. 1, ¶¶ 2, 4-9.) Barens alleged that "[t]he unconstitutional government action against the plaintiff is set for approximately 6:00 p.m. this evening, Thursday, February 28, 2019." (*Id.* at Doc. No. 1, ¶ 3.)

On that same date, Barens filed an Emergency Motion for Temporary Restraining Order ("TRO"), in which he requested that the Court issue an Order temporarily restraining Defendants from terminating Barens as Interim Supervisor. (Doc. No. 2.) The case was assigned to District Judge Solomon Oliver, who referred the Motion for TRO to then-Magistrate Judge David Ruiz. (Doc. No. 4.)

On February 28, 2019, the Magistrate Judge conducted a telephone conference with counsel and subsequently issued a Report & Recommendation in which he recommended that the Court deny

4

Barens' request for a TRO.  (Doc. No. 4.)  Judge Oliver adopted the Magistrate Judge's Report & Recommendation and denied Barens' Motion for TRO.  (Doc. No. 5.)

On or about March 1, 2019, the PCSD hired Ridgley for the position of Supervisor of the Safety & Security Department.  (Ridgley Depo. at Tr. 22; Doc. No. 47-1 at PageID# 812.)

Several months later, on June 28, 2019, Barens filed an Amended Complaint in *Barens I* against the PCSD, Smialek, Greene, Schweitzer, Vaughn, Dendorfer, and Karpus.  *See* Case No. 1:19cv451 (Doc. No. 16.)  Barens alleged that Defendants violated his federal due process rights when they "engaged in secret negotiations" to hire Ridgley as Supervisor of Safety & Security, despite the fact that Ridgley was allegedly a non-classified employee and less qualified than Barens. (*Id*.)  Barens also alleged that Defendants retaliated against him for filing *Barens I*, in violation of the First Amendment.[4]  (*Id*.)

**C.    Ridgley becomes Barens' supervisor and makes certain changes to the Safety & Security Department**

Meanwhile, Ridgley assumed the position of Supervisor of the PCSD Safety & Security Department (hereinafter "SSD"), effective March 11, 2019.  (Barens Depo. Vol. I at Tr. 48; Doc. No. 47-1 at PageID# 812.)  Barens returned to his previous position of "district officer."  (*Id*.)  Ridgley was Barens' direct supervisor, as well as the direct supervisor of other PCSD Safety & Security Department officers, including Paul Moore and Simpson Huston.  (Ridgley Depo. at Tr. 38.)  At the time of Ridgley's hire, William Greene was his (i.e., Ridgley's) direct supervisor.  (*Id*. at Tr. 15.)

Ridgley testified that he became aware of Barens' lawsuit and request for injunctive relief after he was hired for the Supervisor position.  (*Id*. at Tr. 26, 40.)  Ridgley explained that, when he

---

[4] *Barens I* was reassigned to the undersigned on July 3, 2019 pursuant to General Order 2019-13.

was hired, he did not know anyone in the PCSD SSD but that he was excited for his new job, as it involved a larger school district and came with an increase in salary from his previous position at ECSD.  (*Id.* at Tr. 27-28.)

Once he assumed the position of Supervisor, Ridgley and Greene "started putting a plan in place" for the Department.  (*Id.* at Tr. 29-30.)  Specifically, Ridgley believed that the SSD lacked "structure" and needed "streamlining" in terms of its day-to-day operations.  (*Id*. at Tr. 31-33, 37.) To accomplish this objective, Ridgley implemented a daily log and sign-in sheet for the district officers under his supervision.  (*Id*. at Tr. 32-33.)  He also recommended that all SSD vehicles be equipped with GPS tracking for officer safety purposes.  (*Id*. at Tr. 33-34.)  The PCSD agreed with Ridgley's recommendation and installed GPS tracking devices on all four of the SSD vehicles.  (*Id*. at Tr. 34-35.)  *See also* Barens Depo. Vol. I at Tr. 124.  In addition, Ridgley assigned his officers specific duties throughout the District.  (Ridgley Depo. at Tr. 37.)

Barens testified that many of Ridgley's changes negatively impacted him.[5]  For example, Barens testified that, as soon as Ridgley assumed control of the SSD in March  2019, Ridgley changed Barens' job duties to the "lesser role" of money courier (which involved driving to every school in the District, picking up deposits, and taking them to the bank) and then tracked his daily activities "by a locator on the school district car."  (Barens Depo. Vol. I at Tr. 111, 124-125.)  Barens further

---

[5]  Barens testified that, due to work-related stress, he began experiencing mental health symptoms in or around January 2019, and began treatment with clinical psychologist George Tesar, M.D.  (Barens Depo. Vol. I at Tr. 203-216.)  On or about April 12, 2019, Barens applied for FMLA leave due to his mental health symptoms.  (*Id*.)  *See also* Doc. No. 47-1 at PageID#s 874-877.  Dr. Tesar completed a Certification in connection with Barens' application, in which he indicated that Barens was unable to perform any of his job functions due to acute stress disorder.  (Doc. No. 47-1 at PageID#s 874-877.)  Dr. Tesar further explained that "work exposure causes [Barens] severe insomnia, loss of energy, gastro-intestinal distress (nausea, diarrhea), panic attacks, uncharacteristic irritability and impaired concentration."  (*Id*. at PageID# 875.) Barens testified that he went on FMLA leave at some point after submitting his April 12, 2019 FMLA application, but he did not recall the exact beginning and end dates of his leave.  (Barens Depo. Vol. I at Tr. 208-209.)

testified that, once Ridgley became Supervisor, Barens "didn't get any overtime,"[6] even though new employees that were hired by Ridgley got "built in overtime into their shifts as a matter of fact." (*Id.* at Tr. 76, 99, 101-102.) Barens also testified that, as of March 2019, he was no longer permitted to participate in training opportunities on "school district time." (*Id.* at Tr. 137-140.) He further testified that, approximately eight months after Ridgley was hired (i.e., in or around November 2019), Ridgley recommended that the PCSD Board of Education eliminate the "lead officer" position in the SSD, knowing that Barens was the most qualified for that position.[7] (*Id.* at Tr. 117-124.) Lastly, Barens testified that, at some point in time after Ridgley was hired (likely either in September or November 2019), Barens' job title was changed from police officer to "protection officer," and his pay was increased to $30/hour and then improperly reduced back down to $27/hour.[8] (*Id.* at Tr. 49-50, 89-91, 94-97, 107-108.)

Ridgley testified that, over time, he started feeling like Barens "had a problem with" him. (Ridgley Depo. at Tr. 41.) Specifically, Ridgley testified that Barens was "curt" and "standoffish"

---

[6] According to Barens, prior to Ridgley's hire, he (i.e. Barens) "had more overtime than anybody in the department." (*Id.* at Tr. 99.)

[7] According to Smialek, PCSD eliminated the "lead officer" position "because there were only three or four officers in the Department at the time, and it seemed unnecessary to call one of them a lead." (Smialek Depo. at Tr. 30.)

[8] Barens testified that he believed that it was Ridgley that initiated these changes and, further, that Defendants implemented the changes in order to retaliate against him for filing *Barens I*. (*Id.* at Tr. 96, 109-110.) Defendant Hoy testified that he was involved in these changes and explained the reasons for them as follows: "So … the city negotiated … an hourly wage [of $30/hour] for the [city] police officers, and then we gave that rate to everyone who was a police officer. We had [school] security officers and police officers, or people in the safety and security department, which weren't actually in that negotiated $30 an hour wage. So we wanted to change the job description so that they were called something different than police officers so there wouldn't be confusion in payroll." (Hoy Depo. (Doc. No. 47-4) at Tr. 38.) Smialek likewise testified that: "The $3 reduction came from a mistake by payroll or someone, in that the -- the [city] police officers, the Parma police officers, the Seven Hills -- the [city] police officers were -- we intended to move them to $30 and for some reason our school police officers also got moved to $30. When we discovered that, and at this time I believe it was [Defendant] Hoy who discovered it, we said that that was never the intent, change it back [to $27/hour for school police officers]." (Smialek Depo. at Tr. 27.)

and that he did not seem to want to communicate with Ridgley.  (*Id*. at Tr. 42.)  According to Ridgley, "[i]t just felt like there was tension with him."  (*Id*.)

In October 2019, Barens was placed on paid administrative leave "in relation to allegations of employee misconduct," including "potential violations of law, policy and protocol regarding the confidentiality of student information."  (Doc. No. 65-7 at PageID# 2404-2406.)  Several months later, on January 7, 2020, Barens was summoned to an investigative hearing "to review and discuss allegations of employee misconduct including, as it relates to your interactions with staff members."  (*Id*. at PageID# 2407.)

### D. Barens files an internal complaint with the PCSD on January 12, 2020

On January 12, 2020, Barens met with Tiffany Stropko of the PCSD Human Resources Department and submitted a "Formal Complaint" against Ridgley for harassment, retaliation, and/or bullying.  (Hoy Aff. (Doc. No. 50-1) at ¶ 4; Doc. No. 47-3 at PageID#s 1292-1293.)  Barens alleged that Ridgley was strictly enforcing a new attendance policy and the sign-in sheet policy against him (Barens), but did not strictly enforce those policies against other members of the SSD, including officers Jennifer Olp and Matt Davis. [9]  (Doc. No. 47-3 at PageID#s 1292-1293.)  Barens also alleged that, on December 5, 2019, Davis told him that Ridgley instructed Davis and Olp not to speak to Barens "for any reason."[10]  (*Id*. at PageID# 1292.)  Barens maintained that Ridgley allowed Davis

---

[9] It appears that Olp was hired by Ridgley in or around May 2019.  *See* Doc. No. 47-3 at PageID# 1329.  *See also* Affidavit of Jennifer Olp (Doc. No. 65-8) at ¶ 2.  As for Officer Matt Davis, it is not clear from the record when he was hired but it appears that it was done at some point after Ridgley became Supervisor of the SSD.  *See* Doc. No. 47-3 at PageID# 1338.

[10] In her Affidavit, Olp avers that "Ridgley strongly recommended that I not speak to Paul Barens (or Paul Moore) and to report to him immediately if Paul Barens ever spoke to me.  He wanted to know exactly what was said.  Whenever I was approached by Paul Barens the details of that conversation were reported to Joe Ridgley immediately as I had been instructed." (Olp Aff. at ¶¶ 9, 10.)

and Olp to work "daily overtime" but that Ridgley did not offer him (Barens) the same opportunity. (*Id*. at PageID# 1293.)  Barens asserted that "Joe Ridgley continues to harass, retaliate, and bully me and his unethical unprofessional behavior as a supervisor continues to compromise the safety of not only me but the entire staff and especially the students of the Parma City School District."  (*Id*.)

Hoy and Stropko informed Ridgley of Barens' complaint.  (Doc. No. 47-2 at PageID# 1088.)  Because Hoy was recovering from back surgery, Stropko initiated the investigation.  (Hoy Aff. at ¶ 5.)  Upon his return, Hoy completed an Investigative Report, which he provided to Smialek on March 3, 2020.[11]  (*Id*.)  *See also* Doc. No. 47-2 at PageID#s 1088-1091.  In his March 2020 Investigative Report, Hoy states that eight (8) individuals were interviewed regarding Barens' allegations, including Olp and Davis.  (Doc. No. 47-2 at PageID#s 1088-1089.)  Based on the interviews and "a review of the facts and information in [his] possession," Hoy was "unable to conclude, by a preponderance of the evidence, that Mr. Barens has [] been subjected to verbal aggression, demeaning tone, dangerous environment, harassment, retaliation, and a hostile work environment of any kind." [12]  (*Id*. at PageID# 1089.)  Of particular note, Hoy reported that (1) the new attendance policy applied to all Safety and Security officers; (2) Olp did not fail to sign in or sign out, as alleged by Barens; (3)

---

[11] Hoy's Investigative Report references Formal Complaints filed by Barens on January 16, 2020 and January 21, 2020. (Doc. No. 47-2 at PageID#s 1088, 1089.)  The parties herein, however, only direct this Court's attention to Barens' Formal Complaint dated January 12, 2020, which is cited and discussed above.

[12] In his Affidavit, Hoy avers that there is a typo in the March 2020 Investigative Report "regarding the misuse of a double negative." (Hoy Aff. at ¶ 6.)  Specifically, Hoy states that the March 2020 Investigative Report mistakenly states, at two different places in the Report, that Hoy was "unable to conclude, by a preponderance of the evidence, that Mr. Barens has *not* been subjected to verbal aggression, demeaning tone, dangerous environment, harassment, retaliation, and a hostile work environment of any kind" (Doc. No. 47-2 at PageID#s 1089, 1091) (emphasis added).  Hoy explains that: "The relevant portion of the sentence that is in error is the inclusion of the word 'not' in the phrase 'has not been subjected'. The word 'not' should have been removed from the sentences as it was a grammatical error and in obvious contradiction with the ultimate findings of the investigation as outlined in the summary."  (Hoy Aff. at ¶ 7.)

Davis denied that Ridgley ever instructed him not to speak to Barens; (4) Ridgley reported that "all safety and security officers were offered overtime hours during the football season;" and (5) none of the individuals that were interviewed "ever heard Mr. Ridgley use/say any statements that were retaliatory in nature about Paul Barens." (*Id*. at PageID#s 1089-1091.)  In addition, Hoy stated that Davis and Olp "both conveyed that at no point was anyone on the team singled out" and that Ridgley "never made any threats" and "never created a hostile work environment." (*Id*. at PageID# 1091.) In sum, Hoy found Barens' formal complaint to be unsubstantiated.  (*Id*.)

Barens testified that, thereafter (in April or May 2020), the PCSD hired a private investigator, Anthony Bentley, to follow and monitor his activities.  (Barens Depo. Vol. I at Tr. 131-134; Barens Depo. Vol. II (Doc. No. 47-2) at Tr. 326-332.) Barens testified that he was detailed to a certain spot by Ridgley and that he observed, on two occasions, what he believed to be "suspicious activity by an individual that drove by and took pictures of [him]."  (Barens Depo. Vol. II at Tr. 282-283.)  Barens testified that he believed that the vehicle used by this individual was the same one that had previously followed him and fellow PCSD officer, Paul Moore, which had been traced back to Bentley.  (*Id.* at Tr. 283-285; Barens Depo. Vol. I at Tr. 131-134.)  Barens did not know who hired Bentley, or how he was paid.[13]  (Barens Depo. Vol. I. at Tr. 132-133.)

### E.    Barens and the PCSD settle *Barens I*

Meanwhile, pretrial proceedings in *Barens I* were ongoing.  The docket in *Barens I* reflects that the parties engaged in discovery throughout 2019 and participated in mediation proceedings in

---

[13] Smialek testified that PCSD hired Bentley to "track" a different security officer that PCSD believed was abusing company time. (Smialek Depo. at Tr. 32-34.)  Smialek believed that the tracking was unsuccessful and that Bentley only worked for PCSD for "one hour."  (*Id.* at Tr. 33.) Hoy testified that he was not aware that PCSD had hired a private investigator.  (Hoy Depo. at Tr. 40.)

October 2019, which were unsuccessful.  The *Barens I* Defendants filed a Motion for Summary Judgment in January 2020, which Barens opposed.  (Doc. Nos. 32, 39.)  Before this Court could rule on the Motion, however, the parties in *Barens I* notified the Court that they had reached a settlement.

Specifically, on May 13, 2020, Barens signed a "Release of All Claims and Demands" (hereinafter "May 2020 Release").  (Barens Depo. Vol. I at Tr. 71; Doc. No. 47-1 at PageID#s 815-820.)  Therein, Barens ("Releasor") agreed, in consideration of the payment of twenty-five thousand dollars ($25,000), to "release and forever discharge [the PCSD, PCSD Board of Education, Smialek, Greene, Schweitzer, Dendorfer, Vaughn, Karpus], [and] Argonaut Insurance Company … (hereinafter 'Releasees') of any and all claims, damages, causes of action or suits at law or in equity of whatsoever kind or nature, including all claims for costs and attorney fees and all claims for pre-settlement and post-settlement interest, arising out of any act or occurrence up to and including the date hereof and particularly on account of damages arising out of or in any way relating to Releasor's employment with [the PCSD Board of Education] (hereinafter 'employment') as well as any and all claims which were or could have been asserted in [*Barens I*] or any appeals therefrom."  (Doc. No. 47-1 at PageID# 815.)  In addition, the May 2020 Release provides, in relevant part that:

> 2. It is specifically agreed that, in exchange for the foregoing consideration, Releasor releases and forever discharges Releasees of and from any and all claims, damages, causes of action, suits at law or in equity or charges of discrimination arising under 42 USC § 1983, Title VII of the 1964 Civil Rights Act, 42 USC §§ 2000e et. seq.; the Age Discrimination in Employment Act, 29 USC §§ 621 et. seq.; the Family and Medical Leave Act, 29 USC §§ 2601 et. seq.; the Americans with Disabilities Act, 42 USC §§ 12101, et. seq.; any provision of Ohio Revised Code Chapter 4112 and/or any and all claims for promissory estoppel, breach of contract, age discrimination, sex discrimination, retaliation, refusal or failure to adhere to leave rights, sexual harassment, discipline or termination, violation(s) of public policy or any and all other claims that may be premised upon any applicable state, local, or federal law, ordinance or common law decision.

11

\*\*\*

> 5.       Releasor further represents that, in determining the amount of the foregoing consideration, there has been taken into account not only the ascertained injuries, disabilities and damages sustained as a result of employment with the Parma City School District but also the possibility that any injuries, disabilities or damages sustained may be permanent and progressive and recovery therefrom uncertain and indefinite, so that consequences not now anticipated may result from employment with the Parma City School District and that this Release is to compromise and terminate all claims for injuries, disabilities and damages or whatever nature, both known and unknown, including all future developments thereof, in any way growing out of or connected with employment with the Parma City School District.

(*Id*. at PageID#s 815, 816.)  Barens testified that he was represented by counsel when he signed the above Release.  (Barens Depo. Vol. I at Tr. 72.)  He further testified that he understood that "in this settlement [he] was releasing any and all claims for anything that happened up to May 13, 2020."  (*Id*.)  On May 14, 2020, the Court dismissed *Barens I* with prejudice. *See Barens I*, Case No. 1:19cv451 (Doc. No. 42.)

## F.       Barens Applies for Three Other Jobs during the Spring and Summer of 2020

In April or May 2020, Barens applied for the position of Coordinator of Safety and Security at the Cleveland Heights-University Heights School District (hereinafter "CH-UH").  (Barens Depo. Vol. I at Tr. 153.)  Barens testified that he was interviewed for the position by a panel and thought it went "very well."  (*Id*. at Tr. 156.)   According to Barens, at the end of the interview, the CH-UH interview panel told him that he did "a great job."  (*Id*. at Tr. 157.)

Barens testified that he followed up the next day with a contact at CH-UH, Brigitte Pronty, who told him that he had "knocked it out of the park."  (*Id*. at Tr. 158.)  He testified that, subsequently, Pronty called Barens and told him that, although he had been "number one on the list" after all the interviews were completed, "somebody from Parma talked to somebody from Cleveland Heights, and

they eliminated [him]." (*Id*. at Tr. 159-160.)  Barens testified that he did now know who was involved in this conversation, either from Parma or Cleveland Heights. (*Id*.)  On July 13, 2020, Barens received an email from CH-UH advising him that CH-UH had offered the position to another candidate. (*Id*. at Tr. 161; Doc. No. 47-1 at PageID# 856.)

In July 2020, Barens applied for a law enforcement position at the Federal Reserve Bank. (Barens Depo. Vol. I at Tr. 173-174.)  Barens was not selected for an interview. (*Id*. at Tr. 175.)  At some point (it is not clear when), Barens learned from the Federal Reserve Bank online hiring portal that he was no longer being considered for the position. (*Id*. at Tr. 175-176.)

In August 2020, Barens applied for a third law enforcement position, at the Euclid Police Department. (*Id*. at Tr. 183.)  On October 5, 2020, Barens received an email from Captain Scott Roller of the Euclid Police Department, advising him that he was not being considered for the position. (*Id*. at Tr. 176; Doc. No. 47-1 at PageID# 857.)

### G.    Barens Returns to the PCSD for the 2020-2021 School Year and Files a Formal Complaint in October 2020

In August 2020, Barens returned to his position in the SSD.[14]  Barens testified that, at some point shortly thereafter (in or around September 2020), Olp told him that "Ridgley talked to somebody at Euclid, which eliminated [Barens] from the position." (Barens Depo. Vol. I at Tr. 151, 188.) Barens further testified that, around this same time period, Olp told him that Ridgley was "obsessed with ruining [his] life" and that Ridgley "knows everybody, and he has people everywhere that would eliminate [him] from getting a position anywhere else." (*Id*. at Tr. 144.)  Barens also testified that (again, around this same time period), PCSD Payroll Supervisor Sheri Bartko told him that Ridgley

---

[14] According to Barens, he was not permitted to work at PCSD during the summer of 2020, despite the fact that he had worked every previous summer at PCSD. (Barens Depo. at Tr. 76-77.)

13

wanted to "ruin" Barens and that Ridgley would "make sure that [Barens] never work[s] in this area again." (*Id.* at Tr. 142-143.)  Barens acknowledged that he never personally heard Ridgley make any of these alleged statements.  (*Id.* at Tr. 143, 144-145.)

On October 5, 2020, Barens filed a Formal Complaint with the PCSD.  (Doc. No. 51-1 at PageID# 1858.)  In its entirety, Barens' Complaint provides as follows:

> I, Paul C. Barens, am generating this formal complaint in regards to the actions of Parma City School District (Human Resources Department & Joe Ridgley Supervisor Safety & Security).
>
> After participating in the hiring process with the Cleveland Heights University Heights School District and The Cleveland Federal Reserve Bank (Law Enforcement Division) I completed a follow up with both entities and was informed that my employment opportunities with both were negatively impacted by the actions of the parties listed above.
>
> Upon learning of the actions of the parties listed above I am requesting that the Parma City School District conduct a fair and unbiased investigation into this matter.
>
> The actions of the listed parties have resulted in the violation of several Federal laws and Parma City School District policies including but not limited to the following.
>
> > 1.) Policy # 1422 Non Discrimination / Retaliation. - Appendix 1.1
> > 2.) Policy # 1662 Anti-Harassment. Appendix 1.2
> > 3.) Policy #1130 Conflict of interest. Appendix 1.3

(*Id.*)

After speaking with PCSD's counsel (David Rose), Hoy referred Barens' October 2020 Complaint to outside counsel, Robert S. Gilmore, for an investigation.  (Hoy Depo. at Tr. 27-28.)  On January 13, 2021, Attorney Gilmore sent a thirteen-page letter to Smialek that summarized his findings and conclusions regarding Barens' October 2020 Complaint (hereinafter "the Gilmore

14

Report"). (Doc. No. 51-1 at PageID#s 1876-1888.)  Therein, Gilmore explained (in relevant part) as follows. [15]

As part of his investigation, Gilmore interviewed Barens, Smialek, Ridgley, Hoy, Olp, Bartko, and Bryan Loretz of CH-UH.  (*Id.*)  According to Gilmore's interview summary, Barens reported that "he was told by a CH-UH employee that he had been 'slandered' by someone at PCSD."  (*Id.* at PageID# 1877.)  Barens also told Gilmore that "a male employee at the Fed [Reserve Bank] told him that they received negative information about him." (*Id.*)  Regarding his application to the Euclid Police Department, Barens told Gilmore that he had not yet heard back from them.[16]  (*Id.*)

In his Report, Gilmore stated that he interviewed Olp and reviewed her "notebook diary," which contained entries relevant to Barens' allegations.  (*Id.* at PageID#s 1880-1882.)  According to Gilmore, Olp stated that, in July or August 2020, Ridgley told her that Barens had applied at CH-UH and the Fed, and that friends of Ridgley's at both places had asked Ridgley if Barens "was the same person who had sued PCSD."  (*Id.* at PageID# 1881.)  Gilmore also reported as follows:

> Ms. Olp stated that Mr. Ridgley told her in September 2020 that Mr. Barens had applied to the Euclid PD, and that he had been called for a reference about Mr. Barens. Mr. Ridgley told Ms. Olp that he told the Euclid PD that Mr. Barens' job title was not School Resource Officer.  He also told Ms. Olp that he told Euclid PD that Mr. Barens "scared him," and that he was scared to have Mr. Barens around children. Ms. Olp said that she asked Mr. Ridgley if he is "blacklisting" Mr. Barens, and his response was to shake his head "yes."  Ms. Olp said that she told Mr. Ridgley "you can't do

---

[15] The PCSD Defendants, Ridgley, and Barens all cite to, and rely upon, the Gilmore Report in their summary judgment briefing.  *See, e.g.*, Doc. No. 50 at PageID#s 1731-1735, Hoy Aff. at ¶¶ 8,9; Doc. No. 51 at PageID# 1779; Doc. No. 51-1 at PageID#s 1876-1888; Doc. No. 65 at PageID# 2281, 2285.  Accordingly, and as none of the parties object to the Court's consideration of the Gilmore Report, the Court will describe its contents herein.

[16] This is curious because, in discovery, Barens produced an email dated October 5, 2020 (the date of his Formal Complaint) from Captain Roller of the Euclid PD advising him that he would not be considered for the police officer position at Euclid.  (Doc. No. 47-1 at PageID# 857.)  In addition, Barens testified in deposition that he was rejected by the Euclid PD on October 5, 2020.  *See* Barens Depo. Vol. I at Tr. 176, 190.

that," and Mr. Ridgley laughed and said "it was not his fault, that he knows a lot of people."

(*Id.*)[17]

Gilmore also summarized his interview with Bartko.  According to Gilmore, Bartko stated that she asked Ridgley in August 2020 whether Barens would be returning to school that Fall and Ridgley replied that he "hoped not" and he "knew that Mr. Barens was looking for another job."  (*Id.* at PageID# 1882.)  Bartko also told Gilmore that: "Mr. Ridgley stated that he knew people at the places where Mr. Barens had applied and that they had told him that Mr. Barens would not get the job.  Ms. Bartko stated that Mr. Ridgley told her that 'he was not going to let Mr. Barens get a job around here.'  Mr. Ridgley told Ms. Bartko that he had spoken to friends of his at CH-UH and the Fed."  (*Id.*)  Bartko told Gilmore that she subsequently told Barens that Ridgley was "putting a kink into your job search."  (*Id.* at PageID# 1883.)

Gilmore conducted two interviews with Ridgley.  Ridgley denied that he told Olp or Bartko that he had provided negative information about Barens to either CH-UH or the Federal Reserve Bank.  (*Id.* at PageID# 1883.)  He also denied telling either Olp or Bartko that he had prevented (or was trying to prevent) Barens from getting another job.  (*Id.*)  Rather, Ridgley told Gilmore that

---

[17] The parties do not cite to (or provide copies of) any deposition testimony from Olp in the instant action.  As noted *supra*, however, Olp provided an Affidavit, which is attached as an Exhibit to Barens' final corrected Brief in Opposition.  (Doc. No. 65-8.)  Therein, Olp avers that, in the fall of 2020, Ridgley informed her that Barens was trying to find work elsewhere and that "Barens had been applying for jobs where Joe had friends who called him to inquire about Barens."  (Olp Aff. at ¶¶ 21, 22.)  Olp further avers that: "Joe told me that a 'buddy', of his at Cleveland Heights called and asked 'Isn't this the guy you've been bitching about?' Joe also told me that a 'good buddy' at the Federal Reserve had also called and asked similar questions about Barens. Joe advised that both of his 'buddies' stated they would not even interview Barens because of this. ** I asked Joe, 'Did you blacklist Barens? You know you can't do that.' Joe laughed and said, 'Well, you never know who knows who and who is connected around here. I know all sorts of people around here.' ** In October 2020 Joe informed me of a third phone call from Euclid where Barens had applied. Joe reported to me that a supervisor called him. ** Joe told me, 'That's three jobs he [Barens] could have had because of Joe Ridgley: Cleveland Heights, Federal Reserve, and Euclid.' Joe Ridgley referred to himself in the third person at the time of saying this." (*Id.* at ¶¶ 23-26.)

16

friends of his at CH-UH (Bryan Loretz) and the Federal Reserve (Enrique Mendizabal) had called

Ridgley and advised him about Barens' applications but that, by that time, Barens' applications had

already been rejected by CH-UH and the Federal Reserve.[18]  (*Id.* at PageID#s 1878-1879.)  Regarding

Barens' application to the Euclid PD, Gilmore wrote as follows:

> Mr. Ridgley stated that in about mid-September 2020, he received a call from a
> Lieutenant in the Euclid Police Department, Mr. Roller.  Mr. Ridgley knows Mr.
> Roller from being an auxiliary officer in Euclid.  Mr. Roller asked Mr. Ridgley a few
> 'pointed questions' about Mr. Barens.  He asked Mr. Ridgley if he supervises Mr.
> Barens, and Mr. Ridgley confirmed that he does.  He also asked Mr. Ridgley whether
> Mr. Barens is a 'School Resource Officer,' and Mr. Ridgley responded that he is not.
> He also asked Mr. Ridgley if Mr. Barens conducts any school resource classes in
> PCSD, and Mr. Ridgley responded that he does not.  Mr. Roller then asked Mr.
> Ridgley to give his "personal take" on Mr. Barens.  Mr. Roller told Mr. Ridgley that
> he was aware of the lawsuit Mr. Barens had filed against PCSD.  Mr. Ridgley stated
> that he doesn't have much of a relationship with Mr. Barens, that Mr. Barens is 'stone-
> faced' around him, that Mr. Barens is 'scary' to him, and that they rarely speak.

---

[18] As noted above, Gilmore also interviewed Loretz from CH-UH.  According to the Gilmore Report, Loretz told Gilmore that he was not involved in the hiring decision for the position that Barens applied for, but was "kept in the loop" by others at CH-UH who were involved in the hiring process.  (*Id.* at PageID# 1884.)  The Gilmore Report further provides that: "Mr. Loretz was told by someone at CH-UH that Mr. Barens had applied for the Coordinator job, and that CH-UH was considering bringing Mr. Barens and two other candidates in for interviews.  Mr. Loretz said that CH-UH googled these three candidates, and when they saw that Mr. Barens had sued two of his employers (including PCSD), CH-UH was no longer interested in interviewing him." (*Id.* at PageID# 1885.)  In an Affidavit attached as an Exhibit to Ridgley's Motion for Summary Judgment, Loretz avers that he was "not involved in the application or interview process of Mr. Barens for this position." (Doc. No. 51-6 at ¶ 8.) Mendizabal from the Federal Reserve Bank declined to be interviewed by Attorney Gilmore.  (Doc. No. 51-1 at PageID# 1885.)  However, he submitted an Affidavit herein, which is attached as an Exhibit to Ridgley's Motion.  (Doc. No. 51-7.)  Therein, Mendizabal avers that "Ridgley never called me to inquire about Mr. Barens' initial application, his application details, the application process, his application rating, his interview details, his interview ratings, or any other applicant information." (*Id.* at ¶ 5.) He further avers that Barens did not advance to the interview process "because of other strong applicants."  (*Id.* at ¶ 7.) Mendizabal avers that, thereafter, he spoke to Ridgley to inform him that Barens applied for the position. (*Id.* at ¶ 8.)

17

(*Id*. at PageID#s 1879-1880.)[19]  Gilmore reported that both Smialek and Hoy stated that they did not speak to anyone at CH-UH, the Federal Reserve Bank, or the Euclid PD about Barens.[20]  (*Id*. at PageID# 1878, 1880.)

Based on the above, Gilmore concluded that Barens' Complaint was unsubstantiated, explaining as follows:

> In conclusion, I find that the preponderance of the evidence does not support a finding that any of the PCSD Parties provided negative information to CH-UH or the Fed. There is a dispute of fact between Mr. Ridgley's version of events (that after the fact he heard from CH-UH and the Fed) and Ms. Olp's and Ms. Bartko's statements that Mr. Ridgley told them that he "blackballed" Mr. Barens. The only other corroborating evidence is Mr. Loretz's confirmation that he spoke to Mr. Ridgley after CH-UH had already made its decision to not interview Mr. Barens, and that his understanding is that Mr. Ridgley was not asked for information during the period when CH-UH was considering Mr. Barens' application.
>
> I do find, however, that Mr. Ridgley provided negative information about Mr. Barens to Euclid PD, specifically that he found Mr. Barens to be "scary."  I also note that the statements that Mr. Ridgley admitted to making to Ms. Olp about Mr. Barens' job applications were inappropriate. As a manager, Mr. Ridgley should not share such information about one of his subordinates to other subordinates. Mr. Ridgley should not have shared the information he knew about Mr. Barens with Ms. Olp.

---

[19] In deposition, Ridgley testified largely consistently with Gilmore's summary.  *See* Ridgley Depo. at Tr. 48-50, 52- 57, 61-71.  As discussed in more detail *infra*, Captain Roller submitted an Affidavit herein that conflicts in certain respects with Ridgley's testimony.  Specifically, Captain Roller avers that he had, in fact, already decided not to hire Barens before calling Ridgley and talking to him about Barens. (Roller Aff. (Doc. No. 51-5) at ¶ 7-9.)  Captain Roller avers that, prior to speaking with Ridgley, he googled Barens and discovered that Barens had filed prior lawsuits.  (*Id*. at ¶ 7.)  From this, Captain Roller determined that "[i]t was apparent that Barens would be a troublesome or disruptive employee" and he decided not to hire him for that reason. (*Id*. at ¶¶ 7,8.)  Afterwards, Captain Roller called Ridgley to "verify Barens' resume and job responsibilities" at PCSD.  (*Id*. at ¶ 9.)  During that call, Captain Roller learned from Ridgley that Barens' actual job responsibilities were allegedly not consistent with the job duties outlined in his resume. (*Id*.)  Roller further avers that, in his conversation with Ridgley, they never discussed "Barens' character." (*Id*. at ¶ 10.)

[20] According to Gilmore's interview summary, Smialek did state that "Ridgley had told him that someone at CH-UH told Mr. Ridgley that Mr. Barens had applied for a job at CH-UH, but had not been offered the job." (*Id*.)  Smialek stated that Ridgley "told him that the CH-UH employee had told Mr. Ridgley that they had googled Mr. Barens and saw his lawsuit against PCSD, and that was why they did not consider Mr. Barens further." (*Id*.)  Smialek testified in deposition that Gilmore's interview summary was accurate.  (Smialek Depo. at Tr. 40.)

(*Id*. at PageID# 1886.)  Gilmore went on to conclude that "there is no PCSD policy that prohibits an employee from communicating with a prospective employer about a current or former PCSD employee."  (*Id*. at PageID# 1887.)  Gilmore found that there was no violation of PCSD's retaliation policy because the preponderance of the evidence did not support a finding that "any actions taken by the PCSD Parties as to Barens' job applications has a causal connection with" Barens' protected activities of filing *Barens I* and his January 2020 Formal Complaint.  (*Id*.)  Gilmore also concluded that there was no evidence of a violation of PCSD's Anti-Harassment or Conflict of Interest policies.  (*Id.* at PageID#s 1887-1888.)  Gilmore did, however, recommend that Ridgley "receive management training, to improve his interpersonal skills, and his ability to manage his department."  (*Id*. at PageID# 1888.)

As noted above, Gilmore submitted his report and findings to Smialek on January 13, 2021.  (Doc. No. 51-1 at PageID# 1876.)  On that same date, Smialek provided a copy of the Gilmore Report to Barens and advised Barens that "[b]ased on my review of your Complaint … and the information summarized in Mr. Gilmore's report, … I find that your Complaint is not substantiated and therefore affirm the findings and recommendations included in the report."  (Doc. No. 47-3 at PageID# 1266.)  Smialek further advised Barens of his right to appeal.  (*Id*.)

On January 20, 2021, Barens appealed, noting that "Smialek's decision to find my complaint not substantiated was very disappointing but not surprising due to his documented close personal friendship with Joe Ridgley."  (Doc. No. 47-1 at PageID# 852.)  *See also* Barens Depo. Vol. I at Tr. 86.  Barens appeared at a hearing before the PCSD Board of Education on January 28, 2021, at which time he was offered the opportunity to present testimony and documentary evidence and to ask questions.  *See* Barens Depo. Vol. I at Tr. 86-87; Doc. No. 47-3 at PageID#s 1283, 1286.

19

On February 2, 2021, the PCSD Board of Education issued a Resolution, in which it stated that: "After carefully considering all of the information before it, the Board finds most persuasive the January 13, 2021 investigative report that [] Superintendent [Smialek] relied upon in rendering his final disposition.  The investigative report is thorough, sound and utilizes the appropriate standard of review.  As such, the Board affirms the Superintendent's decision."  (Doc. No. 47-3 at PageID# 1286.) *See also* Barens Depo. Vol. I at Tr. 87.  Consistent with Gilmore's recommendation, PCSD directed Ridgley to undergo management training to improve his interpersonal skills and ability to manage his department.  (Hoy Depo. at Tr. 33-35; Hoy Aff. at ¶¶ 8-9.)  Ridgley participated in the required management training in February, March, April, and May 2021.  (Doc. No. 50-1 at PageID#s 1761-1770.)

### H.      Barens continues to work at PCSD until his resignation on October 25, 2021

Barens continued to work in the SSD after the Board issued its decision on February 2, 2021 that his Complaint was unsubstantiated. (Barens Depo. Vol. I at Tr. 89.)

On February 4, 2021, Ridgley sent a letter to Barens notifying him of an investigative hearing set for the next day "to review and discuss [Barens'] chronic absenteeism."  (Doc. No. 47-1 at PageID# 813; Barens Depo. Vol. I at Tr. 51.)  On March 3, 2021, Barens applied for FMLA leave, which was supported by a Certification from Dr. Tesar.  (Doc. No. 47-1 at PageID#s 878-882.)  Dr. Tesar indicated that Barens was unable to perform any of his job functions due to his acute stress disorder and that his condition had "commenced" in January 2021.  (*Id.* at PageID#s 879, 880)  Dr. Tesar further explained that "work exposure" was causing or exacerbating Barens' "stress symptoms," including reduced appetite, insomnia, increased anxiety and irritability, significant heart burn, and increased pain.  (*Id.* at PageID# 879.)  Dr. Tesar stated that Barens "requires time off work

20

to avoid continuing stress compromising his usual high level of function."  (*Id*. at PageID# 880.)

Barens could not recall the exact dates of when he took his FMLA leave, or when he returned to

work.  (Barens Depo. Vol. I at Tr. 218-222.)

According to Barens, during the 2020-2021 school year and until he resigned in October 2021,

he continued to be denied opportunities for training or overtime.  (*Id*. at Tr. 75-76, 99, 101, 116, 137-

141.)  He also testified that he remained assigned to money courier duties, which (as noted above) he

considered to be a "lesser role." (*Id*. at Tr. 111, 115.)  Barens further testified that Ridgley continued

to track his daily activities, both through GPS tracking of the Department vehicles[21] and by asking

fellow officers Olp and Davis to follow him and report back to Ridgley on his activities.  (Barens

Depo. Vol. I at Tr. 124-125, 135-136, 147-148.)  Barens also testified that, throughout this time

period, Ridgley instructed Olp and Davis not to speak to him.[22]  (*Id*. at Tr. 135-136, 147-148.)

On October 15, 2021, Barens resigned from the PCSD, effective October 25, 2021.[23]  (Barens

Depo. Vol. I at Tr. 52; Doc. No. 47-1 at PageID# 814.)

## II.    Procedural History

On January 18, 2022, Barens filed the instant action in this Court against the PCSD, Smialek,

Schweitzer, Vaughn, Bratz, Karpus, Krise, Jr., Hoy, and Ridgley.  (Doc. No. 1.)  Barens filed an

---

[21] According to Olp, Ridgley explained to her that he was using the District's tracking devices to track Barens' movements. (Olp Aff. at ¶ 16.)

[22] Ridgley denied instructing Olp and/or Davis not to speak or interact with Barens.  (Ridgley Depo. at Tr. 79-81.)

[23] Barens testified that he and his family moved to Florida in November 2021, and that he began working as a school resource officer at Out of Door Academy in Sarasota in January 2022.  (Barens Depo. Vol. I at Tr. 35-36; Barens Depo. Vol. II at Tr. 361-362.)  He resigned from that position in May 2022, and opened a mattress store.  (Barens Depo. Vol. I at Tr. 36-37.)  However, shortly after he opened his new business, two hurricanes "shut him down."  (*Id*.)  Barens returned to Ohio and began working as a police officer for Case Western Reserve University in February 2023.  (*Id*. at Tr. 20, 30.)  Barens testified that, at the time of his deposition, his salary at CWRU was $70,800.  (*Id*. at Tr. 31.)

Amended Complaint on February 1, 2022, adding PCSD School Board Member Mark H. Ruda as a Defendant.  (Doc. No. 8.)  In the Amended Complaint, Barens alleges claims under 42 U.S.C. § 1983 for First Amendment Speech and Petition Retaliation (Count One) and Fourteenth Amendment Due Process Violations (Count Two).  (*Id.*)  Barens also alleges the following state law claims:

> (1) "Defendant Ridgley's Tortious Interference with Employment Relations" (Count Three),
>
> (2) "Civil Liability for Criminal Acts under Ohio Law—Defendants Interfered with Civil Rights under Ohio Revised Code §§ 2921.45 and 2307.60" (Count Four),
>
> (3) "Civil Liability for Criminal Acts under Ohio Law—Aiding and Abetting under R.C. 2307.60 and 2923.03 Interfering with Civil and Statutory Rights under R.C. 2921.45 (against All Defendants)" (Count Five), and
>
> (4) "Civil Liability for Criminal Acts under Ohio Law—Retaliation Because Paul Barens, as a Public Servant, Discharged his Duties under R.C. 2307.60 and 2921.05 (Alternative Claim Against All Defendants)" (Count Six).

(*Id.*) Barens seeks declaratory and injunctive relief, as well as compensatory damages, punitive damages, attorney fees, and costs.  (*Id*. at pp. 48-49.)

Defendants PCSD, Smialek, Schweitzer, Vaughn, Bratz, Karpus, Krise, Jr., Ruda and Hoy filed an Answer on April 20, 2022.  (Doc. No. 19.)  Defendant Ridgley filed a separate Answer on April 29, 2022.  (Doc. No. 20.)  The Court conducted a Case Management Conference on July 13, 2022, at which time various case management deadlines were set.   (Doc. No. 26.)

On August 4, 2022, the PCSD Defendants filed a Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) with respect to all of Barens' claims.  (Doc. No. 27.)  After receiving an extension, Barens filed a Brief in Opposition on September 26, 2022.  (Doc. No. 30.)  The PCSD Defendants filed a Reply on October 31, 2022.  (Doc. No. 32.)  On December 16, 2022, the Court

stayed the discovery and dispositive motions deadlines pending a ruling on Defendants' Motion for Judgment on the Pleadings.

On February 27, 2023, this Court issued a lengthy Memorandum Opinion & Order granting in part and denying in part the moving PCSD Defendants' Motion. (Doc. No. 35.) Specifically, the Court granted the PCSD Defendants' Motion with respect to:

> (1) Barens' official capacity claims against Defendants Smialek, Schweitzer, Hoy, Vaughn, Bratz, Karpus, Krise, Jr., and Ruda, with respect to Barens' federal and state law claims,
>
> (2) Barens' individual capacity claims in Count One against Defendants Schweitzer, Vaughn, Bratz, Karpus, and Krise, Jr.,
>
> (3) Barens' individual capacity claims in Count Two against Defendants Smialek, Schweitzer, Hoy, Vaughn, Bratz, Karpus, and Krise, Jr., and
>
> (4) Count Three as to Defendants Schweitzer, Vaughn, Bratz, Karpus, Krise, Jr., and Ruda.

(*Id.*) In addition, as the Amended Complaint asserted only official capacity claims against Defendant Ruda, the Court dismissed him from this action. Lastly, the Court denied the PCSD Defendants' Motion with respect to: (1) Barens' claims in Count One against Defendant PCSD and his individual capacity claims against Defendants Smialek and Hoy; (2) Barens' claims in Count Two against Defendant PCSD; and (3) Counts Four, Five and Six.

On March 1, 2024, the PCSD Defendants filed their Motion for Summary Judgment with respect to Barens' remaining claims. (Doc. No. 50.) Defendant Ridgley filed a separate Motion for Summary Judgment on that same date, with respect to Barens' claims against him. (Doc. No. 51.) After receiving an extension of time, Barens filed a combined Brief in Opposition on April 22, 2024, addressing the Motions for Summary Judgment of both the PCSD Defendants and Defendant Ridgley. (Doc. No. 55.) One week later, on April 29, 2024, Barens filed a "Motion for Leave to File

23

Corrected Opposition Brief with Corrected Tables of Contents and Table of Authorities." (Doc. No. 57.)  Therein, Barens requested leave to file "a corrected version of his opposition brief with the only change being a corrected Table of Contents and Table of Authorities for the Court's and parties' convenience.  (*Id*.)

On April 29, 2024, the Court granted Barens' Motion for Leave and directed him to file his Corrected Brief in Opposition (Doc. No. 57-1), together with all Exhibits, as a separate document on the docket.  Later that day, Barens filed his corrected Brief in Opposition to Defendants' Motions for Summary Judgment, as well as certain Exhibits.  (Doc. No. 58.)  The Exhibits attached to Baren's corrected Brief in Opposition, however, were not the same as the Exhibits attached to his original Brief in Opposition.  *Compare* Doc. Nos. 55-1 through 55-6, with Doc. No. 58-1.  Rather, and without having been granted leave to do so, Barens attached additional Exhibits to his corrected Brief in Opposition that were not previously attached to his original Brief in Opposition.  Moreover, while Barens did attach his original "Exhibits 8, 9, 10, 11 and 12" to his corrected Brief in Opposition, some of those resubmitted Exhibits were not identical to the versions submitted with his original Brief in Opposition.  Barens provided no explanation to this Court for his decision to add different Exhibits to his corrected Brief in Opposition that were not included in his original Brief in Opposition.

On April 30, 2024, this Court issued an Order recounting the above, and directing Barens to file an explanation on the docket.  (Doc. No. 59 at pp. 4.)  Later that same day, Barens filed a "Response and Explanation of Different Exhibits," in which he explained that he attached Exhibits to his corrected Brief in Opposition without first seeking leave "in an effort to more accurately reflect the Exhibit as originally filed."  (Doc. No. 60.)

24

Meanwhile, and also on April 30, 2024, the PCSD Defendants and Defendant Ridgley filed a Joint Motion for Extension of Time to Submit their Reply Briefs and to "Require Plaintiff to Properly Submit a Complete and Accurate Copy of his Brief in Opposition to All Parties."  (Doc. No. 61.) Defendants asserted that Barens had failed to clearly identify the exhibits attached to either his original or corrected Briefs in Opposition and, further, had failed to provide Defendants with all of the exhibits referenced therein.  (*Id.*)  Defendants requested that the Court "require Plaintiff to submit a final, organized and itemized brief in opposition, along with a specific list of exhibits and related attachments."  (*Id.* at pp. 2-3.)  On May 1, 2024, the Court issued an Order, granting Defendants' Motion and directing Barens to file a final, corrected Brief in Opposition and Exhibits by May 8, 2014.  (Doc. No. 62.)

Barens thereafter filed his final corrected Brief in Opposition (and Exhibits) on May 8, 2024. (Doc. No. 65.)  The PCSD Defendants and Defendant Ridgley filed their Reply Briefs on May 30, 2024 and May 31, 2024, respectively.  (Doc. Nos. 66, 68.)  In addition, on May 31, 2024, the PCSD Defendants and Defendant Ridgley filed a "Joint Objections and Motion to Strike" with respect to Exhibits 2, 3, 4, 5, 7, 10, 11, 12, and 13 of Barens' final corrected Brief in Opposition.  (Doc. No. 67.)

On June 3, 2024, Barens filed a Motion for Leave to File a Legible Copy of Exhibit 12 to his final corrected Brief in Opposition.  (Doc. No. 69.)  The PCSD Defendants and Defendant Ridgley filed a Joint Brief in Opposition the next day, to which Barens did not reply.  (Doc. No. 70.)  On June 14, 2024, Barens filed a Response to the PCSD Defendants and Defendant Ridgley's Joint Objections and Motion to Strike.  (Doc. No. 71.)  Defendants filed a Reply in support of their Joint Objections and Motion to Strike on June 21, 2024. (Doc. No. 72.)

### III.    Joint Objections and Motion to Strike

Prior to reaching the substantive arguments raised in the PCSD Defendants' and Ridgley's Motions for Summary Judgment and related briefing, the Court will first address the Defendants' Joint Objections and Motion to Strike.  *See Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.")

In their joint filing, Defendants ask this Court to "strike in their entirety or portions thereof" Exhibits 2, 3, 4, 5, 7, 10, 11, 12 and 13 to Barens' corrected Brief in Opposition.  (Doc. No. 67 at PageID# 2547.)  Defendants argue that these Exhibits "consist of pleadings, statements, affidavits, and various documents that are not supported by admissible evidence or comply with the requirements under Fed. R. Civ. P. 56."  (*Id*. at PageID# 2550.)  Defendants also ask this Court to strike portions of the deposition testimony of Ridgley, Hoy, Smialek, and Greene that are cited by Barens in his Brief in Opposition and to which Defendants objected during deposition.  (*Id*. at PageID#s 2562-2563.)

In response, Barens first argues that Defendants' request to strike "is not the proper vehicle for attacking exhibits filed in support of, or in opposition, to motions for summary judgment."  (Doc. No. 71 at PageID# 2599.)  Rather, he asserts that Defendants' Motion should be construed as objections under Fed. R. Civ. P. 56(c)(2) and that, to the extent this Court finds any of the challenged Exhibits inadmissible, the Court should disregard the evidence rather than striking it.  (*Id*.)  Barens next argues that the Exhibits at issue are either admissible or can be presented in a form that would be admissible and, therefore, should be considered by this Court under Rule 56(c).  (*Id*. at PageID# 2598.)  Regarding Defendants' objections to deposition testimony, Barens maintains that "such trial

26

objections are premature at this pre-trial summary judgment stage and should not be accorded any weight or consideration by the Court is construing the evidence in Plaintiff's favor." (*Id*. at PageID# 2607.)

As a threshold matter, the Court agrees with Barens that a "motion to strike" applies only to pleadings. *See* Fed. R. Civ. P. 12(f). "Pleadings" are enumerated in Fed. R. Civ. P. 7(a) and the list does not include affidavits, briefs, or exhibits. Therefore, a motion to strike is not the proper vehicle for attacking exhibits filed in support of, or in opposition to, motions for summary judgment. *See Berry v. Citi Credit Bureau*, 2020 WL 6440490 at * 6 (W.D. Tenn. March 30, 2020) ('Courts in this district have consistently held that a motion to strike is not the proper device for countering exhibits or affidavits attached to memoranda in support of motions."), *adopted by*, 2020 WL 4596774 (W.D. Tenn. Aug. 11, 2020). *See also Harper v. University of Toledo*, 2024 WL 1347296 at fn 8 (N.D. Ohio March 29, 2024); *Riveredge Dentistry Partnership v. City of Cleveland*, 2024 WL 639689 at * 6 (N.D. Ohio Feb. 15, 2024); *Stephenson v. Family Solutions of Ohio, Inc.,* 2021 WL 795551 at * 5 (N.D. Ohio March 2, 2021).

Rather, in this context, "motions to strike should be construed as objections under Rule 56(c)(2)" of the Federal Rules of Civil Procedure. *Smith v. Interim HealthCare of Cincinnati, Inc.,* 2011 WL 6012971 at * 4 (S.D. Ohio Dec. 2, 2011). *See also* Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes) (explaining that the Rule 56(c)(2) objection "functions much as an objection for trial, adjusted for the pretrial setting... There is no need to make a separate motion to strike.") *See Stillwagon v. City of Delaware*, 274 F.Supp.3d 714, 736-737 (S.D. Ohio 2017); *Druhot v. Smith*, 2024 WL 1049838 at * 5-6 (S.D. Ohio March 11, 2024); *Artuso v. Felt,* 2022 WL 17960677 at *6 (N.D. Ohio); *Berry,* 2020 WL 6440490 at * 6. Accordingly, to the extent Defendants ask this Court to strike

27

Exhibits 2, 3, 4, 5, 7, 10, 11, 12, and 13 from Barens' Brief In Opposition, the Court will construe the Defendants' request as objections under Fed. R. Civ. P. 56(c)(2).

Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  After such an objection is properly raised, the burden is placed on the proponent of the supporting material to demonstrate that the material is admissible as presented or explain how it could be presented in a form that would be admissible.  *See, e.g.*, *Mangum v. Repp*, 674 Fed. Appx. 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes)).  *See also Riveredge Dentistry Partnership*, 2024 WL 639689at * 6.  In evaluating an objection under Rule 56(c)(2), the Court "should disregard [inadmissible evidence] rather than striking it from the record."  *Stephenson*, 2021 WL 795551 at *5 (N.D. Ohio Mar. 2, 2021) (cleaned up).  *See also Weisblat v. John Carroll University*, 2024 WL 4172597 at * 5 (N.D. Ohio Sept. 12, 2024).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."  *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc*., 854 F.2d 1179, 1181 (9th Cir. 1988)).  For example, "hearsay evidence cannot be considered on a motion for summary judgment."  *Wiley,* 20 F.3d at 225-26.  In addition, "affidavits used for summary judgment purposes [must] be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify."  *Id*.  When sustaining an objection, however, "the Court should use a scalpel, not a butcher knife" and excise only those portions that lack a proper foundation. *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 593 (6th Cir. 2009).  *See also Antunes v. Gerdau MacSteel, Inc.,* 2023 WL 3479401 at * 1-2 (6th Cir.

May 16, 2023); *Johnson v. Donahoe*, 642 Fed. Appx 599, 602 (6th Cir. 2016); *Combs v. WalMart*, 2024 WL 555913 at * 3 (S.D. Ohio Feb. 12, 2024).

With the above principles in mind, the Court will address each of the challenged Exhibits separately, below.

### A.    Exhibit 2 – Barens' Amended Complaint (Doc. No. 65-1)

Barens attaches a copy of his Amended Complaint (Doc. No. 8) as Exhibit 2 to his final corrected Brief in Opposition.[24]  (Doc. No. 65-1.)  In their Joint Objections, Defendants argue that Barens' Amended Complaint is improper under Rule 56 because, as the non-moving party, Barens must go "beyond the pleadings" to show the existence of a genuine dispute of material fact.  (Doc. No. 67 at PageID# 2551.)  Defendants maintain that, because the Amended Complaint is a pleading, Barens cannot rely on it to create a fact issue.  (*Id*.)  In response, Barens argues that "Exhibit 2 is cited on page 11 of Plaintiff's Brief in Opposition only to reference the paragraphs therein, ¶¶ 206, 212, 213, 225, 231, 238, and 245, which pertain to maliciousness, reckless and intentional actions."  (Doc. No. 71 at PageID# 2701.)  Barens asserts that "it is not offered as admissible evidence but so that the Court may take notice under Rule 201(c) and therefore should not be stricken as an exhibit from Barens' Brief  in Opposition."  (*Id*.)

At the outset, the Court notes that a review of Barens' final corrected Brief in Opposition reveals that, in fact, Barens repeatedly cites allegations in the Amended Complaint as "evidence" of

---

[24] The Court notes that Barens' Exhibit 2 consists only of the Amended Complaint itself, and not any of the various Exhibits that were attached to the Amended Complaint as Exhibits at the time of filing. *Compare* Doc. No. 65-1 *with* Doc. Nos. 8, 8-1 through 8-5.

certain facts.  For example, on page 3 of his Brief, Barens cites to Paragraphs 16 and 17[25] of the Amended Complaint as evidence of his job duties and responsibilities as a PCSD district officer. (Doc. No. 65 at PageID# 2284.)  On page 11, Barens cites to Paragraphs 206, 212, 213, 225, 231, 238 and 245 (in which generally alleges that Defendants engaged in intentional, malicious, and/or wanton and reckless actions) to support his argument that the "Release provisions do not bar Barens' claims as a matter of law."  (*Id.* at PageID# 2292.)  Later, on page 15, Barens cites to Paragraphs 195, 197, 199-200 of the Amended Complaint as evidence that he was speaking as a private citizen when he filed *Barens I* and made his January 2020 and October 2020 internal complaints.  (*Id.* at PageID# 2296.)  On page 29, Barens cites to pages 34 and 35 of his Amended Complaint as evidence of the date on which he first became aware that the Gilmore Report set forth factual conclusions. (*Id.* at PageID# 2310.)  Additionally, on page 30 of his Brief, Barens argues (without citing to any record evidence) that he has alleged sufficient facts in his Amended Complaint (Paragraphs 79-96 and 153-159) to withstand summary judgment on his tortious interference claim.  (*Id.* at PageID# 2311.)

The Court agrees with Defendants that factual allegations in Barens' Amended Complaint do not constitute evidence demonstrating the existence of a genuine issue of material fact.  Notably, Barens' Amended Complaint in this action is not verified.  It therefore does not constitute an opposing affidavit or otherwise carry any evidentiary weight on summary judgment proceedings.  *See King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (holding that "'a verified complaint ... satisfies the burden of the nonmovant to respond' to a motion for summary judgment, unlike 'mere allegations or denials' in unverified pleadings") (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999)).

---

[25] As discussed *infra*, the Amended Complaint is not verified.  (Doc. No. 8.)  In addition, the Court notes that, while Ridgley admitted the allegations in Paragraphs 16 and 17 of the Amended Complaint in his Answer, the PCSD Defendants did not.  *See* Doc. No. 19 at ¶ 17; Doc. No. 20 at ¶ 15.

*See also Hurick v. McKee*, 2018 WL 4908138 at * 3 (6th Cir. April 30, 2018) (noting that plaintiff did not verify his complaint and, therefore, it "could not serve as an opposing affidavit sufficient to rebut the defendants' summary judgment motion"); *Lawrence v. McDonough*, 2024 WL 814495 at * 13 (M.D. Tenn. Feb. 26, 2024); *Sanchez v. Auto-Owners Ins. Co.,* 2015 WL 6472649 at * 5 (W.D. Mich. Oct. 27, 2015).

As both the United States Supreme Court and the Sixth Circuit have noted, the party opposing a motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). *See also Hurick*, 2018 WL 4908138 at * 2; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2721 (4th ed. updated Apr. 2023) ("The importance of going beyond the pleadings on a summary-judgment motion is emphasized by the requirement in 56(c)(1) that a party either asserting that a fact cannot be or that it is genuinely disputed 'must' support that assertion by citation to materials in the record.")

In light of the above, the Court grants Defendants' objection as follows.  In evaluating the pending Motions for Summary Judgment, the Court will disregard Barens' citations to and/or reliance on the unverified allegations in his Amended Complaint to demonstrate the existence of a genuine issue of material fact.

**B.    Exhibit 3—Sheri Bartko handwritten statements (Doc. No. 65-2)**

Exhibit 3 to Baren's final corrected Brief in Opposition consists of two handwritten statements which Barens identifies as having been written by Sheri Bartko, who worked in PCSD's Payroll Department at all times relevant herein.  (Doc. No. 65-2 at PageID#s 2368, 2369.)  The statements

are not notarized and neither one contains a declaration that it is true and correct and/or that it is signed under penalty of perjury.  (*Id*.)  The first handwritten statement is undated.  (*Id*. at PageID# 2368.)  The signature on the first statement is illegible but is purportedly Bartko's.  (*Id*.)  The second handwritten statement is dated January 8, 2020, and appears to contain Bartko's signature.  (*Id*. at PageID# 2369.)

Defendants argue that the Court should not consider Exhibit 3 because neither of Bartko's statements qualifies as an affidavit or a declaration under 28 U.S.C. § 1746.  (Doc. No. 67 at PageID#s 2552-2553.)  In response, Barens argues (without further explanation or citation to authority) that "[t]hese statements are part of the record in this matter as they were attached to the Amended Complaint as an exhibit."  (Doc. No. 71 at PageID# 2601.)  He further asserts that Ridgley testified to "the contents of" the statements during his deposition.  (*Id*.)  Lastly, Barens maintains that he "anticipates that Ms. Bartko at trial would confirm her handwriting, date of conversation with Defendant Ridgley, date of preparation of Exhibit 3, all as Federal Rule of Evidence 801(d)(2)(A) and (D) and 803 (1) present sense impression (3) declarant's state of mind, and (5) recorded recollections."  (*Id*.)

Fed. R. Civ. P. 56(c)(4) permits the consideration of declarations for summary judgment motions, but "the declaration must comply with 28 U.S.C. § 1746."  *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 781 (6th Cir. 2024).  That statute provides as follows:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate,

verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

\*\*

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746.  The Sixth Circuit has interpreted this statute as requiring declarants to "(1) sign the declaration, (2) declare its contents as true, (3) swear under the penalty of perjury, and (4) provide a date." *Milczak*, 102 F.4th at 781 (citing *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994)).  *See also Blount v. Stanley Engineering Fastening*, 55 F.4th 504, 515-516 (6th Cir. 2022) (finding district court did not err in excluding affidavit because it was unsworn and, therefore, not a proper declaration under § 1746.  If a statement fails to comply with the statutory requirements of 28 U.S.C. § 1746, it "is not competent summary-judgment evidence."  *Rogers v. Henry Ford Health Sys*., 897 F.3d 763, 767 n.1 (6th Cir. 2018).  *See also Worthy v. Michigan Bell Tel. Co*., 472 Fed. Appx 342, 344 (6th Cir. 2012) ("Statements that are not sworn [within a compliant affidavit or in compliance with 28 U.S.C. § 1746] are not competent summary judgment evidence."); *AMF Bruns America, L.P. v. Vantage Mobility International, LLC*, 2024 WL 2803320 at * 6 (N.D. Ohio May 31, 2024)(same).

For the following reasons, the Court finds that Bartko's statements do not satisfy the second and third requirements of § 1746.[26]  Bartko does not declare either statements' contents to be true, nor does she swear under penalty of perjury with respect to either the first or second statement.  (Doc. No. 65-2 at PageID#s 2368, 2369.)  Additionally, the first statement (*Id*. at PageID# 2368) does not

---

[26] Neither of Bartko's statements qualify as affidavits because they are not "sworn to by the affiant in front of an 'officer authorized to administer oaths.'" *Peters v. Lincoln Electric Co*., 285 F.3d 456, 475 (6th Cir. 2002) (quoting Black's Law Dictionary 54 (5th ed.1979)).

provide a date or a legible signature.  In light of these deficiencies, and the Sixth Circuit authority cited above, the Court finds that Bartko's statements (Doc. No. 65-2) do not comply with § 1746 and the Court will not consider them herein.

Barens' arguments to the contrary are without merit.  As an initial matter, the Court rejects Barens' argument that the Court should consider the unsworn Bartko statements because they are attached to the Amended Complaint and, therefore, are "part of the record." (Doc. No. 71 at PageID# 2601.)  Barens cites no authority for the proposition that the statutory requirements of § 1746 need not be met simply because a copy of an unsworn statement is attached to an unverified complaint.

The Court also rejects Barens' argument that Exhibit 3 is admissible because "the contents of the statements were testified to" by Ridgley in his deposition. (*Id.*)  Bartko's handwritten statements were marked as an exhibit during Ridgley's deposition and he was questioned regarding their contents. (Ridgley Depo. at Tr. 97-108.)  Ridgley testified that he did not recall ever seeing either of the Bartko statements prior to his deposition.  (*Id.* at Tr. 98.)  While he agreed with some of the representations in Bartko's statements, he expressly denied several others, including Bartko's representations that Ridgley said that (1) he wanted to "get rid of Barens and Moore" (*Id.* at Tr. 101); (2) "it pays to know people everywhere" (*Id.* at Tr. 102); (3) the Federal Reserve would not be hiring Barens because of what Ridgley told them (*Id.* at Tr. 103); (4) he gave a "bad review" of Barens to CH-UH (*Id.* at Tr. 105); (5) as far as he was concerned, Barens "wouldn't be getting a job anywhere anytime soon" (*Id.* at Tr. 106-107); and (6) he "just wanted [Barens] to resign" (*Id.* at Tr. 107.)

As Defendants do not object to Ridgley's deposition testimony regarding Bartko's statements in their Joint Objections, Barens can cite to and rely on such testimony in opposing Defendants' Motions.  This does not mean, however, that Bartko's statements *themselves* are competent summary

34

judgment evidence. Indeed, Barens cites no authority (and makes no reasoned argument) that Ridgley's testimony somehow cures the statements' deficiencies under § 1746 or otherwise renders them admissible.  And, indeed, the Court finds that it does not.

The Court also rejects Barens' argument that the Court should consider Bartko's statements because he anticipates that Bartko will authenticate them and swear to their truthfulness at trial.  (Doc. No. 71 at PageID# 2601.)  Barens had every opportunity to either depose Bartko or obtain her sworn affidavit during the lengthy discovery period in this case.  He failed to do so.  The Court is not willing to assume that Barens would be able to procure Bartko's attendance at trial or (in the event that she were to appear at trial) speculate regarding the contents of any trial testimony she might offer.

Finally, the Court rejects Barens' unsupported argument that the Court should consider Bartko's statements because they are admissible under Fed. Rules of Evid. 801(d)(2)(A) and 803(1), (3), and/or (5).  (Doc. No. 71 at PageID# 2601.)  Barens provides no meaningful analysis regarding how or why any of the above evidentiary rules would apply to Bartko's statements.  The Court cannot take such an undeveloped issue and transform it into a substantive argument on Barens' behalf. Indeed, it is well established that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same).  Here, the Court finds that, by failing to provide any meaningful discussion of this issue, or citation to legal authority, Barens has waived any argument that the Court should consider Bartko's unsworn statements under Fed. Rules of Evid. 801(d)(2)(A) and 803(1), (3), and/or (5).

Accordingly, and for all the reasons set forth above, the Court sustains Defendants' objections to Exhibit 3 and will not consider that Exhibit herein.

35

**C.      Exhibits 4, 5, 7 and 10-- Jennifer Olp Exhibits (Doc. Nos. 65-3, 65-4, 65-5, 65-8)**

Barens attaches several Exhibits to his final corrected Brief in Opposition that involve former PCSD Safety & Security Officer, Jennifer Olp.  Specifically, Barens attaches the following:  (1) two audio recordings of an alleged conversation between Olp and Ridgley (Exhibit 7); (2) a transcript of those recordings (Exhibit 4); (3) Olp's Affidavit (Exhibit 10); and (4) a copy of Olp's Formal Complaint dated October 8, 2020 (Exhibit 5).  (Doc. Nos. 65-3, 65-4, 65-5, 65-8.)  Defendants object to each of the above Exhibits on various grounds.  (Doc. No. 67 at PageID#s 2553-2560.)  The Court will address Exhibits 4, 5, 7 and 10 separately, below.

**1.      Exhibits 4 and 7—Audio Recordings and Transcript**

Exhibit 7 consists of two audio files which were saved to a USB drive and manually filed in this action.  The first audio recording (hereinafter "Recording No. 1") is 3 minutes and 32 seconds long, and purports to be a conversation between Olp and Ridgley.  The second audio recording (hereinafter "Recording No. 2") is 1 minute and 15 seconds in length, and is also purportedly a conversation between Olp and Ridgley.  The date(s) of the conversations recorded in Recording Nos. 1 and 2 are not clear.

Exhibit 4 purports to be a transcript of the two Recordings.  The Transcript was made by a court reporter and is titled "Transcript of a Recorded Conversation between: Officer Jen Olp and Mr. Joe Ridgley."  (Doc. No. 65-3 at PageID# 2370.)  The Transcript indicates that the date, time and location of the recorded conversation were "not specified."  (*Id*.)  The Transcript identifies Recording No. 1 as "Part 1 Olp rec Ridgley about ruining my job opportunities," and Recording No. 2 as "Part 2 Olp rec Ridgley regarding my job opportunities."  (*Id*.)  The Transcript is a total of nine pages in

length.  (*Id*. at PageID#s 2370-2372.)  As Defendants correctly note, there are numerous instances where the court reporter has marked portions of the Recordings "indiscernible."  (*Id*.)

Defendants argue that the Recordings and the Transcript are inadmissible because they are incomprehensible.  (Doc. No. 67 at PageID# 2554.)  Defendants note that, "on almost every page," the Transcript states that portions are "indiscernible" or there was "no audible speech."  (*Id*.) Defendants argue that this is reflective of the Recordings themselves, asserting that "the entire conversation cannot be completely heard or accurately transcribed, leaving uncertainty about what was said during the 'indiscernible' segments."  (*Id*.)  Defendants further argue that "there is no information to verify when or where this conversation occurred" and "there is no way of confirming whether the recording and transcript encompasses all recordings in their entirety."  (*Id*.)  Defendants maintain that it is unclear (1) "whether the full audio of Recording #1 was transcribed or only parts of it" and (2) whether Recording #2 [was] initiated immediately after Recording #1, or [whether] there were additional discussions between Olp and Ridgley that were not recorded or provided to the transcriber."  (*Id*.)  Because there is "no way of validating the accuracy of these exhibits," Defendants maintain the Court should disregard them.  (*Id*.)

Barens argues that the Transcript is admissible because it was attached to the Amended Complaint as an Exhibit and is "therefore part of the record."  (Doc. No. 71 at PageID# 2601.)  He maintains that the Recordings are admissible because they are "a part of the record in this case and [were] produced in discovery."  (*Id*.)  Lastly, Barens asserts that "[a]t trial in this matter, Jennifer Olp would be called to testify regarding the circumstances of her recording this conversation with [] Ridgley, when made, the place where the conversation took place, identifying the voice and speakers on the recording, time during business hours, all as a Federal Rule of Evidence 801(d)(2) opposing

party statement by [] Ridgley and 803(1) present sense impression, 803(3) declarant [] Ridgley's state of mind, and 803(5) recorded recollection."  (*Id*. at PageID#s 2601-2602.)

As noted above, evidence submitted in opposition to a motion for summary judgment must be admissible.  *See, e.g., Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).  To be admissible, audio recordings must be "authentic, accurate and trustworthy, and 'must be audible and sufficiently comprehensible for the jury to consider the contents.'" *United States v. Wesley*, 417 F.3d 612, 620 (6th Cir. 2005) (quoting *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983) ("*Robinson I*"). *See also United States v. Miller*, 562 Fed. Appx 272, 290 (6th Cir. 2014); *United States v. Braxton*, 2022 WL 910571 at * 2-3  (6th Cir. March 29, 2022); *Lewis v. Tackett*, 697 F.Supp.3d 702, 716 (E.D. Ky. 2023).  "The fact that the tape has some unintelligible portions does not automatically render the entire recording inadmissible."  *Wesley*, 417 F.3d at 620 (citing *United States v. Robinson*, 763 F.2d 778, 781 (6th Cir.1985) ("*Robinson II*")).  To be inadmissible, "the incomprehensible portions must be so 'substantial as to render the recordings as a whole untrustworthy.'" *United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir.1995) (quoting *Robinson II*, 763 F.2d at 781).  *See also Lewis*, 697 F.Supp.3d at 716.

Similarly, a party may use a transcript at trial only if the transcript is reliable.  *See Robinson I,* 707 F.2d at 875–79; *Braxton,* 2022 WL 910571 at * 2-3.  If the parties have not stipulated to the accuracy of a transcript, then the court should "make an independent determination of accuracy by reading the transcript against the tape."  *Robinson I,* 707 F.2d at 878–79.  "Where … there are inaudible portions of the tape, the court should direct the deletion of the unreliable portion of the transcript." *Id*.  "This, however, assumes that the court has predetermined that unintelligible portions of the tape do not render the whole recording untrustworthy."  *Id*.  In the end, "the decision to employ

38

recordings and transcripts" rests within "the sound judicial discretion of the trial court." *Id*. at 875. *See also Braxton*, 2022 WL 910571 at * 2-3.

As an initial matter, the Court notes that Olp discusses and authenticates the Recordings and Transcript in her Affidavit, averring that she "recorded [an October 2020] conversation with Joe Ridgley on my phone and an accurate and authentic transcript of the recording is attached to the Barens Complaint." (Olp Aff. at ¶¶ 25-27).  The Transcript that is attached to Barens' Complaint (Doc. No. 1-3) (and Amended Complaint (Doc. No. 8-4)) is the same as the Transcript that is attached as Exhibit 4 to Barens' final corrected Brief in Opposition (Doc. No. 65-3).

The Court has repeatedly listened to both Recordings and carefully compared them to the Transcript.  The Court finds that there are several portions of the Recordings (particularly Recording No. 1) that are not sufficiently comprehensible to be admissible, either because of background noise (such as ruffling or crinkling of paper) or because Ridgley is speaking too quietly to be heard. However, the Court finds that the audible portions of the Recordings are clear and are accurately transcribed in the Transcript.  Moreover, the portions of the Recordings which are not comprehensible are accurately indicated as "indiscernible" in the Transcript.  Lastly, the Court concludes that the incomprehensible portions of the recordings are not so substantial as to render the Recordings untrustworthy as a whole.

That being said, the Court shares Defendants' concerns regarding whether the Recordings are full and complete recordings of Olp's conversation with Ridgley.  There is a noticeable and abrupt gap between the end of Recording No. 1 and the beginning of Recording No. 2.  As such, it is not clear (1) whether there were additional discussions between Olp and Ridgley between the end of Recording No. 1 and the beginning of Recording No. 2 (that were either not recorded, or recorded

but not provided to the court reporter for transcription); and (2) if so, whether those discussions relate to Barens or are otherwise relevant to the instant action.  Nor is it entirely clear whether there were additional relevant discussions between Olp and Ridgley either directly before Recording No. 1 or directly after Recording No. 2.

In light of the above, the Court declines to consider the Recordings and Transcript because it is not clear that they are a full and accurate representation of the entirety of the conversation between Olp and Ridgley. Notably, Olp fails to address this issue in her Affidavit. Although Olp avers generally that the Transcript is accurate and authentic, she does not acknowledge, address, or explain the gap between the two Recordings or state whether there were additional conversations that occurred between herself and Ridgley during that gap. Nor does Olp aver generally that the Recordings are a full and complete recording of her conversations with Ridgley about Barens on that date.

The Court rejects Barens' arguments that the Recordings and Transcript are nonetheless admissible.  The fact that the Recordings were produced in discovery and the Transcript is attached as an Exhibit to the Amended Complaint does not, standing alone, render them admissible.  Moreover, the Court rejects Barens' argument that the Recording and Transcript are admissible because Olp could be called to testify about them at trial.  The Court is not inclined to speculate about Olp's potential trial testimony regarding the Recording and Transcript.  As Defendants correctly note, Olp could have further explained the circumstances surrounding her Recordings (or averred to their completeness) in her Affidavit, but failed to do so.  The Court is not willing to overlook the omissions in Olp's Affidavit by relying on Barens' speculation as to what she might testify to at trial.

Accordingly, and for all the reasons set forth above, the Court will not consider the Recordings or the Transcript in resolving the instant Motions for Summary Judgment.  However, the Court notes that much of the relevant content of the Recordings and Transcript is duplicative of other evidence in the summary judgment record, including Ridgley's deposition testimony, Olp's Affidavit, and the Gilmore Report.

### 2.  Exhibits 5 -- Olp Formal Complaint and Addendum Thereto

Exhibit 5 to Barens' final corrected Brief in Opposition consists of the (1) "Formal Complaint Submitted to Parma City School District October 8th, 2020 by Jennifer Olp" (hereinafter "Olp Complaint"); and (2) "Addendum to Formal Complaint" dated January 7, 2021 (hereinafter "Olp Addendum").  (Doc. No. 65-4.)  The Olp Complaint is seven (7) single-spaced pages and purports to "detail[] the inappropriate behaviors and professional misconduct of Joseph Ridgley."  (*Id.* at PageID# 2375.)  Among other things, the Olp Complaint sets forth detailed allegations of alleged misconduct by Ridgley towards Barens, Moore, Bartko, and Olp.  (*Id.* at PageID#s 2375-2381.)  The Olp Addendum is two and a half (2½) single-spaced pages and is intended "to serve as an explanation and additional details as to what has occurred since [Olp] filed [her] formal complaint with the District."  (*Id.* at PageID# 2382.)  Neither the Olp Complaint nor the Olp Addendum contain Olp's signature or are notarized.  Moreover, neither document contains a statement declaring its contents to be true or swearing that it is made under the penalty of perjury.  (Doc. No. 65-4.)

Defendants argue that Exhibit 5 is inadmissible for multiple reasons.  (Doc. No. 67 at PageID#s 2555-2556.)  Defendants first note that an investigation of the Olp Complaint determined that it was "unsubstantiated" because "the facts alleged [therein] lacked proof or supporting

41

evidence."[27] (*Id.*) As such, Defendants assert that Olp's allegations are nothing more than rumors, conclusory allegations, and subjective beliefs. (*Id.*) Defendants next maintain that "much of" the information in the Olp Complaint is based on Olp's "inadmissible opinions and beliefs rather than factual personal knowledge." (*Id.*) Defendants argue that any statements in the Olp Complaint or Addendum that recount situations involving other female employees (such as Sheri Bartko) are hearsay. (*Id.*) Lastly, Defendants maintain that the Olp Complaint contains "various conclusory assertions, without a proper foundation." (*Id.*)

Barens' entire response is as follows: "At trial in this matter, Jennifer Olp would be called to testify regarding the substance of her formal complaint against [] Ridgley, when made, the place where the referenced conversations took place, identifying the specific statements by [] Ridgley, time during business hours, all as a Federal Rule of Evidence 801(d)(2) and 803(1) present sense impression[,] (3) declarant [] Ridgley's state of mind, and (5) recorded recollection. Because Ms. Olp's testimony can be anticipated to confirm the accuracy of Exhibit 5, the contents of her Complaint is a proper exhibit under Rule 56." (Doc. No. 71 at PageID# 2602.)

---

[27] The record reflects that the PCSD retained outside counsel Kirsten B. Mooney to investigate Olp's Complaint. (Doc. No. 47-3 at PageID#s 1326-1346.) On January 13, 2021, Mooney sent a letter to Smialek detailing her findings and conclusions, including summaries of her interviews of Olp, Ridgley, and Bartko (hereinafter "the Mooney Report"). (*Id.*) Among other things, the Mooney Report contains a section titled "Issues With Respect to Mr. Barens," in which Mooney details Olp's allegations regarding Ridgley's alleged misconduct towards or involving Barens. (*Id.* at PageID#s 1332-1333.) In the Analysis and Conclusion section of her Report, Mooney states that Olp "seemed credible and forthcoming" and finds that Olp's "notebook of contemporaneous notes" "largely supports and corroborates some of the claims against Mr. Ridgley, and I find it credible." (*Id.* at PageID# 1343.) Mooney further finds that "Ms. Bartko also corroborated many of Ms. Olp's allegations against Mr. Ridgley," including that "Ms. Bartko confirmed that Mr. Ridgley publicizes his animosity towards Mr. Barens in the workplace and stated that he has complained to her directly about Barens." (*Id.*) However, Mooney determined that "overall, it appears that many of Ms. Olp's complaints about Mr. Ridgley are 'he said/she said' situations" with no independent witnesses. (*Id.* at PageID# 1344.) Mooney ultimately concluded that Olp's allegations (while credible) did not demonstrate a violation of PCSD's Anti-Harassment Policy. (*Id.* at PageID#s 1343-1346.) Mooney did, however, "express concern for Mr. Ridgley's actions despite the fact that Ms. Olp's Complaint is unsubstantiated" and recommended that he be required to attend a workshop or training sessions regarding "the development of interpersonal skills and/or supervisory responsibilities toward staff/subordinates and management training." (*Id.* at PageID# 1346.)

42

As an initial matter, the Court finds that neither the Olp Complaint nor the Olp Addendum qualify as affidavits because they do not contain Olp's signature and were not sworn to under oath or affirmation before a notary public.  *See Sfakianos v. Shelby County Gov't*, 481 Fed. Appx. 244, 245 (6th Cir. 2012) ("By definition an affidavit is a 'sworn statement in writing made ... under an oath or on affirmation before ... an authorized officer.'") (quoting *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir.1990)); *Clotz v. Mobilehelp, LLC*, 2023 WL 3304506 at * 3 (N.D. Ohio May 8, 2023).  Moreover, neither of these documents constitute proper declarations under 28 U.S.C. § 1746 because they are not signed by Olp, and Olp does not declare the contents of either document to be true or swear under the penalty of perjury.  *See, e.g., Milczak*, 102 F.4th at 781.

The Court does note that, in her Affidavit, Olp authenticates the Olp Complaint and the Olp Addendum.  (Olp Aff. at ¶¶ 11, 29.)[28]  However, there is a difference between (1) averring that the Olp Complaint and Addendum are true and accurate copies of her October 8, 2020 Complaint and January 7, 2021 Addendum, and (2) averring that the specific content of the Olp Complaint and Addendum is true and accurate under penalty of perjury.  Olp fails to aver the latter at any point in her Affidavit.  The Court finds that Olp's bare authentication of the Olp Complaint and Addendum does not transform either of those documents into testimonial evidence.  Therefore, while the Court will take note of the fact that Olp filed her Formal Complaint and Addendum with PCSD on October 8, 2020 and January 7, 2021, respectively, the Court cannot (and will not) consider the specific allegations set forth within those documents in determining whether Defendants are entitled to summary judgment in their favor with respect to Barens' remaining claims.

---

[28] The Court acknowledges that Defendants have objected to Paragraphs 11 and 29 of Olp's Affidavit.  (Doc. No. 67 at PageID# 2559.)  The Court addresses Defendants' objections to these specific Paragraphs *infra,* and rejects them for the reasons stated.

The Court further notes, in passing, that many of the specific allegations and assertions in the Olp Complaint are either not relevant to the instant action, speculative, conclusory, based solely upon Olp's subjective beliefs, and/or hearsay. Moreover, while some of the allegations in the Olp Complaint and Addendum may be relevant, admissible, and based on Olp's personal knowledge, the Court notes that any such allegations are largely duplicative of other evidence in the record, including the admissible paragraphs in Olp's Affidavit, Baren's deposition testimony, Ridgley's testimony, and the Gilmore Report.

### 3.    Exhibit 10 – Olp Affidavit

Exhibit 10 to Barens' final corrected Brief in Opposition is Olp's Affidavit.  (Doc. No. 65-8.) Therein, Olp states, "after first having been duly sworn and placed under oath, that the following statements are made based upon her personal knowledge and direct observation."  (*Id*. at PageID# 2414.)  Olp's Affidavit is five (5) pages long and contains thirty-three (33) numbered paragraphs. (*Id*. at PageID#s 2414-2418.)  It is signed, dated, and notarized.  (*Id.* at PageID# 2418.)  Lastly, Olp's Affidavit authenticates and attaches, as an Exhibit, copies of the Olp Complaint and Olp Addendum. (*Id*. at ¶¶ 11, 29 and PageID#s 2419- 2428.)

Defendants request that the Court "strike all or sections of" Olp's Affidavit because it contains "beliefs" and inadmissible evidence.  (Doc. No. 67 at PageID#s 2557-2558.)  Defendants assert that "the affidavit does not state that Olp is competent to testify on the matters stated therein" and, instead, merely states her name, address, and that she was hired by Ridgley. (*Id*. at PageID# 2558.) Defendants then argue that Paragraphs 5, 6, 7, 8, 11, 12, 29, and 30-33 are inadmissible because they are irrelevant, contain hearsay, consist of legal conclusions, and/or are "based off Olp's 'beliefs'

which does not demonstrate the personal knowledge required by Rule 56." (*Id*. at PageID#s 2558-2559.)

In response, Barens argues that the Olp Affidavit is based upon her personal knowledge and direct observations and sets forth facts that she is competent to testify about. (Doc. No. 71 at PageID# 2603.)  Barens further maintains that the challenged Paragraphs are relevant because they go to Ridgley's reputation, character, credibility, motive, and intent. (*Id*. at PageID#s 2603-2604.)

Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4). "Whenever the court receives accompanying affidavits with a memorandum either in support of or in opposition to a motion for summary judgment, it is required to evaluate the contents and determine whether the affidavits meet the relevant criteria under the Federal Rules of Civil Procedure." *Berry*, 2020 WL 6439171 at * 6. "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) (2010 Advisory Committee Notes). *See Erwin v. Village of Morrow*, 2019 WL 1495921 at * 2 (S.D. Ohio April 4, 2019); *Reddy v. Good Samaritan Hosp. & Health Ctr*., 137 F.Supp.2d 948, 954 (S.D. Ohio 2000).

A declaration or an affidavit offered in support of, or in opposition to, a motion for summary judgment "must set forth specific facts (not conclusory statements) made on the basis of personal knowledge." *Enigwe v. Diversity City Media*, 2008 WL 11352583 at *2 (S.D. Ohio June 2, 2008). *See also Sears v. Jo-Ann Stores, Inc.*, 2014 WL 3672113 at *3 (M.D. Tenn. July 23, 2014) (citing *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 772 (6th Cir. 2012)).  In this context, personal

45

knowledge means "personal observations or experiences."  *Alexander v. Kellogg USA, Inc*., 674 Fed. Appx. 496, 499 (6th Cir. 2017).  "Courts may infer personal knowledge from the content and context of an affidavit."  *Id*. at 499 (citing *Reddy*, 137 F.Supp.2d at 956).  "[I]nferences, thoughts and opinions must be based on first-hand observations or personal experience, substantiated by specific facts."  *Erwin,* 2019 WL 1495921 at * 2.  An affiant's "statement ... based upon h[er] 'belief'... [does] not demonstrate the personal knowledge required by [Rule 56]."[29] *Alpert*, 481 F.3d at 409.

At the outset, the Court rejects Defendants' argument that the Olp Affidavit should be disregarded in its entirety.  The Olp Affidavit qualifies as a valid affidavit because it is signed, dated, and sworn to under oath before a notary public.  (Doc. No. 65-8 at PageID# 2418.)  Moreover, Olp prefaces her Affidavit by stating that the statements made therein are "based upon her personal knowledge and direct observation."  (*Id*. at PageID# 2414.)  The Court will not parse the entirety of the Olp Affidavit to determine whether each statement in each paragraph is or is not admissible.  Rather, the Court will limit its analysis only to those specific paragraphs that are expressly challenged by Defendants in their Joint Objection.

### a.      Paragraph 5

Defendants first object to Paragraph 5 of Olp's Affidavit, in which Olp avers as follows:

5.    I have caught Joe lying about timely submission of my payroll sheets. This information was confirmed by the payroll clerk (Sherry Bartkow [sic]), who stated to me that she often had to seek out Ridgley in the summers to find my timesheet. She advised me of the possibility that I was never paid for all my hours worked.

---

[29] As the Sixth Circuit has explained, "when affidavits based on knowledge and belief are submitted to support or oppose a motion for summary judgment, the district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit." *Ondo v. City of Cleveland*, 795 F.3d 597, 604-605 (6th Cir. 2015).  If the court can distinguish between the two, "the court should excuse the affiant's stylistic error, and must admit the parts based solely upon personal knowledge, while striking the parts based upon belief."  *Id*.  If the court cannot differentiate between the two, "the court must strike the affidavit in its entirety."  *Id*.

(Olp Aff. at ¶ 5.)  Defendants assert that this Paragraph is inadmissible because it (1) is not relevant; and (2) contains hearsay by attempting to introduce an out-of-court statement made by Bartko to substantiate Olp's concerns regarding Ridgley's submission of payroll sheets.  (Doc. No. 67 at PageID# 2558.)  In response, Barens argues that Paragraph 5 is relevant because "Ridgley is a party in this matter and his reputation, character and credibility may be considered by the Court."  (Doc. No. 71 at PageID# 2603.)

The Court finds that Paragraph 5 is not admissible for several reasons.  The Court agrees with Defendants that Olp's averment that Ridgley lied about timely submitting her payroll sheets is not relevant to any of Barens' remaining claims, none of which involve allegations of improper payroll submissions. Indeed, Barens does not argue otherwise. Rather, Barens appears to maintain that evidence of other, unrelated alleged misconduct by Ridgley is relevant because it goes to Ridgley's "reputation, character and credibility." This argument is without merit, however, as it is well established that courts do not make credibility determinations or weigh the evidence at the summary judgment stage.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ....").  *See also Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) (same).

Additionally, the Court agrees (and Barens does not dispute) that Paragraph 5 contains inadmissible hearsay. Olp's averments regarding statements allegedly made by Bartko to Olp regarding Ridgley's alleged failure to timely submit her timesheet is hearsay and, therefore, not properly considered on summary judgment.  *See Wiley*, 20 F.3d at 225-26.  Lastly, even aside from the above, Olp fails to provide any foundation for her conclusory averment that "I have caught Joe

lying about timely submission of my payroll sheets." Accordingly, Defendants' objections to Paragraph 5 are sustained.

### b. Paragraph 6

Defendants next object to Paragraph 6, in which Olp avers as follows:

> 6. I was treated differently by Joe Ridgley after telling him that Paul Barens may not be wrong in some of what Mr. Barens was saying to Mr. Ridgley. The different treatment would include things like not driving my regular patrol vehicle or being sent to a specific school for the entire day or canceling my mentor group meetings for that week. Ultimately, in my last school year with the district, Ridgley advised the girl's mentoring program I started would no longer be continued.

(Olp Aff. at ¶ 6.) Defendants argue that this Paragraph is "irrelevant to the current case because Olp is not a party in this matter and the Complaint does not contain allegations of Ridgley mistreating or eliminating opportunities from Olp." (Doc. No. 67 at PageID# 2558.) In response, Barens argues, summarily, that "this paragraph is relevant and probative of Defendant Ridgley's motive and intent regarding Plaintiff Barens." (Doc. No. 71 at PageID# 2603.)

Although not cited by Barens, he appears to be referencing Federal Rule of Evidence 404(b). That Rule provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, the Rule further provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In determining the admissibility of evidence under Rule 404(b), a district court must use the following three-step process:

> First, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. Second, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. Third,

> if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*Pressman v. Franklin Nat. Bank*, 384 F.3d 182, 187 (6th Cir. 2004) (citation omitted).  *See also United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003).

Here, Barens makes no meaningful attempt to apply Rule 404(b)(2) (or the Sixth Circuit's three step process under that Rule) to Paragraph 6 of Olp's Affidavit.  Nor does he cite any authority in support of his apparent assertion that it is appropriate for this Court to undertake a Rule 404(b)(2) analysis in the summary judgment context.  As noted above, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson*, 125 F.3d at 995.  Here, the Court finds that, by failing to provide any meaningful discussion of this issue or citation to legal authority, Barens has waived any argument that it would be appropriate for the Court to consider the averments in Paragraph 6 under Rule 404(b)(2).  Nor has Barens provided any other reasoned explanation or discussion about how or why Olp's averments in Paragraph 6 are otherwise relevant to Barens' remaining claims in this action. Accordingly, Defendants' objections to Paragraph 6 are sustained.

### c.     Paragraph 7

Defendants next object to Paragraph 7, in which Olp avers as follows:

> 7.   I have witnessed Joe Ridgley sexually harassing women on the job, specifically Sherri Bartko in Payroll, by hugging, kissing, and calling them inappropriate names like "honey" and others.

(Olp Aff. at ¶ 7.)  Defendants argue that Paragraph 7 is inadmissible because it is irrelevant, consists of a legal conclusion, and "contains hearsay by referencing Sheri Bartko without any verification of this claim directly from Sheri Bartko herself." (Doc. No. 67 at PageID# 2559.)  In response, Barens

49

argues (summarily) that Paragraph 7 is "relevant and probative of Defendant Ridgley's reputation of character, motive, and intent."  (Doc. No. 71 at PageID# 2604.)

The Court finds that Paragraph 7 is not relevant to the instant action.  Olp's allegation that she witnessed Ridgley sexually harassing women at the PCSD is not relevant to any of Barens' claims. Moreover, this Court does not make credibility determinations regarding a party or witness' character at the summary judgment stage.  *See Anderson*, 477 U.S. at 255; *Willard*, 952 F.3d at 806.  Lastly, to the extent Barens is arguing that Paragraph 7 is admissible under Rule 404(b)(2), the Court finds that he waived any such argument by failing to provide any meaningful discussion of, or citation to legal authority regarding, the applicability of that Rule to Paragraph 7.  *See McPherson*, 125 F.3d at 995. Accordingly, Defendants' objections to Paragraph 7 are sustained.

### d.      Paragraph 8

Defendants next object to Paragraph 8, in which Olp avers as follows that: "I believe that had I reported Joe Ridgley's behavior I would have been retaliated against by Joe Ridgley and Charles Smialek."  (Olp Aff. at ¶ 8.)  Defendants argue that Paragraph 8 is inadmissible because it is (1) "based off Olp's 'beliefs' which does not demonstrate the personal knowledge required by Rule 56; (2) "nothing more than a legal conclusion;" and (3) not relevant to the instant action.  (Doc. No. 67 at PageID# 2559.)  Barens argues that Paragraph 8 is "based upon Olp's personal knowledge and direct observation of Joseph Ridgley."  (Doc. No. 71 at PageID# 2604.)  He further asserts that Olp would be expected to testify at trial "in accordance with FRE 803 (1) and (3)"[30] to demonstrate her personal knowledge of Ridgley's behavior.  (*Id*.)

---

[30] Fed. R. Evid. 803 sets forth exceptions to the rule against hearsay.  Rule 803(1) provides an exception for present sense impression, which is defined as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R Evid. 803(1).  Rule 803(3) provides an exception for "then-existing Mental,

The Court finds that Paragraph 8 is inadmissible.  As noted above, an affiant's "statement ... based upon h[er] 'belief'... [does] not demonstrate the personal knowledge required by [Rule 56]." *Alpert*, 481 F.3d at 409.  Olp's statement in Paragraph 8 that she "believes" that she would have been retaliated against if she had reported Ridgley's behavior, does not demonstrate personal knowledge within the meaning of Rule 56.  Rather, Paragraph 8 is speculative and based on nothing more than her beliefs and opinions.  Accordingly, Defendants' objections to Paragraph 8 are sustained.

### e.      Paragraphs 11, 12, and 29

Defendants next object to Paragraphs 11, 12 and 29, in which Olp avers as follows:

> 11.  On October 8, 2020 I submitted a formal complaint consisting of seven (7) pages to the Parma City School District and a true and an authentic copy of my complaint is attached with this Affidavit and the Amended Complaint in the matter of Paul Barens v. Parma City School District.
>
> 12.  Although my complaint was determined to be "unsubstantiated", the specific facts of my complaint relating to Joe Ridgley's plan and Paul Barens was not addressed by the investigators.  Nor was I interviewed about a plan to rift the Safety & Security Department. The conversation I had with the investigator for Mr. Barens was approximately 38 minutes in length and the topic of replacing the department was not talked about.
>
> **
>
> 29.  On January 7, 2021 I submitted an Addendum to my Formal Complaint. A true and authentic copy of that Addendum is attached hereto.

(Olp Aff. at ¶¶ 11, 12, 29.)  Defendants argue that Paragraphs 11, 12, and 29 are inadmissible because Olp's Complaint was found to be unsubstantiated and, therefore, "any facts within it offered to establish the occurrence of an event or to prove that such facts occurred are consequently

---

Emotional, or Physical Condition," as follows: "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3).

51

unsubstantiated and thus irrelevant." (Doc. No. 67 at PageID# 2559.)  Defendants further argue these Paragraphs are inadmissible because Olp's Complaint contains hearsay.  (*Id*.)  Barens argues that Paragraphs 11, 12, and 29 are admissible because they are based upon Olp's personal knowledge and direct observation and because they "show the factual basis of Olp's knowledge in context."  (Doc. No. 71 at PageID# 2604.)

This Court has already determined, *supra,* that it will not consider the specific allegations set forth within the Olp Complaint and Addendum in resolving the instant Motions.  However, the Court does not agree with Defendants that Olp's averments in Paragraphs 11 and 29 (i.e., that she filed her Complaint and Addendum with PCSD on October 8, 2020 and January 7, 2021, respectively, and that the copies of those documents attached to her Affidavit are authentic) are therefore also inadmissible. It is certainly within Olp's personal knowledge that she submitted her Complaint and Addendum to PCSD on those dates and that the copies attached to her Affidavit are true and accurate copies of those documents.  Moreover, Defendants cite no authority that the fact that Olp's Complaint was deemed unsubstantiated necessarily requires the conclusion that Olp's averments that she filed the Complaint and Addendum with the PCSD are inadmissible.  Thus, the Court rejects Defendants' request that it disregard Paragraphs 11 and 29 of Olp's Affidavit.

The Court also disagrees with Defendants that Paragraph 12 is inadmissible.  The Court finds that Olp's statements in Paragraph 12 are based on her personal knowledge of her interviews with the investigators hired by PCSD, i.e., Gilmore and Mooney.  Nor does it appear to contain any hearsay evidence.  Accordingly, Defendants' objections to Paragraphs 11, 12, and 29 are rejected.

### f.      Paragraphs 30-33

Defendants next object to Paragraphs 30, 31, 32, and 33, in which Olp avers as follows

30.  On February 1, 2021, I resigned my employment with Parma City School District.

31.  Before leaving, I made numerous attempts to find employment elsewhere.

32.   In the month of December 2020, I submitted 12 applications for employment. I have not  received an interview or even a phone call from any of these places. I have applied for both law  enforcement related work as well as non- law enforcement work. Some of the places I have applied to, I know Joe Ridgley has friends.

33.   I believe it is a real possibility I am being retaliated against by Ridgley and Hoy (because  according to Ridgley, Hoy is "in his pocket") and possibly being black- listed for certain places  of employment.

(Olp Aff. at ¶¶ 30-33.)  Defendants argue that the above Paragraphs are irrelevant since Olp is not a plaintiff and the instant action does not involve allegations that Olp was being retaliated against. (Doc. No. 67 at PageID# 2559.) Defendants further argue that Paragraph 33 is based on Olp's "beliefs" rather than her personal knowledge.  (*Id*.)  Barens argues that Paragraphs 30-33 are "probative and relevant to the case" and that "at trial, [Olp] should be expected to testify regarding Rule 803(1) and (3) statements." (Doc. No. 71 at PageID# 2604.)

The Court finds that Paragraph 30 is admissible because it based on Olp's personal knowledge and may be relevant to the context and timeline of Barens' allegations.  Paragraphs 31 through 33, however, are not admissible.  Regarding Paragraphs 31 and 32, whether or not Olp attempted to find employment elsewhere (or how many job applications she submitted) is not relevant.  Additionally, Paragraph 32 does not contain a sufficient foundation for Olp's averment that she knows Ridgley has friends at some of the places where she applied.  Lastly, Paragraph 33 is not admissible because it is speculative and based solely on Olp's beliefs and opinions rather than on her personal knowledge. Accordingly, Defendants' objection to Paragraph 30 is rejected, while Defendants' objections to Paragraphs 31, 32, and 33 are sustained.

**D.     Exhibit 11- Affidavit of Simpson Alexander Huston**

53

Exhibit 11 to Barens' final corrected Brief in Opposition is the Affidavit of former PCSD Safety & Security officer, Simpson Alexander Huston.[31]  (Doc. No. 65-9.)  Therein, Huston states, "after first having been duly sworn and placed under oath," that "the following statements are made based upon his personal knowledge and direct observation."  (*Id*. at PageID# 2429.)  Huston's Affidavit is four (4) pages long and contains thirteen (13) numbered paragraphs.  (*Id*. at PageID#s 2429-2432.)  It is signed, dated, and notarized.  (*Id.* at PageID# 2432-2433.)

Defendants argue that Huston's Affidavit "must be stricken, or portions thereof" for several reasons.  (Doc. No. 67 at PageID#s 2560-2561.)  Defendants first assert that "the affidavit does not state that Huston is competent to testify on the matters stated therein" and, instead, merely states his name, address, and that he is a former employee of PCSD.  (*Id*. at PageID# 2560.)  Defendants then argue that Paragraphs 10, 12, and 13 are inadmissible because they are irrelevant, contain hearsay, "contain medical opinions that can only be offered through the use of a designated expert witness," and/or are based on Huston's 'beliefs' rather than his personal knowledge.  (*Id*.)  In response, Barens argues, summarily, that "Ohio courts have rejected the Defendants' approach to strike or exclude." (Doc. No. 71 at PageID# 7605.)  Barens further asserts that "the content and context of [Huston's] affidavit demonstrate his competency to testify."  (*Id*.)

At the outset, the Court rejects Defendants' argument that the Huston Affidavit should be disregarded in its entirety.  The Huston Affidavit qualifies as a valid affidavit because it is signed, dated, and sworn to under oath before a notary public.  (Huston Aff. at PageID# 2432-2433.)  *See*

---

[31] In Paragraphs of his Affidavit which are not challenged by Defendants, Huston avers that he worked in the PCSD Safety & Security Department from December 2007 to December 2019.  (Huston Aff. at ¶ 4.)  Huston further avers that he met Barens in the beginning of the school year 2014.  (*Id*. at ¶ 5.)  He states that, when Barens became Interim Supervisor, they worked together to implement a support group for LGBT students and worked with high-risk students throughout the district.  (*Id*. at ¶¶ 5, 6.)

*Sfakianos*, 481 Fed. Appx. at 245; *Clotz* 2023 WL 3304506 at * 3.  Moreover,  Huston prefaces his Affidavit by stating that the statements made therein are "based upon his personal knowledge and direct observation."  (Huston Aff. at PageID# 2429.)  The Court will not parse the entirety of the Huston Affidavit to determine whether each statement in each paragraph is or is not admissible. Rather, the Court will limit its analysis only to those specific paragraphs that are expressly challenged by Defendants in their Joint Objections.

### 1.    Paragraph 10

Defendants first object to the following statement in Paragraph 10 of Huston's Affidavit, which is highlighted below in bold:[32]

> 10.  Mr. Barens and I spoke often. **I remember listening to a recording of board member, Amanda Karpus. Karpus informed Barens that Mr. Smialek (Superintendent) wasn't going to hire Barens permanently**. Mr. Barens was devastated. I didn't mention it to Mr. Barens at the time but I noticed a change in behavior with staff members that we worked very well with and as time went on it became more apparent. Mr. Barens brought it to my attention that he observed a person in the lobby that he saw in a photo on facebook with Mr. Smialek; it turned out to be Mr. Ridgley. Mr. Moore and I were trying to assure Mr. Barens that maybe it didn't mean anything.  Around March 2019, Mr. Ridgley was given the position of Director of Safety and Security. During a meeting with Mr. Ridgley, Mr. Barens and I were told that we could no longer do "Champions for Life" groups.

 (Huston Aff. at ¶ 10) (emphasis added).

Defendants  argue  that  the  statement  highlighted  in  bold,  above,  "contains  hearsay  by attempting to introduce an out-of-court statement made by Amanda Karpus to prove that Smialek did not hire Barens as Safety Director."  (Doc. No. 67 at PageID# 2560.)  Defendants further assert that this statement is irrelevant because it relates to *Barens I*, which was settled via the May 2020 Release.

---

[32] Defendants only object to the sentences in bold, above, and do not object to any other statements contained in Paragraph 10.  Thus, the Court limits its evaluation solely to the objections raised to the specific sentences highlighted in bold and does not consider the admissibility of any other statements in that Paragraph.

(*Id.*)  In response, Barens argues that the statement at issue "is not offered to prove or introduce an out of court statement by Amanda Karpus to provide that Smialek did not hire Barens as Safety Director." (Doc. No. 71 at PageID# 2605.)  Rather, Barens asserts the statement at issue is admissible because it is "probative of Barens' reaction to the events" and is admissible under Fed. R. Evid. 803(1).  (*Id.*)

The Court will not consider Huston's statement that he "remember[s] listening to a recording of board member, Amanda Karpus" in which "Karpus informed Barens that Mr. Smialek (Superintendent) wasn't going to hire Barens permanently."  It is undisputed that Barens was not hired for the permanent Supervisor position.  And while Barens' reaction to Karpus' alleged statement may have been relevant to *Barens I*, the Court is not persuaded that it is relevant to Barens' remaining claims in the instant action.  Indeed, Barens has failed to sufficiently explain how Huston's description of his (i.e., Barens') reaction to Karpus's statement is relevant or probative to any particular issue in the instant action.  Accordingly, the Court sustains Defendants' objection to the this particular statement in Paragraph 10 of Huston's Affidavit.

### 2. Paragraphs 12 and 13

Defendants next object to the following statements in Paragraphs 12 and 13, which are highlighted in bold below:

12.  After my departure, for nearly two years Mr. Barens called and texted me four to six times a day every day while he was working. Mr. Barens would have his cell phone so I could listen to his conversation and interactions with staff members because they all had changed their behavior towards him. Mr. Barens would call me on his way home stating that his chest was hurting and that he felt anxious **which seemed like a panic attack**. I recognized his need for medical attention and encouraged him to stop at urgent care on his way home. Mr. Barens called me numerous times while at home - late night, early morning stating that he had dreams his family was leaving him. Sometimes, I had calls from Mr. Barens at 2 a.m. - 3 a.m. - 4 a.m. stating that he woke up with night sweats and that he dreamed Kim, his wife, was going to leave him. I

assured him that it was just a dream. It got to the point that he was calling me every night and day, six to eight times, for months. **Sometimes, when he called I would tell him he sounded tearful and hopeless like some of my friends that were in Vietnam and experiencing PTSD. I would often suggest talking to someone in Mental Health Services. I also referred him to Dr. George Tesar, a clinical psychiatrist with the Clinic**.

13.  Mr. Barens told me about jobs he applied for and didn't get. **I would meet him sometimes for lunch and he seemed depressed**. He often asked me "What did I do wrong? I am just standing up for myself." Mr. Barens complained that people are treating him like he did something wrong and that he is tired of it. My reply was go and talk to someone. I told Mr. Barens he could call me anytime day or night and in between because I understood. I told Mr. Barens that based upon what I observed and knew about what  he was experiencing  that I would have had the same reactions.

(Huston Aff. at ¶¶ 12, 13)(emphasis added).  Defendants argue that the bolded language above constitute  "medical opinions that can only be offered through the use of a designated expert witness." (Doc.  No. 67 at PageID# 2560.)  Defendants note that Barens did not identify Huston as an expert witness qualified to testify regarding Barens' medical condition.  (*Id*.)  Lastly, Defendants maintain that Huston's "beliefs" do not demonstrate expert opinions or personal factual knowledge. (*Id*.)  In response, Barens argues that "Huston is not an expert witness testifying on Barens' medical condition" but, rather, has personal factual knowledge of Barens' condition based on his direct observations.  (Doc. No. 71 at PageID#s 2605-2606.)  Barens further argues that Huston would be expected to testify at trial "pursuant to Rule 803 present sense impression and recorded recollection." (*Id*. at PageID# 2606.)

For the following reasons, the Court finds that the bolded language of Paragraphs 12 and 13, set forth above, are not admissible.  In a previous paragraph, Huston avers that he "worked in behavioral services as a mental health technician in the [Cleveland] Clinic's Psychiatry Department from 1979 until 2012," where he "provided individual counselling and group therapies" to clients in various "modalities."  (Huston Aff. at ¶ 3.)  Huston goes on to detail his training and experience in

57

crisis management, family intervention, and "anger management for military veterans, police officers, and firemen who were experiencing PTSD." (*Id*.)  Given this context, the Court shares Defendants' concerns regarding Huston's statements that Barens seemed to be experiencing a panic attack, appeared depressed, and "sounded tearful and hopeless like some of [Huston's] friends that were in Vietnam and experiencing PTSD." (Huston Aff. at ¶¶ 12, 13.)  Barens does not dispute that he failed to identify Huston as an expert witness regarding Barens' mental health condition.  Thus, it is not appropriate for Huston to diagnose Barens' mental health conditions or symptoms in his Affidavit.  The Court finds that Huston's statements in Paragraph 12 and 13 (highlighted in bold, above) stray improperly into the area of medical opinion testimony and are, therefore, inadmissible.  Accordingly, the Court sustains Defendants' objections to Huston's statements in Paragraph 12 and 13, which are highlighted in bold above.

### E.        Exhibit 12—Affidavit of Paul Moore

Barens identifies Exhibit 12 to his final corrected Brief in Opposition as the Affidavit of Paul Moore. (Doc. No. 65-10.)  Defendants object to this Exhibit on the grounds that it is illegible. (Doc. No. 67 at PageID# 2561.)  In his Brief in Opposition, Barens acknowledges that, as filed, the Affidavit of Paul Moore is illegible and that, as a result, Defendants cannot make proper objections to its contents. (Doc. No. 71 at PageID# 2606.)  Citing Fed. R. Civ. P. 56(d)(3), Barens requests permission to substitute a legible copy of the Moore Affidavit. (*Id*.)  Barens maintains that, at trial, Moore would be expected to testify "under Rule 803(1) present sense, (5) recorded recollection, and 801(d)(2) accurately reflecting his knowledge of a conversation with Defendant Ridgley in Ridgley's office." (*Id*.)  In addition, on June 3, 2024, Barens separately filed a Motion for Leave to File a Legible Copy of the Moore Affidavit. (Doc. No. 69.)  Therein, Barens states that he "just received [a legible copy]

58

via email from the affiant, Paul Moore, a Georgia resident."  (*Id*.)  No further explanation, analysis, or citation to authority is provided.

Defendants oppose Barens' Motion for Leave.  (Doc. No. 70.)  Defendants argue that Barens has already been provided multiple opportunities to submit corrected filings to ensure the "accuracy and completeness" of his corrected Brief in Opposition.  (*Id*.)  Defendants assert that "after three attempts at filing his Brief in Opposition, the illegible affidavit of Exhibit 12 is part of the final document per the Court's order."  (*Id*. at PageID# 2592.)  Defendants further assert that the Moore Affidavit is dated February 26, 2024 and, therefore, Barens has apparently been in possession of it for three months prior to the final filing deadline.  (*Id*.)  Lastly, Defendants argue that "granting Barens another chance to correct his Brief in Opposition would result in an undue hardship for Defendants, necessitating them to re-evaluate and potentially revise the previously submitted replies and Joint Motion to Strike."  (*Id.*)

It is apparent to this Court (and all parties agree) that Exhibit 12 to Barens' final, corrected Brief in Opposition is entirely illegible.   Thus, the Court cannot, and will not, rely on that Exhibit as filed.  The question, then, is whether this Court will allow Barens the opportunity to now file a legible version of Exhibit 12.  For the following reasons, the Court declines to do so.  This Court has afforded Barens multiple opportunities to file a complete and accurate Brief in Opposition and Exhibits. Barens filed his initial Brief in Opposition and Exhibits on April 22, 2024.  One week later, he requested leave to file a corrected Brief in Opposition, which the Court granted.  On April 29, 2024, Barens filed a corrected Brief, to which he attached Exhibits that did not match the Exhibits attached to his initial Brief.  Noting that Barens had not been granted leave to change his Exhibits, the Court ordered Barens to submit an explanation for the discrepancies.  After considering Barens' explanation

(Doc. No. 60), the Court ordered him to file a "final, corrected Brief in Opposition and Exhibits" by May 8, 2024.  (Doc. No. 62.)  Barens thereafter filed his final, corrected Brief in Opposition and Exhibits on May 8, 2024.  (Doc. No. 65.)

As the name implies, Barens' "final, corrected Brief in Opposition and Exhibits" was intended to be his final opportunity to submit an accurate and complete Brief in Opposition and Exhibits. Despite this, Barens failed to file a legible copy of the Moore Affidavit with his final Brief, despite the fact that he appears to have had it in his possession since at least April 22, 2024.[33]  *See* Doc. No. 55-5.  Barens offers no meaningful explanation or excuse for failing to ensure that he filed a legible copy of this Affidavit to his final, corrected Brief in Opposition.[34]  Nor does he dispute Defendants' argument that they would suffer undue hardship by allowing him to supplement the record with a legible copy at this time.  Accordingly, the Court denies Barens' Motion for Leave to File a Legible Copy of Plaintiff's Exhibit 12.  (Doc. No. 69.)  Defendants' objections to Exhibit 12 to Barens' final corrected Brief in Opposition are sustained.

F.     **Exhibit 13—Affidavit of Paul Barens**

---

[33] A faded, but legible, copy of the Moore Affidavit is attached as an Exhibit to Barens' initial Brief in Opposition, which was filed on April 22, 2024.  (Doc. No. 55-5.)

[34] In his Brief in Opposition to Defendants' Joint Objections, Barens asks the Court to allow him to substitute a legible copy of the Moore Affidavit pursuant to Rule 56(d)(3).  That Rule provides as follows:  "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: *** (3) issue any other appropriate order." Fed. R. Civ. P. 56(d)(3).  Barens provides no argument, explanation, or citation to authority explaining why he believes he is entitled to relief under Rule 56(d)(3).  Thus, the Court finds any such argument to be waived.  Moreover, even if Barens had not waived this argument, the Court would find it to be without merit because Barens did not show "by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition," as required by that Rule.  First, neither Barens nor his counsel provide an affidavit or declaration in support of his Rule 56(d)(3) request.  Second, Barens does not identify any specified reasons why he could not attach a legible copy of the Moore Affidavit to his final corrected Brief in Opposition nor does he sufficiently explain what that Affidavit is "essential to justify [his] opposition" to Defendants' summary judgment motions.

60

Exhibit 13 to Baren's final corrected Brief in Opposition is the Affidavit of Paul Barens, dated April 21, 2024.  (Doc. No. 65-11.)  Therein, Barens states, "after first having been duly sworn and placed under oath," that "the following statements are made based upon his personal knowledge and direct observation."  (*Id*. at PageID# 2437.)  Barens' Affidavit is one (1) page and contains five (5) numbered paragraphs.  (*Id*.)  It is signed, dated, and notarized.  (*Id*.)

Defendants request that the Court disregard Barens's Affidavit "in whole or in part."  (Doc. No. 67 at PageID# 2562.)  In particular, Defendants object to Paragraphs 4 and 5 of that Affidavit on the grounds that they are irrelevant, contain legal conclusions, and consist of nothing more than Barens's subjective beliefs.  (*Id*. at PageID#s 2561-2562.)  In response, Barens argues that Paragraphs 4 and 5 are based upon his personal knowledge and direct observation and are, therefore, admissible. (Doc. No. 71 at PageID#s 2606-2607.)

The Court first rejects Defendants' argument that the Barens Affidavit should be disregarded in its entirety.  The Barens Affidavit qualifies as a valid affidavit because it is signed, dated, and sworn to under oath before a notary public.  (Doc. No. 65-11.)  In addition, Barens prefaces his Affidavit by stating that the statements made therein are "based upon his personal knowledge and direct observation."  (*Id*.)  The Court will therefore limit its analysis only to those specific paragraphs that are expressly challenged by Defendants in their Joint Objection.

### 1.  Paragraph 4

Defendants object to Paragraph 4 of the Barens Affidavit, in which he avers that: "Once I read the [Gilmore] report on January 19, 2021, I knew as a fact that someone in PCSD, likely Joseph Ridgley, had interfered with my legal rights and retaliated against me."  (Barens Aff. at ¶ 4.)  The Court finds that Paragraph 4 is inadmissible.  Barens' averments that, once he read the Gilmore

61

Report, he knew that PCSD had "interfered with his legal rights" and "retaliated against" him constitute impermissible legal conclusions.  Additionally, Barens' averment that he knew that it was "someone at PCSD, *likely* Joseph Ridgley" that interfered with his legal rights is speculative and based on his subjective beliefs, rather than his personal knowledge.  Accordingly, the Court sustains Defendants' objections to Paragraph 4 of the Barens Affidavit and will not consider that Paragraph herein.

### 2.     Paragraph 5

Defendants next object to Paragraph 5 of the Barens Affidavit, in which he avers that: "Mr. Ridgley admitted to Robert Gilmore that he had made negative remarks to me about prospective employers."  (Barens Aff. at ¶ 5.)  Defendants argue that Paragraph 5 is inadmissible because the Gilmore Report concluded that Barens' allegations were not supported by a preponderance of the evidence.  (Doc. No. 67 at PageID# 2562.)  Barens argues that Paragraph 5 is admissible because it is based upon his personal knowledge and direct observation.  (Doc. No. 71 at PageID# 2606-2607.)

The Court is not persuaded that all of the information contained in the Gilmore Report is irrelevant simply because Gilmore (who was hired and paid by PCSD) determined that Barens' allegations were not supported by a preponderance of the evidence.  Nonetheless, the Court will not rely on Paragraph 5.  The Gilmore Report contains a summary of Gilmore's two interviews with Ridgley.  The Gilmore Report, therefore, speaks for itself.  Barens' characterization of what Ridgley allegedly "admitted" to Gilmore during his investigation is therefore not relevant or appropriate.  Accordingly, the Court will not consider Paragraph 5 of the Barens Affidavit.

### G.     Deposition Objections

Lastly, Defendants object to deposition testimony that is cited by Barens in his Brief in Opposition and to which Defendants specifically objected during deposition. (Doc. No. 67 at PageID#s 2562-2563.) Defendants maintain the following objections which were raised during deposition: (1) two objections to "form" during Ridgley's deposition on Tr. 94-95; (2) "all objections" made during Hoy's deposition, including those on Tr. 30, 36, and 37; (3) "all objections" made during Greene's 30(b)(6) deposition, including those on Tr. 30, 36, and 37; and (4) "all objections" made during Smialek's deposition, including those on Tr. 25, 27, 28, 29, 30, 41, 42, 43, 45, 46, 48, and 49.

As an initial matter, the Court will not pore through all of the Ridgley, Hoy, Smialek, and Greene deposition testimony cited by Barens in order to identify Defendants' objections and then rule upon each of every one of them.  Defendants cite no authority that it is incumbent on the Court to do so at this stage of the proceedings and, indeed, the Court finds that it is not.  Regarding the specific objections noted by Defendants, the Court notes as follows.  Defendants' assertion that there are objections on pages 25, 27, 28, 29, 30, 41, 42,  45, 46,  48 and 49 of the Smialek Deposition Transcript is incorrect.  (Doc. No. 47-3.)  Upon careful review, the Court notes that, in fact, there are no objections on any of those pages of the Smialek Deposition Transcript.  Regarding the Ridgley, Hoy, and Greene depositions, the Court does not rely herein on the specific testimony cited in Defendants' Joint Objections.  Therefore, the Court need not (and will not) address Defendants' deposition objections at this time.

## IV.    Motions for Summary Judgment

### A.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252). A fact is "material . . . only if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Computer Packages, Inc*., 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp*., 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may [also] meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems*., 593 Fed. Appx at 508–09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v.*

64

*Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### B.    Analysis

For purposes of clarity, the Court notes that the following claims remain in the instant action following this Court's ruling on the PCSD Defendants' Motion for Judgment on the Pleadings:  (1) First Amendment Speech and Petition Retaliation under 42 U.S.C. § 1983 against PCSD, and Smialek, Hoy, and Ridgley, in their individual capacities (Count One); (2) Fourteenth Amendment Due Process Violation against PCSD and Ridgley (Count Two); (3) Tortious Interference with Employment Relations against Ridgley (Count Three); and (4) Civil Liability for Criminal Acts under Ohio Rev. Code §§ 2921.45, 2921.05, 2923.03, and 2307.60 against all Defendants (Counts Four, Five, and Six).

The PCSD Defendants and Ridgley move for summary judgment in their favor with respect to each of the above claims.  (Doc. Nos. 50, 51.)  The PCSD Defendants and Ridgley first argue that some or all of Barens' claims are barred by the May 2020 Release.  (*Id.*)  The PCSD Defendants further assert that, to the extent this Court finds that any claims arising prior to the May 13, 2020 are not barred by the Release, such claims are time-barred under the two year statute of limitations for § 1983 claims.  (Doc. No. 50 at PageID#s 1722, 1739-1740.)  The PCSD Defendants and Ridgley then assert that they are entitled to summary judgment in their favor with respect to Barens' First Amendment Retaliation claim because Barens cannot demonstrate that the alleged speech was constitutionally protected, or that any of the Defendants took any adverse action against him because of his allegedly protected speech.  (Doc. Nos. 50, 51.)  Defendants next assert that they are entitled to summary judgment in their favor with respect to Barens' Fourteenth Amendment Due Process

65

claim because there is no evidence to support Barens' claim that his due process rights were, in fact, violated.  (*Id*.)

Regarding Barens' state law claims, the PCSD Defendants and Ridgley argue that Barens' claims for Civil Liability for Criminal Acts (Counts Four, Five, and Six) are time-barred.  (*Id*.) Defendants assert that, even if these claims are not time-barred, Defendants are entitled to judgment in their favor because there is no evidence of any underlying criminal violations.  (*Id*.)  Ridgley then argues that he is entitled to judgment in his favor with respect to Barens' Tortious Interference claim (Count Three) because Barens "cannot prove that he had a business expectancy with [CH-UH, the Federal Reserve, or ECSD]" and because "Ridgley lacked knowledge of the expectancies" and did not intentionally interfere or cause damages.  (Doc. No. 51 at PageID# 1776.)  Lastly, Ridgley argues that he is entitled to judgment in his favor with respect to all of Barens' federal and state claims because Barens failed to mitigate his damages.  (*Id*.)

Barens opposes the arguments raised by the PCSD Defendants and Ridgley regarding the scope of his Release, his First Amendment Retaliation claim, and his state law claims.[35]  (Doc. No. 65.)  The Court will address the parties' arguments separately, below.

### 1.    The May 2020 Release

As discussed *supra*, on May 13, 2020, Barens signed a "Release of All Claims and Demands" (the "May 2020 Release") to resolve *Barens I*.  The PCSD Defendants maintain that the May 2020 Release "serves to bar all of Plaintiff's claims."  (Doc. No. 50 at PageID# 1739.)  They assert that "[t]he language of the May 13, 2020 Release is clear and unambiguous" that Barens "released all

---

[35] As discussed *infra*, Barens fails, entirely, to respond to any of Defendants' arguments regarding his Due Process Claim in Count Two.

past, present and future claims and demands against the PCSD Defendants growing out of or connected with his employment with PCSD." (*Id.*)  The PCSD Defendants further argue that, under Ohio law, Barens "is now barred from bringing the remaining claims under 42 U.S.C. § 1983 and 'any and all other claims that may be premised upon any applicable state, local or federal law, ordinance or common law decision.'" (*Id.*)  In particular, the PCSD Defendants maintain that the May 2020 Release not only bars Barens from asserting "any and all claims that occurred prior to May 13, 2020," but also any future claims arising out his employment with the PCSD. (*Id.* at PageID#s 1722, 1738-1739.)

Ridgley argues that the terms of the May 2020 Release are "clear and unambiguous" that Barens "released all claims arising out of any act prior and up to May 13, 2020 regarding his employment with Parma and its employees." (Doc. No. 51 at PageID# 1784.)  Ridgley further argues that he is entitled to judgment in his favor as a matter of law because the "eleven retaliatory actions" set forth in Paragraph 91 of Barens' Amended Complaint either occurred before the Release was executed, could have been asserted in *Barens I*, or "had nothing to do with Defendant Ridgley." (*Id.* at PageID# 1785.)

In response, Barens first argues that his constitutional claims do not fall within the May 2020 Release. (Doc. No. 65 at PageID#s 2289-2291.)  He maintains that constitutional rights may be contractually waived only "where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." (*Id.*)  Barens asserts that, here, "the Release does not address or mention the possibility of constitutional claims." (*Id.*)  He further argues that "the intent of the parties to preclude constitutional litigation regarding any subsequent constitutional claim related to Barens'

67

employment is far from explicitly stated in the release and should not be presumed." (*Id*. at PageID# 2293.)  Barens also maintains that Defendants have failed to demonstrate negotiation on the terms of the Release or that "Barens had a full understanding of the reach or consequences of the waiver of constitutional claims regarding any conduct by defendants." (*Id*. at PageID#s 2291, 2292.)

Barens next argues that "even assuming that his constitutional, civil, and independent tort claims fall within the …. Release, the Release, as applied to the claims alleged in the Amended Complaint, is void as against public policy." (*Id*. at PageID# 2291.)  He maintains that "[u]nder Ohio law, a release is invalid as to future willful and wanton misconduct," such as that alleged in Plaintiff's Amended Complaint.  (*Id*.)  Barens asserts that "even broadly worded releases … are invalid where the claim includes maliciousness, wanton, or intentional acts." (*Id*. at PageID# 2293.)  Barens argues that Defendant Ridgley "confuses factual allegations in the Amended Complaint as 'claims' or actions subject to the Release by a chronology." (*Id*.)  In sum, Barens asserts that "none of [his] claims are barred by the Release of All Claims and Demand from the 2019 lawsuit, as the release is illegal under Ohio law."[36]  (*Id.* at PageID# 2295.)

In their respective Reply Briefs, the PCSD Defendants and Ridgley maintain that the May 2020 Release clearly and unambiguously includes Barens' § 1983 and state law claims arising out of any act prior and up to May 13, 2020.  (Doc. Nos. 66, 68.)  The PCSD Defendants further assert that the Release also includes any and all future claims relating to Barens' employment with the PCSD. (Doc. No. 66.)  Both the PCSD Defendants and Ridgley emphasize that Barens was represented by

---

[36] The Court notes that this is in direct contradiction to Barens' statement, earlier in his Brief in Opposition, that he "released only those claims arising out of any act prior and up to May 13, 2020 covered by his lawsuit regarding his employment with Parma and its employees."  (*Id*. at PageID#  2293.)

competent counsel when he signed the Release, and that he admitted in deposition that he understood it.  (*Id*.)  Defendants argue that the authority cited by Barens in support of his argument that the release is invalid or void against public policy are distinguishable.  (*Id*.)  Lastly, Ridgley asserts that Barens does not, in fact, "point to or present specific evidence that Ridgley acted intentionally, wantonly, maliciously, or recklessly." (Doc. No. 68 at PageID# 2571.)

Under Ohio law,[37] "[a] release of a cause of action for damages is ordinarily an absolute bar to a later action on any claim encompassed within the release."  *Haller v. Borror Corp*., 552 N.E.2d 207, 210 (Ohio 1990).  *See also Lucarell v. Nationwide Mut. Ins. Co*., 97 N.E.3d 458, 465 (Ohio 2018); *Reo v. Allegiance Administrators*, 2018 WL 3110756 at * 4 (Ohio App. 11th Dist. June 25, 2018); *Denlinger v. City of Columbus*, 2000 WL 1803923 at * 5 (Ohio App. 10th Dist. Dec. 7, 2000). A release is a contract subject to the rules governing construction of contracts.  *See Seals v. General Motor Corp.*, 546 F.3d 766, 771 (6th Cir. 2008) (citing *Shifrin v. Forest City Enters., Inc.,* 597 N.E.2d 499, 501 (Ohio 1992)).  *See also Wheel Specialties, Ltd*, 530 Fed. Appx. at 494; *Task v. Nat'l City Bank*, 1994 WL 43883 at * 4 (Ohio App. 8th Dist. Feb. 10, 1994).

It is well established that "the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."  *Savedoff v. Access Grp., Inc*., 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted).  *See also Ohio Historic al Soc'y v. Gen. Maint. & Eng'g Co*., 583 N.E.2d 340, 345 (Ohio App. 7th Dist. 1989).  It is the role of the court to discern the intent of the parties, which is "presumed to reside in

---

[37] The May 2020 Release provides that it "shall be construed and interpreted in accordance with the laws of the State of Ohio" (Doc. No. 47-1 at PageID# 820) and therefore the Court will apply Ohio law in determining whether Barens' claims can proceed.  *See Wheel Specialties, Ltd v. Starr Wheel Group*, 530 Fed. Appx. 491, fn 3 (6th Cir. 2013) (citing *Medical Mut. of Ohio v. K. Amalia Enters., Inc.,* 548 F.3d 383, 391 (6th Cir. 2008)).

the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)).  *See also Wheel Specialties, Ltd.*, 530 Fed. Appx. at 494; *Pram Nguyen ex rel. U.S. v. City of Cleveland, Ohio*, 2014 WL 3508198 at * 5 (N.D. Ohio July 15, 2014).  "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co*, 374 N.E.2d 146, 150 (Ohio 1978).  "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123 at *2 (N.D. Ohio Sept.20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003) (citation omitted).  *See also Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation."); *Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009).  In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio App. 7th Dist. 2002), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 665 N.E.2d 746, 752 (Ohio App. 8th Dist. 1995).

Applying the above principles, the Court first finds that the terms of the May 2020 Release are clear and unambiguous that Barens released any federal and state claims that arise out of any act

70

or occurrence prior to the date of the Release; i.e., May 13, 2020. The Release broadly provides that Barens agrees to "release and forever discharge" the PCSD of "*any and all* claims, damages, causes of action or suits at law or in equity of *whatsoever kind or nature* …. arising out of *any act or occurrence up to and including the date hereof* and particularly on account of damages arising out of or in any way relating to [Barens'] employment with the [PCSD Board of Education] as well as any and all claims which were or could have been asserted in" *Barens I.* (Doc. No. 47-1 at PageID# 815.) Given the breadth of this provision, the Court finds that Barens plainly and unambiguously released Defendants from any and all claims relating to his employment at PCSD that arose prior to the date of the May 13, 2020 Release. *See, e.g., Fox v. Nationwide Mutual Ins. Co.*, 117 N.E.3d 121, 140 (Ohio App. 10th Dist. 2018) (noting that "'broadly-worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor.'") (quoting *Denlinger*, 2000 WL 1803923 at * 6); *Sourial v. Nationwide Mutual Ins. Co.*, 116 N.E.3d 761, 774 (Ohio App. 10th Dist. 2018) (same); *Scotts Co. LLC v. Liberty Mutual Ins. Co.*, 606 F.Supp.2d 722, 734-735 (S.D. Ohio March 26, 2009) (same).

In so finding, the Court rejects Barens' argument that his federal constitutional claims do not fall within the terms of the May 2020 Release. (Doc. No. 65 at PageID#s 2289-2291.) As noted *supra*, the Release expressly provides (in relevant part) that:

2. It is specifically agreed that, in exchange for the foregoing consideration, Releasor releases and forever discharges Releasees of and from **any and all claims, damages, causes of action, suits at law or in equity or charges of discrimination arising under 42 USC § 1983**, Title VII of the 1964 Civil Rights Act, 42 USC §§ 2000e et. seq.; the Age Discrimination in Employment Act, 29 USC §§ 621 et. seq.; the Family and Medical Leave Act, 29 USC §§ 2601 et. seq.; the Americans with Disabilities Act, 42 USC §§ 12101, et. seq.; any provision of Ohio Revised Code Chapter 4112 and/or any and all claims for promissory estoppel, breach of contract, age discrimination, sex discrimination, retaliation, refusal or failure to adhere to leave rights, sexual

> harassment, discipline or termination, violation(s) of public policy **or any and all other claims that may be premised upon any applicable** state, local, or **federal law**, ordinance or common law decision.

(Doc. No. 47-1 at PageID#s 815-816) (emphasis added).  Thus, although the words "constitutional claims" do not appear in the above Paragraph, the Release does expressly provide that Barens agrees to release any and all claims under § 1983.  As the Supreme Court has noted, the purpose of § 1983 is to "give a remedy to parties deprived of constitutional rights, privileges, and immunities by an official's abuse of his position."  *Monroe v. Pape*, 365 U.S. 167, 172 (1961), *overruled on other grounds by, Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978).  Moreover, the Release also expressly provides that Barens agrees to release "any applicable… federal law," which would clearly encompass the United States Constitution.  Thus, the Court finds that constitutional claims clearly and unambiguously fall within the scope of the May 2020 Release.

Barens nonetheless asserts that he should not be found to have released his federal constitutional claims because there is no clear and compelling evidence that he "had a full understanding of the reach or consequences of the waiver of constitutional claims regarding any conduct by defendants."  (Doc. No. 65 at PageID# 2292.)  For the following reasons, the Court finds Barens' argument to be without merit.

The Supreme Court has directed federal courts to closely scrutinize waivers of constitutional rights, and "indulge every reasonable presumption against a waiver."  *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937).  *See also Sambo's Rests. Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981).  "In the First Amendment context the evidence must be 'clear and compelling' that such rights were waived."  *Sambo's Rests. Inc.*, 663 F.2d at 690 (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 145 (1967)).  *See also National Polymer Products v. Borg-Warner*, 641 F.2d 418 (6th Cir. 1981).

Stated more generally, a constitutional right may be waived if the agreement is "'voluntarily, intelligently, and knowingly' made." *Fuentes v. Shevin*, 407 U.S. 67, 94-95 (1972).  *See also VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 690 (6th Cir. 2012) ("There is a presumption against waivers of constitutional rights, which can be overcome by clear evidence "that there was 'an intentional relinquishment or abandonment of a known right or privilege.'") (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)).  "A waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes,* 407 U.S. at 95-96.  Courts also employ this test when considering a potential waiver of § 1983 claims. *See Town of Newton v. Rumery*, 480 U.S. 386, 397-98 (1987); *Morrison v. Warren*, 375 F.3d 468, 474 (6th Cir. 2004); *Walker v. Mahoning County*, 2008 WL 11380126 at * 3 (N.D. Ohio June 26, 2008).

Here, the Court finds there is clear and compelling evidence that Barens voluntarily, intelligently, and knowingly waived any federal constitutional claims relating to his employment with PCSD arising out of any act or occurrence prior to the date of the May 2020 Release.  As noted above, the Release itself expressly provides that Barens agrees to release and discharge "any and all claims … arising under 42 U.S.C. § 1983 … and any and all other claims that may be premised upon any applicable … federal law."  (Doc. No. 47-1 at PageID# 815-816.)  Notably, Barens testified that he was represented by counsel when he signed the Release.  (Barens. Depo. Vol. I at Tr. 72.)  The Release provided Barens with twenty-one days from the receipt of the Release to consider its terms, and then, an additional seven days from the execution of the Release within which to revoke his signature. (Doc. No. 47-1 at PageID# 816.)  Thus, there is no evidence that Barens was pressured into signing the Release and, to the contrary, the Release provided him with ample time and opportunity to revoke his signature if he changed his mind.  In addition, the Release expressly provides as follows:

> 21.     Releasor does hereby declare that he has read this Release, that he has had a full opportunity to consult legal counsel concerning the terms of this Release and the settlement described herein, that he fully understands the terms of same, that he enters into this Release relying solely upon his own judgment and the advice of his own legal counsel and that he executes this Release as his own voluntary act.

(*Id.* at PageID# 819.)  Lastly, Barens testified that he understood that "in this settlement … [he] was releasing any and all claims for anything that happened up to May 13, 2020."  (Barens Depo. Vol. I at Tr. 72.)  Based on the above, the Court concludes that the evidence is clear and compelling that Barens voluntarily, knowingly, and intelligently waived any and all federal constitutional claims relating to his employment with PCSD that arose prior to the date of the May 2020 Release.[38]

The Court does not, however, agree with the PCSD Defendants that Barens released any and all *future* claims arising out of his employment with the PCSD.  In Ohio, "[r]eleases from liability for future tortious conduct are generally not favored by the law and are narrowly construed."  *Brown-Spurgeon v. Paul Davis Sys. of Tri-State Area, Inc*., 2013 WL 1883214 at * 9 (Ohio App. 12th Dist. May 5, 2013).  *See also Reo*, 2018 WL 3110756 at * 4; *Wheel Specialties, Ltd*., 530 Fed. Appx. at 495.  "[W]hile the execution of a release may bar claims of negligence, it cannot bar claims of willful and wanton conduct."  *Brown-Spurgeon*, 2013 WL 1883214 at * 9 (citing *Harsh v. Loran Cty. Speedway*, 675 N.E.2d 885 (Ohio App. 8th Dist. 1996) and *Bowen v. Kil-Kare, Inc*., 585 N.E.2d 384 (Ohio 1992)).  "Nonetheless, courts routinely apply such releases to bar future tort liability as long as the intent of the parties, with regard to exactly what kind of liability and what persons and/or entities

---

[38] The Court also notes, generally, that releases entered into for employment-related discrimination claims are valid if knowingly and voluntarily exercised.  *See Sako v. Ohio Dep't of Admin. Services*, 278 Fed. Appx. 514, 517 (6th Cir. 2009); *Leeper v. Verizon Wireless*, 2009 WL 585795 at * 3 (S.D. Ohio March 6, 2009).

are being released, is stated in *clear and unambiguous terms*." *Brown-Spurgeon*, 2013 WL 1883214 at * 9 (emphasis added). *See also Reo*, 2018 WL 3110756 at * 4.

The PCSD Defendants rely on language in Paragraph 5 that "this Release is to compromise and terminate all claims for injuries, disabilities and damages of whatever nature, both known and unknown, including all future developments thereof, in any way growing out of or connected with employment with the [PCSD]." (Doc. No. 47-1 at PageID# 816. )  When read in context of the entire agreement, however, it is clear that this provision is not intended to be a release of any and all future state and federal claims relating to Barens' employment.  First, the Court notes that interpreting this provision to release any and all future claims would conflict with Paragraph 1, which expressly limits the scope of Barens' release to any and all claims "arising out of any act or occurrence *up to and including the date hereof*… as well as any and all claims which *were or could have been asserted in*" *Barens I*.  (Doc. No. 47-1 at PageID# 815) (emphasis added).  This highlighted language is inconsistent with the PCSD Defendants' interpretation of Paragraph 5 as applying to any and all future claims.  The PCSD Defendants do not acknowledge or address this inconsistency in their summary judgment briefing.

Second, the Court finds that, when read in the context of the entirety of Paragraph 5, the "future developments" language relied upon by the PCSD Defendants does not in clear and unambiguous terms state that Barens is releasing any and all future claims relating to his employment. In its entirety, Paragraph 5 of the Release provides as follows:

> 5.  [Barens] further represents that, in determining the amount of the foregoing consideration, there has been taken into account not only the ascertained injuries, disabilities and damages sustained as a result of employment with the [PCSD] but also the possibility that any injuries, disabilities or damages may be permanent and progressive and recovery therefrom uncertain and indefinite, so that consequences not now anticipated may result from employment with

> the [PCSD] and that this Release is to compromise and terminate all claims for injuries, disabilities and damages of whatever nature, both known and unknown, including all future developments thereof, in any way connected with employment with the [PCSD].

(Doc. No. 47-1 at PageID# 816.)  Read in full context, the Court finds that the reference to "all claims for injuries, disabilities and damages of whatever nature, both known and unknown, including all future developments thereof" relates to unknown and/or future developments relating to only the injuries, disabilities, and damages Barens sustained as of the time of the Release – not to Barens' future federal and/or state law claims.  Certainly, it is not "clear and unambiguous" that Paragraph 5 operates as a release of any and all future federal and state claims that Barens may have relating to his employment with PCSD.  *See Brown-Spurgeon*, 2013 WL 1883214 at * 9; *Reo*, 2018 WL 3110756 at * 4.

Accordingly, the Court finds that the terms of the May 2020 Release are clear and unambiguous that Barens released any federal and state claims herein that arise out of any act or occurrence prior to the date of the Release; i.e., May 13, 2020.[39]  The Court does not, however, find that Barens released any and all *future* claims arising out of his employment with the PCSD.

### 2.    Count One—First Amendment Speech and Petition Retaliation

In Count One, Barens alleges a claim for First Amendment Speech and Petition Retaliation under § 1983.  (Doc. No. 8 at ¶¶ 194 - 206.)  Specifically, Barens alleges that he "was a public

---

[39] In light of this finding, the Court need not reach the PCSD Defendants' argument that Barens' § 1983 claims are barred by the two year statute of limitations governing such claims.  The Complaint in this action was filed on January 18, 2022. (Doc. No. 1)  The PCSD Defendants argue that, if "the Court determines the May 13, 2020 Release is not applicable," any of Barens' § 1983 claims that accrued prior to January 18, 2020 are time-barred.  (Doc. No. 50 at PageID# 1739-1740.)  Because the Court has concluded that the terms of the Release bar Barens from asserting any claims that arose prior to May 13, 2020, the Court need not (and will not) address the PCSD Defendants' alternative argument that Barens' § 1983 claims accruing prior to January 18, 2020 are time barred.

76

employee who engaged in protected activity by reporting departmental wrongdoing (speech) and filing federal litigation (petition) on matters of public concern when that speech was not part of his ordinary job duties." (*Id*. at ¶ 195.)  He further alleges that he was speaking as a private citizen, both when he filed the 2019 lawsuit and when he made his January 2020 and October 2020 internal complaints about Defendant Ridgley.  (*Id*. at ¶¶ 195, 199-200.)  Barens alleges that "in his lawsuit and complaints, [he] clearly articulated claims of retaliation and governmental misconduct." (*Id*. at ¶ 200.)  He alleges that Defendants knew he had engaged in protected speech and petition but nevertheless took adverse actions against him, including "changing and curtailing his job duties, denying Barens any overtime, making disparaging remarks about Barens to staff and others outside the District, and constructively discharging him." (*Id*. at ¶ 196.)  Barens asserts his First Amendment retaliation claim against the PCSD, as well as against Smialek, Hoy, and Ridgley in their individual capacities.

### a.    Individual Capacity Claims

The Court will first address Barens' individual capacity claims against Smialek, Hoy, and Ridgley.  In their respective Motions for Summary Judgment, these Defendants argue that they are entitled to judgment in their favor because Barens was not engaged in protected speech and was not subjected to any adverse actions in retaliation for his First Amendment activity.  (Doc. No. 50 at PageID#s 1740-1744; Doc. No. 51 at PageID#s 1789-1799.)  Relatedly, Smialek, Hoy and Ridgley argue that they are entitled to qualified immunity with respect to Barens' individual capacity claims because Barens has failed to present any evidence that these Defendants committed a constitutional violation.  (Doc. No. 50 at PageID#s 1750-1751; Doc. No. 51 at PageID#s 1799-1801.)  In response, Barens argues that Smialek, Hoy and Ridgley are not entitled to qualified immunity because there is

a genuine issue of material fact regarding whether these Defendants violated his First Amendment rights.  (Doc. No. 65 at PageID#s 2296-2304.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, the parties do not dispute that Smialek, Hoy, and Ridgley acted under color of state law for purposes of Barens' First Amendment claim.  The critical question, then, is whether there is a genuine issue of material fact that these Defendants deprived Barens of his federal constitutional rights under the First Amendment.  The Court will begin by addressing this question in the context of Smialek, Hoy, and Ridgley's qualified immunity defense.

Government officials "are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether a government official is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the [official]'s conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.*  These steps may be addressed in any order, and the defendant official need only prevail on one of them to be granted qualified immunity.  *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable government official would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  In evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the particular situation that [the defendants] confronted and ask whether the law clearly established that their conduct was unlawful."  *Howse v. Hodous,* 953 F.3d 402, 407 (6th Cir. 2020).

### i.      Violation of a Constitutional Right

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I.  Public employees such as Barens, however, receive limited First Amendment protections.  *Barton v. Neely*, 114 F.4th 581, 588 (6th Cir. 2024).  *See also Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (noting that "[p]ublic employers can permissibly limit the speech of their employees in certain circumstances.") Indeed, "government offices could not function if every employment decision became a constitutional matter," *Connick v. Myers*, 461 U.S. 138, 143 (1983), so a public employee's First Amendment rights are narrower than those of "the citizenry at large," *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017).  Nevertheless, "citizens do not surrender their First Amendment rights by accepting public employment."  *Lane v. Franks*, 573 U.S. 228, 231 (2014).  Rather, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

Here, Barens asserts a claim for First Amendment retaliation.  As the Sixth Circuit has explained, a First Amendment retaliation claim has the following three elements: (1) the plaintiff engaged in protected conduct [i.e., constitutionally protected speech]; (2) an adverse action was taken

against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Myers v. City of Centerville*, 41 F.4th 746, 759-760 (6th Cir. 2022) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).  *See also DeCrane v. Eckart*, 12 F.4th 586, 593 (6th Cir. 2021). Smialek, Hoy, and Ridgley argue that Barens has failed to establish any of the above elements.

### aa.    Protected Conduct

Federal courts use a three-prong test to determine if a public employee's speech is constitutionally protected.  *See generally Lane*, 573 U.S. at 237-242; *Handy-Clay*, 695 F.3d at 540. First, the employee must have spoken as a private citizen, not "pursuant to [his or her] official duties." *Garcetti*, 547 U.S. at 421.  *See also Myers*, 41 F.4th at 760.  Second, the speech must involve "matters of public concern."  *Connick*, 461 U.S. at 143.  Third, the employee's interests, "as a citizen, in commenting upon matters of public concern," must outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Whether a public employee's speech is constitutionally protected is a question of law.  *See Myers*, 41 F.4th at 760; *Mayhew*, 856 F.3d at 463. Here, Smialek, Hoy, and Ridgley argue that Barens has failed to establish either that he spoke on a "matter of public concern" or that he spoke as a "private citizen."

### i.    Speech of a Matter of Public Concern

Barens alleges that he engaged in protected conduct when he filed *Barens I* and made his January 2020 and October 2020 internal complaints.  (Doc. No. 8 at ¶ 195, 197, 200.)  Smialek, Hoy, and Ridgley argue that neither *Barens I* nor the January and/or October 2020 internal complaints constitute speech on a matter of public concern.  (Doc. No. 50 at PageID#s 1740-1743; Doc. No. 51

at PageID#s 1790-1791.)  Smialek and Hoy first argue that Barens is barred from relying on either *Barens I* or the January 2020 internal complaint as protected speech because that speech occurred prior to the effective date of the May 2020 Release.  (Doc. No. 50 at PageID#s 1741, 1742.)  They then assert that (even assuming Barens is not barred from relying on speech occurring prior to the Release) neither *Barens I,* the January 2020 internal complaint, nor the October 2020 internal complaint constitute speech on a matter of public concern because they each relate entirely to Barens' "private grievances" regarding "internal office affairs" and lost job opportunities. (Doc. No. 50 at PageID# 1742; Doc. No. 51 at PageID# 1791.)  Ridgley likewise argues that Barens' speech is not constitutionally protected because it relates solely to Barens' "personal issues occurring at [his] job." (Doc. No. 51 at PageID# 1791.)

Barens argues that *Barens I* and the January 2020 and October 2020 internal complaints constitute speech on matters of public concern because "[t]his case is about an employee who petitioned the court for redress of issues with his public employer."  (Doc. No. 65 at PageID# 2298.) Barens asserts, summarily, that "in the context of [] Ridgley, specifically the facts of record of [] Ridgley 'encouraging members of the department not to speak to him or 'speaking negatively' to other employees are matters of not only personal interest, but public concern." (*Id*. at PageID#s 2298-2299.)  Barens does not specifically address, in this context, Smialek and Hoy's assertion that *Barens I* and January 2020 internal complaint may not be considered protected speech in light of the May 2020 Release.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573

U.S. at 241 (citation and internal quotation marks omitted).  *See also Myers*, 41 F. 4th at 760; *Handy Clay*, 695 F.3d at 543.  To determine whether speech involves a matter of public concern, courts consider "the content, form, and context of [the] statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.  "While motive for the speech is a relevant factor, ... 'the pertinent question is not *why* the employee spoke, but *what* he said.'"  *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)).  *See also Myers*, 41 F. 4th at 760.  That means "[w]e examine 'the *point* of the speech in question[.]'" *Mayhew*, 856 F.3d at 467 (quoting *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)).

In citing examples of speech that involve matters of public concern, the Supreme Court has specifically identified statements seeking to "bring to light actual or potential wrongdoing or breach of public trust," such as public corruption and misuse of state funds.  *See Connick*, 461 U.S. at 148; *Lane,* 573 U.S. at 241.  Expanding further, the Sixth Circuit recently explained as follows:

> "[W]e have consistently reiterated that allegations of public corruption 'are exactly the type of statements that demand strong First Amendment protections.'" *Mayhew*, 856 F.3d at 468 (quoting *Handy-Clay*, 695 F.3d at 543–44). So too are statements "[e]xposing governmental inefficiency and misconduct," *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951, as well as those addressing "failure[s] to follow state law, major state policy decisions, or discrimination of some form," *Boulton*, 795 F.3d at 532 (citations omitted).  In those easy cases, the public clearly has an interest in hearing the speech.

> At the other end of the spectrum is "the quintessential employee beef: management has acted incompetently." *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988) (quoting *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984)). Hence, speech about "internal personnel disputes" generally does not involve matters of public concern. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001). After all, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick,* 461 U.S. at 149, 103 S.Ct. 1684.

> However, even if speech addresses an internal personnel dispute, it may involve a matter of public concern if the dispute arose from "actual or potential wrongdoing or any breach of the public trust." *Brandenburg*, 253 F.3d at 898 (quoting *Brown v. City*

> *of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989)). The distinction makes sense given the competing rationales. Most internal personnel disputes implicate only "the employee's personal interest[s] qua employee," *Brown*, 867 F.2d at 322, while disputes arising from wrongdoing or breaches of trust implicate broader interests in good governance and democratic control, *see id.; Farhat*, 370 F.3d at 590 (noting speech containing information that facilitates "informed decisions about the operation of ... government" involves a matter of public concern).

*Myers*, 41 F.4th at 761. The Sixth Circuit has "recognized that the most difficult cases to adjudicate are 'mixed speech' cases, i.e., those in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute, but where the employee claims that some part of the speech also touches upon matters of public concern." *Farhat,* 370 F.3d at 590. *See also Mayhew*, 856 F.3d at 468.

As an initial matter, the Court rejects Smialek and Hoy's argument that Barens is barred from relying on either *Barens I* or the January 2020 internal complaint as protected speech because they occurred prior to the effective date of the May 2020 Release. Smialek and Hoy raise this argument in a single sentence in their Motion and cite no authority in support thereof. Nor do they offer any discussion or analysis of the language in the Release in support of this assertion. Upon careful review, the Court concludes that, although the Release bars Barens from asserting any claims arising prior to the effective date of that Release (i.e., May 13, 2020), it does not bar Barens from relying on *Barens I* or the January 2020 internal complaint in support of his claims that, *after* May 13, 2020, Defendants retaliated against him in violation of the First Amendment.

As noted *supra*, "[a] release of a cause of action for damages is ordinarily an absolute bar to a later action on *any claim* encompassed within the release." *Haller*, 552 N.E.2d at 210 (emphasis added). Consistent with this principle, the May 2020 Release provides (in relevant part) that, in exchange for a payment of $25,000, Barens releases the PCSD from "any and all claims … of

83

whatsoever kind or nature… arising out of any act or occurrence up to an including the date hereof." (Doc. No. 47-1 at PageID# 815.)  Barens' First Amendment retaliation claims arose once Defendants engaged in adverse action that was motivated, at least in part, by his protected speech.  *See, e.g., Hayes v. Metropolitan Gov't of Nashville and Davidson Cty, Tenn*., 2023 WL 8628935 at * 5 (6th Cir. Dec. 13, 2023 (noting that "[First Amendment] retaliation claims are measured in retaliatory actions, not instances of protected conduct").  In other words, Barens' First Amendment claims that are predicated on adverse actions occurring after May 13, 2020 did not arise prior to the effective date of – and are not encompassed within – the Release.  *See, id*.  In sum, the Court concludes that there is nothing in the language of the Release that prevents Barens from relying on protected speech that occurred prior to the date of the Release, so long as the claim arises from adverse actions occurring after the date of the Release.  And, as discussed *infra*, Barens has come forward with evidence that at least some adverse actions either occurred, or continued, after May 13, 2020.

The Court next considers, then, whether *Barens I,* the January 2020 internal complaint, and/or the October 2020 internal complaint constitute speech on a matter of public concern.  As noted above, this determination is a matter of law.  *See Myers*, 41 F.4th at 760 (finding that whether a public employee's speech is constitutionally protected is a question of law); *Mayhew*, 856 F.3d at 464; *Buddenberg v. Estate of Weisdack*, 711 F.Supp.3d 712, 772 (N.D. Ohio 2024).  The Court will each of these instances of alleged protected speech separately.

First, this Court has already determined, as a matter of law, that *Barens I* constitutes speech as a matter of public concern. In its February 2023 Memorandum Opinion & Order, this Court examined the specific allegations in *Barens I*; discussed and applied relevant Sixth Circuit authority (including that court's decisions in *Mayhew, supra*, *Banks v. Wolfe County Bd of Educ*., 330 F.3d 888

(6th Cir. 2003), and *Bagi v. City of Parma, Ohio*, 714 Fed. Appx. 480 (6th Cir. 2017)); and concluded that "Barens' 2019 lawsuit constitutes speech on a matter of public concern because it relates, at least in part, to Barens' general concerns regarding PCSD's alleged failure to follow its own hiring policies in making a key hiring decision, including allegations that PCSD's actions resulted in the hiring of an unqualified applicant which jeopardized the 'safety and security' of children enrolled in the PCSD."  (Doc. No. 35 at PageID# 376-384.)

Smialek, Hoy, and Ridgley do not acknowledge or address this Court's lengthy analysis or conclusion that *Barens I* constitutes speech on a matter of public concern for First Amendment purposes.  Nor do these Defendants address any of the Sixth Circuit cases cited by this Court in its February 2023 Opinion or otherwise explain why this Court should reach a different conclusion on this issue in the context of these summary judgment proceedings.  Upon careful review, the Court reaffirms its previous finding that *Barens I* constitutes speech on a matter of public concern, for the reasons set forth in its February 2023 Opinion & Order.  (Doc. No. 35.)

Regarding Barens' January 2020 and October 2020 internal complaints, the Court noted in its February 2023 Opinion that its review was "somewhat hampered by the fact that copies of these internal complaints are not currently in the record before the Court."  (Doc. No. 35 at PageID# 384.) Based solely on the allegations in the Amended Complaint, the Court found that Barens had "sufficiently alleged that the January 2020 and October 2020 internal complaints included allegations that Defendants violated his federal constitutional rights by retaliating against him for filing the 2019 lawsuit and, in so doing, endangered the safety of other PCSD officers by instructing them not to speak to him."  (*Id*.)  The Court concluded that "[a]s these are issues relating to possible violations of the law and matters affecting issues of public safety, the Court finds, for purposes of this opinion

85

only, that Barens has sufficiently alleged that the January 2020 and October 2020 internal complaints constitute speech on a matter of public concern." (*Id*. at PageID# 386.)  The Court now has copies of both the January 2020 and October 2020 internal complaints in the record before it and, thus, will revisit its determination on this issue.  For the following reasons, the Court finds that the January 2020 internal complaint constitutes (at least in part) speech on a matter of public concern, but that the October 2020 internal complaint does not.

In his January 2020 internal complaint, Barens alleged that Ridgley was strictly enforcing a new attendance policy and the sign-in sheet policy against him (Barens), but did not strictly enforce those policies against other members of the SSD, including officers Olp and Davis.  (Doc. No. 47-3 at PageID#s 1292-1293.)  Barens also alleged that, on December 5, 2019, Davis told him that Ridgley instructed Davis and Olp not to speak to Barens "for any reason."  (*Id*. at PageID# 1292.)  Barens maintained that Ridgley allowed Davis and Olp to work "daily overtime" but that Ridgley did not offer him (Barens) the same opportunity.  (*Id*. at PageID# 1293.)  Barens asserted that "Ridgley continues to harass, retaliate, and bully me and his unethical unprofessional behavior as a supervisor continues to compromise the safety of not only me but the entire staff and especially the students of the Parma City School District."[40]  (*Id*.)

The Court finds that much of the January 2020 internal complaint involves the sort of "internal personnel disputes" that generally do not involve matters of public concern.  *See Myers*, 41 F.4th at 761; *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).  For example, Barens'

---

[40] In Hoy's Memorandum/Investigative Report dated March 3, 2020, Hoy references a formal complaint filed by Barens on January 16, 2020 (rather than January 12, 2020).  (Doc. No. 47-2 at PageID# 1089.)  The Court only has before it Barens' internal complaint dated January 12, 2020.  The parties do not direct this Court's attention to any additional, supplemental, or different internal complaint filed by Barnes that is dated January 16, 2020.  Thus, the Court limits its review to the January 12, 2020 internal complaint located at Doc. No. 47-3 at PageID#s 1292-1293.

assertions that Ridgley strictly enforced the attendance and sign in policies against him but not against Olp, and gave Olp and Davis the opportunity to work overtime but did not give him that same opportunity, are best characterized as implicating Barens' personal interests, rather than actual or potential wrongdoing or breach of the public trust.  *See Brandenburg*, 253 F.3d at 898.  However, the Court agrees with Barens that his January 2020 internal complaint also includes speech that implicates public safety concerns, which would fall within the scope of speech on a matter of public concern.  Specifically, Barens alleged in his January 2020 internal complaint that Ridgley instructed his fellow officers, Olp and Davis, "not to speak to [him] for any reason."  (Doc. No 47-3 at PageID# 1292.)  He further asserted that, in so doing, Ridgley "continues to compromise the safety of not only me but the entire staff and especially the students of the Parma City School District."  (*Id*. at PageID# 1293.)  Barens also suggested that Ridgley engaged in this behavior in retaliation for Barens' exercise of his First Amendment rights.  (*Id.*)

As the Sixth Circuit has explained, "speech involves matters of public concern when it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."  *Brandenburg*, 253 F.3d at 898.  In particular, the Sixth Circuit has held that public employee speech constitutes speech on a matter of public concern when it relates to "actual or potential wrongdoing or breach of the public trust," including possible violations of the law and issues relating to public safety.  *See, e.g., Brandenburg*, 253 F.3d at 898 (""Generally, '[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'"); *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997) ("Speech on matters directly affecting the health and safety of the public is obviously a matter of public concern.")  Although a close call, the

Court finds that there are potential safety implications raised by Barens' assertion that Ridgley directed his fellow officers not to speak to him "for any reason."  As Barens correctly notes, it is a "matter of public concern that officers trust and communicate with each other to perform their jobs for the safety of members of the public, not just school staff but also students."  (Doc. No. 65 at PageID#s 2291-2292.) The Court further agrees that Barens' assertion that Ridgley issued this directive in retaliation for Barens' exercise of his First Amendment rights, relates to the sort of "actual wrongdoing" that implicates broader interests of public concern.  Accordingly, the Court finds that Barens' January 2020 internal complaint constitutes speech on a matter of public concern.

However, the Court does not agree with Barens that the October 2020 internal complaint constitutes speech on a matter of public concern.  In that complaint, Barens stated that "[a]fter participating in the hiring process with the Cleveland Heights University Heights School District and The Cleveland Federal Reserve Bank (Law Enforcement Division) I … was informed that my employment opportunities with both were negatively impacted by the actions of" Defendants Hoy and Ridgley.  (Doc. No. 51-1 at PageID# 1858.)  He then asserted (without further explanation) that Hoy's and Ridgley's actions "have resulted in the violation of several Federal laws and Parma City School District policies," including PCSD's Non-Discrimination/Retaliation, Anti-Harassment, and Conflict of Interest Policies.  (*Id*.)  According to the Gilmore Report, however, Barens could not identify any state or federal laws that he believed had been violated and, further, did not allege that PCSD's alleged interference with his job applications was in retaliation for either *Barens I* or the January 2020 internal complaint.  (Doc. No. 51-1 at PageID# 1884, 1887.)

The Court finds that the October 2020 internal complaint is an "internal personnel dispute" that does not involve matters of public concern.  *See Myers*, 41 F.4th at 761; *Brandenburg*, 253 F.3d

88

at 898.  Essentially, Barens is alleging that Ridgley and/or Hoy provided negative information about him to three potential employers.  Barens does not explain how this is anything more than a personal grievance, as opposed to "information [that] is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."  *Brandenburg*, 253 F.3d at 898. Accordingly, the Court finds that Barens' October 2020 internal complaint does not constitute speech on a matter of public concern for purposes of the First Amendment.

<b>ii.   Speech as a Private Citizen</b>

To demonstrate that his speech is constitutionally protected, Barens must also demonstrate that he was speaking as a private citizen (rather than as a public employee) when he filed *Barens I* and made his January 2020 internal complaint.  *See Lane*, 573 U.S. at 241; *Handy-Clay*, 695 F.3d at 540.   Smialek and Hoy argue, summarily, that Barens was speaking as a public employee (rather than a private citizen) because "Plaintiff's lawsuit was filed to keep his interim job title as director of safety and security and his [] internal complaint[] concerned with supervisor and co-workers."  (Doc. No. 50 at PageID# 1743.)  Ridgley does not directly address this issue, other than to argue generally that Baren was "an employee complaining about personal issues occurring at [his] job."  (Doc. No. 51 at PageID# 1791.)  In response, Barens argues, equally summarily, that he was a private citizen when he filed *Barens I* and made his January 2020 internal complaint.  (Doc. No. 65 at PageID# 2298.)

Public employees' statements made "pursuant to their official duties," rather than in their capacities as private citizens, are not protected by the First Amendment and therefore are subject to "employer discipline."  *Garcetti*, 547 U.S. at 421.  However, a public employee's speech that "simply relates to public employment or concerns information learned in the course of public employment"

may be protected.  *Lane*, 573 U.S. at 239.  "[T]he question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes [is] 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform.'"  *Fox*, 605 F.3d at 350 (quoting *Garcetti*, 547 U.S. at 424–25).  In conducting this inquiry, federal courts look to the "content and context" of the statement, consulting several non-exhaustive factors, including "the speech's impetus; its setting; its audience; and its general subject matter."  *Mayhew*, 856 F.3d at 464.  *See also Barton*, 114 F.4th at 589.  The Sixth Circuit also directs courts to consider whether the speech was made within or outside the "ordinary chain of command."  *Fox*, 605 F.3d at 349–50.  In sum, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.  The critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane*, 573 U.S. at 240.  *See also Barton*, 114 F.4th at 589.

Here, the parties do not adequately acknowledge, address, or apply any of the authority noted above.  Upon review, the Court finds that Barens was speaking as a private citizen when he filed *Barens I*.  Defendants have not argued, or directed this Court's attention to any evidence in the record, that Barens' job duties included filing a federal lawsuit to address alleged due process violations and retaliation by his supervisor.  Thus, it does not appear that Barens' impetus behind *Barens I* was to fulfill a job duty.  *See DeCrane*, 12 F. 4th at 596 ("If an employee speaks to fulfill a job duty … the speech is more likely to be as a government agent.  If, by contrast, the employee speaks to fulfill an unrelated goal …, the speech is more likely as a private citizen.").  Moreover, the setting of the speech was off-the-clock and away from the office, and the speech's audience was to an outside entity.  *Id*.

(noting that "[o]n-the-clock speech at the employer's place of business is more likely to be speech as a government agent as compared to off-the-clock speech away from the office" and that "[s]peech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals.")  In sum, the Court finds that filing *Barens I* was not ordinarily within the scope of Barens' official job duties and, therefore, that he was speaking as a private citizen when he filed that suit.

However, the Court concludes that Barens was not speaking as a private citizen when he made his January 2020 internal complaint.  Barens' January 2020 internal complaint constitutes speech on a matter of public concern because potential safety implications are raised by Barens' assertion that Ridgley directed his fellow officers not to speak to him "for any reason."  But it is beyond dispute that maintaining student and staff safety was one of Barens' principal job duties as a PSCD school protection officer.  Moreover, Barens raised this concern in an internal grievance submitted up the "chain of command" to the PCSD Human Resource Department.  Thus, the Court concludes that Barens was speaking as a public employee when he reported his legitimate safety concerns to the PCSD Human Resources Department in his January 2020 internal complaint.  *See, e.g., Ashford v. University of Michigan*, 89 F.4th 960, 972 (6th Cir. 2024) ("[W]e have viewed internal escalations of concerns or grievances as insufficient to establish private speech when the speech directly relates to or otherwise concerns an employee's day-to-day duties.")  Indeed, in the very first paragraph of the January 2020 complaint, Barens states that he is generating his formal complaint in his "capacity of [sic] Police Officer for the Parma City School District."  (Doc. No. 47-3 at PageID# 1292.)

Accordingly, the Court finds that Barens was speaking as a private citizen when he filed *Barens I*, but not when he made his January 2020 internal complaint.

91

### iii.  Pickering Balancing

A public employee's sworn testimony is not categorically entitled to First Amendment protection, however, simply because it is speech as a citizen on a matter of public concern.  *Lane*, 573 U.S. at 242.  Under *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), if an employee speaks as a citizen on a matter of public concern, the next question is whether the government had "an adequate justification for treating the employee differently from any other member of the public" based on the government's needs as an employer.  *See also Garcetti*, 547 U.S. at 418.  As the Sixth Circuit has explained, "[t]o carry their *Pickering* burden, the defendants must demonstrate that the 'potential disruptiveness' of [the employee's] speech 'was enough to outweigh whatever First Amendment value it might have had.'"  *Myers*, 41 F. 4th at 764 (quoting *Waters v. Churchill*, 511 U.S. 661, 681 (1994)).  Evaluating this issue, courts must "engage in a context-specific inquiry, examining 'whether the [speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'"  *Id*. (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

Here,  Smialek, Hoy and Ridgley do not argue, at any point in their Motions, that the PCSD's interests, as an employer, outweigh Barens' interests in commenting on matters of public concern in *Barens I*, under *Pickering* and its progeny.  Accordingly, the Court deems this issue waived and will not address it herein.

### iv.  Conclusion as to Protected Conduct

Accordingly, and for all the reasons set forth above, the Court finds that Barens has demonstrated that he engaged in protected conduct when he filed *Barens I* in February 2019.

92

### bb.    Adverse Actions

To succeed on his First Amendment retaliation claim, Barens must also prove that each Defendant took an adverse action against him "motivated at least in part" by his protected speech. *Josephson*, 115 F.4th at 787.  Here, Barens asserts that Smialek, Hoy, and Ridgley engaged in the following eleven (11) retaliatory adverse actions against him: (1) compelling him to endure an involuntary three dollar an hour reduction in pay; (2) eliminating him from any and all overtime available within the PCSD; (3) intentionally changing his job title of Police Officer; (4) deliberately changing his job duties to a lesser diminished role; (5) intentionally eliminating promotional supervisory positions knowing that he was the most qualified candidate; (6) tracking his daily activities through GPS monitoring; (7) hiring a private investigator from Buckeye Legal Investigations, Anthony Bentley, to follow and monitor him; (8) instructing Olp to follow Barens; (9) deliberately eliminating him from any and all training opportunities; (10) misrepresenting his employment and speaking negatively to other district employees as well as outside individuals about his employment; and (11) encouraging members of the Safety & Security Department not to speak with him and provide written reports on any conversations they had with him.  (Doc. No. 8 at ¶ 91.) *See also* Doc. No. 65 at PageID#s 2286-2287, Doc. No. 47-2 at PageID#s 1059-1060.

Smialek, Hoy, and Ridgley argue that Barens cannot rely on the majority of the above alleged adverse actions because they occurred prior to the effective date of the May 2020 Release and are, therefore, barred.  (Doc. No. 50 at PageID#s 1725-1726; Doc. No. 51 at PageID#s 1785-1787.)  Even assuming that Barens is not barred from relying on some or all of the above actions, Smialek and Hoy assert that Barens has failed to come forward with any evidence that either of them had any involvement in any of the above actions.  (Doc. No. 50 at PageID#s 1744-1745.)  Likewise, Ridgley

maintains that he "did not make the decision to reduce Barens' pay by three dollars, change Barens' job title, eliminate promotional supervisory positions, or hire the private investigator." (Doc. No. 51 at PageID# 1798.)

In response, Barens acknowledges that he released any claims "arising out of any act prior and up to May 13, 2020" relating to his employment with PCSD. (Doc. No. 65 at PageID# 2293.) Barens then addresses five of the eleven alleged retaliatory adverse actions (i.e., the elimination of overtime pay, change in his job title, change in his job duties, elimination of promotional supervisory positions, and GPS tracking), arguing that there is evidence in the record to support the fact that Smialek, Hoy, and/or Ridgley participated in those adverse actions in retaliation for Barens' exercise of his First Amendment rights. (*Id*. at PageID#s 2300-2303.) Barens does not address any of the remaining six alleged retaliatory adverse actions noted above.[41] (*Id*.)

In their Reply Brief, Smialek and Hoy argue that Barens has failed to sufficiently argue or direct this Court's attention to any evidence that they (as opposed to Ridgley) participated in any of the alleged adverse actions. (Doc. No. 66 at PageID# 2529.) Smialek and Hoy further note that, during his deposition, Barens' only testimony or evidence to support his claim that they were involved in any conspiracy or retaliatory activity of any kind is that these Defendants "should have known" by virtue of their job titles and duties. (*Id*. at PageID# 2530.) In sum, Smialek and Hoy argue that "there is a complete lack of evidence before the Court as Plaintiff provides nothing more than a 'guilt by

---

[41] It is not entirely clear, but it appears that Barens may also be arguing that additional adverse actions include the fact that Defendants served "five investigative meeting notices on him for allegations of misconduct, conduct regarding student information, staff interactions, and chronic absenteeism." (Doc. No. 65 at PageID# 2300.) He asserts that "one of the notices is for an incident involving two other officers' interaction with a special needs child – which Barens was not involved or present for the interaction but nonetheless placed on administrative leave." (*Id*.) (citing Ridgley Depo. at Tr. 117-119). *See also* Doc. No. 47-5 at PageID#s 1695-1699. Neither Smialek, Hoy, or Ridgley address these investigative meeting notices in their Reply Briefs.

association' conspiracy theory as to their participation in _any_ retaliatory activity." (*Id*. at PageID# 2531) (emphasis in original).

Ridgley argues that "the record remains clear that the [alleged adverse] actions … were unrelated to [him] or were beyond his scope of authority." (Doc. No. 68 at PageID# 2578.)  He asserts that the change in Barens' job title was "not his [i.e., Ridgley's] decision" and that "only the Board and the superintendent have the authority to eliminate" a supervisory position.  (*Id*. at PageID#s 2587-2579.)  Lastly, Ridgley notes that Barens failed to address all of the eleven allegedly retaliatory adverse actions and argues that his failure to do so constitutes a waiver.  (*Id*. at PageID# 2579.)

An adverse action in the First Amendment retaliation context is an action that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quotation omitted).  *See also Josephson*, 115 F. 4th at 787; *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019).  "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d at 386.  Any adverse actions, other than "those that create only *de minimis* negative consequences," can "offend the Constitution." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). *See also Josephson*, 115 F.4th at 787.  The adverse nature of a particular action "will depend on context." *Bell v. Johnson*, 308 F.3d 594, 602–03 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 388).  By way of example, the Sixth Circuit has held that giving a poor employment reference, imposing a financial burden, and placing an employee under "close surveillance" may constitute adverse employment actions. *See Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (in Title VII retaliation context, noting that "giving a poor reference is an adverse employment action"); *Hubbell*

*v. FedEx SmartPost, Inc.*, 933 F.3d 558, 570 (6th Cir. 2019) (in Title VII retaliation context, noting that placing an employee under "close surveillance" may constitute an adverse employment action); *Benison*, 765 F.3d at 660 (in First Amendment retaliation context, stating that penalties that "'impose a financial burden' on the plaintiffs' constitute adverse action") (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 304 (6th Cir. 2012)).  "[T]he adverse-action inquiry is a question of fact." *Josephson*, 115 F.4th at 787 (citing *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583–84 (6th Cir. 2012)).  As a result, the Sixth Circuit has held that "retaliation claims based on all but genuinely 'inconsequential' official actions 'should go to the jury.'" *Id.* (quoting *Bell,* 308 F.3d at 603).

As an initial matter, the Court finds that Barens may not rely on any discrete adverse actions that occurred prior the effective date of the Release, i.e., May 13, 2020.  Indeed, Barens himself acknowledges that he released any claims "arising out of any act prior and up to May 13, 2020" relating to his employment with PCSD.  (Doc. No. 65 at PageID# 2293.)  Thus, the Court finds that Barens may not rely on the following adverse actions in support of his First Amendment retaliation claim herein:

(1)    the involuntary $3/hour reduction in pay, which occurred in either March, September, or November 2019 and applied to all officers in the PCSD Safety & Security Department (Barens Depo. Vol. I at Tr. 49-50, 94-97, 107-108; Hoy Depo. at Tr. 38; Smialek Depo. at Tr. 27);

(2)    the change in job title to school protection officer, which occurred in March, September, or November 2019 and applied to all officers in the PCSD Safety & Security Department (Barens Depo. Vol. I at Tr. 40, 49-50; Hoy Depo. at Tr. 38; Smialek Depo. at Tr. 27);

(3)    the change in his job duties to the "lesser role" of money courier, which occurred in March 2019 (Barens Depo. Vol. I at Tr. 111-112);

(4)    the directive that all SSD staff members (including Barens) were no longer permitted to participate in state mandated continuing education and training courses on "district time," and the elimination of Barens' training programs

96

for students, including his ALICE, anti-bullying, and Champions for Life programs, all of which occurred in March 2019 (*Id.* at Tr. 137-141.)[42]

(5)     the elimination of the Lead Officer supervisory position, which occurred in November 2019 (*Id*. at Tr. 117-118).

The Court concludes (and Barens does not argue to the contrary) that Barens may not rely on the five actions listed above in support of his First Amendment claims because they are discrete acts that occurred prior to the May 13, 2020 effective date of the Release.[43]

The Court acknowledges that several other adverse actions (discussed below) allegedly commenced prior to May 13, 2020.  However, the Court finds that there is evidence in the record that these actions were not discrete acts that occurred on one occasion prior to the Release (such as the four actions noted *supra*), but rather were actions that were allegedly repeated again and again after the Release was executed.  Specifically, Barens testified that, once Ridgley became Supervisor of the Department in March 2019, Ridgley denied him the opportunity to work overtime at any point in time until Barens' resignation in October 2021.  (Barens Depo. Vol. I at Tr. 75-76, 99, 101-102.)  Barens further testified that he believed that, beginning in March 2019 and continuing until he resigned in

---

[42] The Court also notes that Barens failed, at any point in his Brief in Opposition, to argue that the elimination of training opportunities constitutes an "adverse action" for purposes of his First Amendment claim  (Doc. No. 65 at PageID#s 2299-2303.)

[43] As noted *supra*, Barens also asserts that Defendants served "five investigative meeting notices on him for allegations of misconduct, conduct regarding student information, staff interactions, and chronic absenteeism."  (Doc. No. 65 at PageID# 2300.)  The record reflects that four of the five investigative meeting notices referenced by Barens are dated prior to May 13, 2020.  (Doc. No. 47-5 at PageID#s 1695-1698.)  In addition, it appears that the incident involving a special needs child for which Barens was placed on administrative leave, occurred in 2019.  (Ridgley Depo. at Tr. 117-118.)  As these events occurred prior to May 13, 2020, Barens may not rely on them to demonstrate that Defendants took "adverse actions" against him.  The last investigative notice is dated February 4, 2021 and states that the purpose of the meeting is to "review and discuss chronic absenteeism."  (Doc. No. 47-5 at PageID# 1699.)  The Notice is signed by Ridgley, with Mr. Greene and Hoy copied.  (*Id*.)  The Court will not address whether this February 2021 hearing notice constitutes an "adverse action."  Aside from a brief reference to this Notice in his Brief in Opposition, Barens provides no explanation regarding the circumstances surrounding this Notice or when/how it was ultimately resolved.  Accordingly, the Court finds that Barens has forfeited any argument premised on the February 2021 Notice, for purposes of the instant Motions.

October 2021, Ridgley tracked his activities via GPS tracking device on school district vehicles.  (*Id.* at Tr. 124-125, 130.)  Lastly, Barens testified that, from at least December 2019 and continuing thereafter, Ridgley instructed Olp and Davis not to speak to him.  (*Id.* at Tr. 134-136, 147-148.)  In light of their allegedly continuing nature, the Court will consider these three adverse actions (i.e., elimination of overtime, GPS tracking, and instructing fellow officers not to speak to him) herein. However, even if Barens is successful in demonstrating that one or more of the Defendants undertook these actions, the Court finds that Barens may only seek to recover damages relating thereto to the extent that they occurred after the May 13, 2020 effective date of the Release.

Lastly, the Court finds that Barens may rely on the remaining three adverse actions because there is evidence in the record that they first occurred after the effective date of the May 2020 Release. Regarding Barens' assertion that Defendants hired a private investigator to track him, Barens testified that he could not recall precisely when this occurred but thought it was either in "April or May 2020" or at some point in 2021.  (Barens Depo. Vol. I at 131-134; Barens Depo. Vol. II at Tr. 328.) Construing the evidence in a light most favorable to Barens, the Court finds that the evidence tips in favor of this particular adverse action occurring after the May 13, 2020 effective date of the Release. Regarding Barens' assertion that Ridgley instructed Olp to follow him, Barens testified that he could not recall exactly when this occurred but he believed it was in 2021.  (Barens Depo. Vol. I at 134-135.)  Lastly, regarding Barens' assertion that Defendants misrepresented his employment and spoke negatively about him to other PCSD employees and outside individuals, Barens testified (and Defendants do not contest) that this allegedly occurred in the summer and fall of 2020, i.e., May through September 2020.  (*Id.* at Tr. 142-144, 151, 188.)  *See also* Doc. No. 51-1 at PageID#s 1858, 1876-1888.

98

Thus, in determining liability, the Court will proceed to evaluate the following six (6) adverse actions in support of Barens' First Amendment retaliation claim: (1) elimination of overtime opportunities; (2) GPS tracking of his location; (3) hiring a private investigator to follow and monitor him; (4) instructing Olp to follow him; (5) instructing members of the SSD not to speak to him and to provide written reports on any conversations they had with him; and (6) misrepresenting his employment and speaking negatively about him to SSD members and "outside individuals."

As an initial matter, the Court finds that the above actions qualify as "adverse actions" because they "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison*, 765 F.3d at 659 (6th Cir. 2014).  Specifically, the Sixth Circuit has expressly found that penalties that impose a "financial burden" (such as the denial of overtime) constitute an adverse action.  *Id*. at 660 (quoting *Dye*, 702 F.3d at 304.)  Additionally, placing an employee under "close surveillance" may also constitute an adverse employment action.  *Hubbell*, 33 F.3d at 570 (Title VII retaliation context).  The Sixth Circuit has also held that "giving a poor reference is an adverse employment action." *Taylor*, 703 F.3d at 339 (Title VII retaliation context).  Lastly, the Sixth Circuit has found that a reasonable jury may find retaliatory conduct based on evidence of a continuing pattern of adverse actions over time.  *See, e.g., Josephson*, 115 F.4th at 787-788.

Smialek, Hoy, and/or Ridgley devote much of their briefing to arguing that Barens has failed to prove that any of them actually participated in the above adverse actions. Defendants are correct that this Court must determine whether Barens has come forward with sufficient evidence to create a genuine issue of material fact that *Smialek, Hoy, and/or Ridgley* took one or more of the above adverse actions against him.  *See Josephson*, 115 F.4th at 787 ("To succeed on his First Amendment retaliation claim, Josephson must prove that *each Defendant* took an adverse action against him

99

'motivated at least in part' by his protected speech") (emphasis added).  Thus, the Court will consider whether Barens has come forward with sufficient evidence from which a reasonable jury could find that Smialek, Hoy, and/or Ridgley participated in the seven specific adverse actions noted above.

1. <u>Elimination of Overtime</u>.  Barens testified that, before Ridgley was hired, he (i.e., Barens) frequently worked overtime, including during the summer.  (Barens Depo. Vol. I at Tr. 99.)  Indeed, Barens testified that, prior to Ridgley's hire, he was getting overtime in "pretty much every paycheck" and "had more overtime than anybody in the department."  (*Id*.)  After Ridgley was hired, Barens testified that overtime was "never offered" to him but "everybody else that was in the department after Ridgley hired them [including Olp and Davis] …. had built-in overtime into their shifts as a matter of fact." (*Id*. at Tr. 101-102.)  Notably, Barens further testified that Ridgley "set up the shifts," i.e., that it was Ridgley that determined who got overtime built into their shifts.[44]  (*Id*. at Tr. 102.)

The Court finds that Barens' testimony is sufficient to create a genuine issue of material fact regarding whether Ridgley eliminated him from "any and all overtime opportunities."  Barens has not, however, come forward with any evidence that either Smialek or Hoy participated in the decision to deny overtime to Barens or otherwise had any role in the distribution of overtime opportunities with the SSD.  Indeed, at no point in Barens' Brief in Opposition does he argue or direct this Court's attention to any evidence that Smialek or Hoy had any involvement whatsoever with the alleged denial of overtime.  To the contrary, Smialek testified that he had no knowledge or familiarity with this issue.  (Smialek Depo. at Tr. 28.)

---

[44] Barens also testified that Olp told him that Ridgley "didn't care for him" and that's why he did not get overtime. (Barens Depo. Vol. I at Tr. 104-105.)  Likewise, Barens testified that Bartko told him that Ridgley was not giving him overtime because "Joe don't like you."  (*Id*. at Tr. 106.)

100

   2.  <u>GPS tracking of PCSD SSD vehicles.</u>  Ridgley testified that, at the time of his hire, there

were four (4) vehicles assigned to the SSD, none of which were equipped with GPS tracking devices.

(Ridgley Depo. at Tr. 33.)  He testified that he recommended to his supervisor, William Greene, that

the SSD vehicles be equipped with GPS tracking because SSD officers perform residency checks and

he "wanted to make sure my officers were safe," i.e., "if we did not hear from them or something

would happen, we would have a last location if we had to look for them."  (*Id*. at Tr. 34.)  At some

point thereafter, GPS tracking devices were installed in each of the SSD vehicles.  (*Id*. at Tr. 34-35.)

Smialek and Hoy testified that they were generally aware that SSD vehicles were installed with GPS

tracking devices, but had no other further knowledge regarding this issue.  (Smialek Depo. at Tr. 31-

32; Hoy Depo. at Tr. 39-40.)

   Barens argues that Ridgley "implemented GPS systems simply to track Barens."  (Doc. No.

65 at PageID# 2303.)  Barens testified in deposition that Ridgley used the GPS devices to track his

daily activities, stating that "there [were] certain locations that I would be at that was conveyed back

to me that Ridgley knew I was there."  (Barens Depo. Vol. I at Tr. 125.)  He further testified that Olp

told him that Ridgley tracked his daily activities "hoping that he can catch [him] doing something

wrong."  (*Id*. at Tr. 128.)  Barens also relies on Olp's Affidavit, in which she avers as follows:

> 16.   Joe also gave me a complete tutorial about the District's tracking devices in
> our vehicles and how the TransUnion program works. He explained to me that
> he was using the program to track Paul Moore and Paul Barens' movements.
> Anytime a vehicle was put into park or stopped, it was marked in chronological
> order on a map within this program. This allowed Ridgley to track the vehicle
> from the beginning of the workday to the end.
>
> 17.   Joe Ridgley told me about a file folder, stating he was building his case against
> Barens.  Ridgley told me that it was Barens' file and it contained evidence of
> all his wrongdoing and insubordination. He showed me the file, it was eight
> and half by eleven approximately half an inch thick; he showed me the tracking
> of Barens['] work vehicle and the tracking documents for his vehicle.

101

(Olp Aff. at ¶¶ 16, 17.)

Based on the above, the Court finds that it was Ridgley who recommended that GPS tracking devices be placed on all SSD vehicles.  The Court further finds that Barens has come forward with sufficient evidence to create a genuine issue of material fact that Ridgley used the GPS devices to specifically track and monitor Barens' daily activities.  Regarding Smialek and Hoy, there is evidence that these Defendants were generally aware that GPS trackers were installed in SSD vehicles. However, Barens has not directed this Court's attention to any evidence that either Smialek or Hoy participated in the decision to install these GPS tracking devices or that they had any knowledge of Ridgley's alleged use of this technology to specifically track and monitor Barens' daily activities.

Accordingly, the Court finds that Barens has come forward with sufficient evidence to create a genuine issue of material fact that Ridgley improperly monitored Barens via the GPS tracking devices, but has not come forward with sufficient evidence to implicate either Smialek or Hoy.

3.  <u>Hiring a private investigator to follow and monitor Barens</u>.  Barens testified that, at some point in 2020 or 2021, he and then-SSD officer Paul Moore "felt like [they] were being followed." (Barens Depo. Vol. I at Tr. 131-132.)  He explained that he and Moore had a "feeling that somebody was following [them] for … probably a week or so of just eerie encounters with the same vehicle." (*Id*. at Tr. 133.)  Barens testified that he witnessed an individual drive by and take pictures of him on two occasions.  (Barens Depo. Vol. II at Tr. 282-283.)  He testified that he and Moore confirmed from the plate information that the vehicle belonged to a private investigator at Buckeye Legal. (Barens Depo. Vol. I at Tr. 133-134; Barens Depo. Vol. II at Tr. 283-284.)  Barens also testified that Sherri Bartko told him that PCSD Treasurer Sean Nuccio later commented in a supervisor's meeting that "they found out we hired a private investigator."  (Barens Depo. Vol. I at Tr. 132.)  Barens

102

testified that he did not know whose decision it was to hire a private investigator or who authorized payment to the investigator.  (*Id*. at Tr. 132-133.)

Smialek testified that the PCSD hired private investigator Anthony Bentley from Buckeye Legal to track an SSD officer who PCSD believed was abusing company time, but that it was not Barens who was being tracked.  (Smialek Depo. at Tr. 32-33.)  He testified that the tracking was unsuccessful because the SSD officer being tracked detected Mr. Bentley within an hour.  (*Id*.) Smialek testified that he did not think PCSD ever used that investigator again.  (*Id*.)  Smialek could not recall who made the recommendation to hire Bentley.  (*Id*.)  He believed (but was not certain) that it would have been an expense "through our human resources department."  (*Id*. at Tr. 34.)  Hoy, however, testified that he was not involved in, or aware of, a private investigator being hired by PCSD.  (Hoy Depo. at Tr. 40.)  Greene testified (in his capacity as Rule 30(b)(6) representative for PCSD) that he "had no idea" who recommended or made the decision to hire Mr. Bentley.  (Greene 30(b)(6) Depo. (Doc. No. 65-14) at Tr. 12-13.)  Greene testified that his only knowledge regarding Bentley was that, during a meeting with the superintendent (i.e., Smialek), it came up that PCSD had hired a private investigator to "tail" another employee, not Barens.  (*Id*. at Tr. 11-12.)  Greene had no knowledge of PCSD hiring Bentley to investigate Barens.  (*Id*. at Tr. 13.)

The Court finds that Barens has failed to direct this Court's attention to sufficient evidence that either Ridgley, Smialek, or Hoy made the decision to hire a private investigator to follow him. Notably, Barens testified that he could not identify whose decision it was to hire a private investigator or who authorized payment to the investigator.  (Barens Depo. Vol. I at Tr. 132-133.)  Nor has Barens identified any other evidence that sheds light on this issue.  To the contrary, Barens fails entirely to address this particular adverse action at any point in his summary judgment briefing.  In sum, Barens

103

has not directed this Court's attention to any evidence that Ridgley or Hoy had any knowledge or involvement in the decision to hire Bentley.  While there is evidence that Smialek was aware that the PCSD hired Bentley, Smialek testified that Bentley was hired to follow a different SSD officer, not Barens.  Barens has not directed this Court's attention to any evidence that Smialek recommended or participated in the decision to hire Bentley and/or that he hired Bentley for the specific purpose of following Barens.

Accordingly, the Court finds that Barens has not come forward with sufficient evidence to create a genuine issue of material fact that either Smialek, Hoy or Ridgley participated in the alleged adverse act of hiring a private investigator to follow him.

4.  <u>Instructing Officer Olp to follow Barens</u>.  Barens testified that Olp and Davis both told him that Ridgley had instructed them to follow him and to report to Ridgley where Barens was located.  (Barens Depo. Vol. I at Tr. 135.)  Barens further testified that Olp told him that Ridgley issued this instruction because he wanted to "ruin' Barens.  (*Id*. at Tr. 136.)  Barens admitted that he did not know for certain whether Olp or Davis actually did follow him and report back to Ridgley.  (*Id*. at Tr. 136-137.)  Notably, Olp does not aver in her Affidavit that Ridgley instructed her to follow Barens.  (Doc. No. 65-8 at PageID#s 2414-2418.)  Nor has Barens produced any evidence (other than his own testimony) that Ridgley instructed Davis to follow him.  Smialek testified that he had no knowledge of Ridgley instructing Olp to follow Barens.  (Smialek Depo at Tr. 35.)  Neither Hoy nor Ridgley were asked about this issue during deposition.

The Court finds that Barens has failed to direct this Court's attention to sufficient admissible evidence that Ridgley instructed Olp and/or Davis to follow him, or that Smialek or Hoy had knowledge of, or involvement in, any such decision.  The only evidence that Ridgley issued this

instruction is Barens' testimony that Olp and Davis told him that Ridgely told them to follow Barens. However, Barens' testimony is hearsay, which cannot be considered on a motion for summary judgment. *Wiley*, 20 F.3d at 225-226.  Moreover, although she provided a lengthy affidavit, Olp herself did not aver that Ridgley instructed her not to follow Barens.  Barens does not direct this Court's attention to any deposition testimony or affidavit from Davis regarding this issue.  Indeed, Barens fails entirely to address this particular adverse action at any point in his summary judgment briefing. In sum, Barens has not directed this Court's attention to any admissible evidence that Ridgley instructed Olp and/or Davis to follow him, or Smialek or Hoy had any knowledge or involvement in such an alleged instruction.  Accordingly, the Court finds that Barens has not come forward with sufficient evidence to create a genuine issue of material fact regarding that Ridgley took this alleged adverse action or that Smialek or Hoy had any knowledge or involvement thereof.

5. <u>Instructing members of the Safety & Security Department not to speak to Barens and to provide written reports on any conversations they had with him.</u>  Barens testified that Olp and Davis told him that Ridgley encouraged them not to speak to Barens and to provide written reports about any conversations they had with him.  (Barens Depo. Vol. I at Tr. 148.)  Barens also raised this issue in his January 2020 internal complaint.[45]  (Doc. No. 47-3 at PageID# 1292.)  Additionally, in her Affidavit, Olp avers as follows:

---

[45] As noted *supra,* in his Memorandum/Investigative Report regarding Barens' January 2020 internal complaint, Hoy stated that he interviewed Davis regarding Barens' assertion that Davis told him that he was instructed by Ridgley not to speak to Barens.  (Doc. No. 47-2 at PageID#s 1089-1090.)  Hoy summarized Davis' response to this allegation as follows: "Mr. Davis, in a meeting that occurred on 2/25/2020, was read the statement that Mr. Barens provided.  Mr. Davis replied that this is 'False.' He continued to add that Mr. Ridgley had only informed him of what was going on and that he and Ms. Olp could do whatever they want.  Mr. Davis denied that Mr. Ridgley ever 'instructed' him not to speak with Mr. Barens."  (*Id*. at PageID# 1090.)

105

9. Joe Ridgley strongly recommended that I not speak to Paul Barens (or Paul Moore) and to report to him immediately if Paul Barens ever spoke to me. He wanted to know exactly what was said.

10. Whenever I was approached by Paul Barens the details of that conversation were reported to Joe Ridgley immediately as I had been instructed. It should be noted that I have told Mr. Ridgley on numerous occasions that I did not want to be involved in their conflicts and asked to please be left out of it.

(Olp Aff. at ¶¶ 9, 10.)

Ridgley denied that he ever instructed or advised Olp not to speak to Barens, or that he otherwise placed any limits upon Olp's or any other staff member's interaction with Barens. (Ridgley Depo. at Tr. 79-80.) He also denied instructing Olp to report back to him regarding any conversations she had with Barens. (*Id.* at Tr. 80.) Ridgley stated that he "encouraged [SSD staff] to do their job and nothing more" and noted that "I don't tell anybody what to do with their interactions." (*Id.* at Tr. 80-81.) Smialek testified that he was not familiar with Ridgley encouraging or instructing members of the SSD not to speak with Barens and/or provide written reports about any conversations with him. (Smialek Depo. at Tr. 42.) Hoy was clearly aware that Barens had reported in his January 2020 internal complaint that Ridgley instructed Davis not to speak with Barens. (Doc. No. 47-2 at PageID#s 1089-1090.) However, when Hoy interviewed Davis about Barens' allegation, Davis stated it was "false" and that Ridgley had not instructed him not to speak to Barens. (*Id.* at PageID# 1090.) During his deposition, Hoy testified that he not aware that Ridgley instructed SSD staff members not to speak to Barens. (Hoy Depo. at Tr. 41.)

Based on the above, the Court finds that Barens has come forward with sufficient evidence to create a genuine issue of material fact that Ridgley instructed Olp not to speak to Barens and to report back regarding any conversations she had with him. Although Ridgley denies that this occurred, Barens has come forward with testimonial evidence from Olp that contradicts Ridgley's deposition

106

testimony.  It is for the jury to decide who to believe.  The Court further finds, however, that Barens

has not come forward with evidence that either Smialek or Hoy had knowledge of, or participated in,

Ridgley's alleged instruction to Olp that she should not speak to Barens.

      6.  <u>Misrepresenting Barens' employment and speaking negatively about Barens to Safety &</u>

<u>Security Department members and outside individuals</u>.  Barens relies principally on Olp's Affidavit

and the Gilmore Report in support of this alleged adverse action.  Olp avers that, in the fall of 2020,

Ridgley told her that Barens "had been applying for jobs where [Ridgley] had friends who called him

to inquire about Barens."  (Olp Aff. at ¶ 22.)  Olp further avers as follows:

> 23.    Joe told me that a "buddy" of his at Cleveland Heights called and asked "Isn't this the guy you've been bitching about?" Joe also told me that a "good buddy" at the Federal Reserve had also called and asked similar questions about Barens. Joe advised that both of his "buddies" stated they would not even interview Barens because of this.

> 24.    I asked Joe, "Did you blacklist Barens? You know you can't do that." Joe laughed and said, "Well, you never know who knows who and who is connected around here. I know all sorts of people around here."

> 25.    In October 2020 Joe informed me of a third phone call from Euclid where Barens had applied. Joe reported to me that a supervisor called him.

> 26.    Joe told me, "That's three jobs he [Barens] could have had because of Joe Ridgley: Cleveland Heights, Federal Reserve, and Euclid." Joe Ridgley referred to himself in the third person at the time of saying this.

(*Id*. at ¶¶ 23-26.)  Olp also avers that Ridgley spoke negatively about Barens to her, including stating

that he wanted to "get rid" of Barens.  (*Id*. at ¶¶ 4, 13.)

      After Barens filed his October 2020 internal complaint, Attorney Gilmore conducted an

investigation during which he (among other things) interviewed Olp, Bartko, and Ridgley.  (Doc. No.

51-1 at PageID#s 1876-1888.)  During her interview, Olp conveyed the substantially same

information as is set forth in her Affidavit.  (*Id*. at PageID# 1881-1882.)  Bartko reported that Ridgley

told her that he had spoken to friends of his at CH-UH and the Federal Reserve Bank about Barens, and stated that "he was not going to let Mr. Barens get a job around here." (*Id.* at PageID# 1882.) Bartko also told Gilmore that Ridgley spoke negatively about Barens, including stating that he hoped Barens would not be returning to the PCSD in the fall of 2020. (*Id.*)

Ridgley denied that he told Olp or Bartko that he had provided negative information about Barens to either CH-UH or the Federal Reserve Bank. (*Id.* at PageID# 1883.)  He also denied telling Olp or Bartko that he had prevented (or was trying to prevent) Barens from getting another job. (*Id.*) Rather, Ridgley told Gilmore that friends of his at CH-UH and the Federal Reserve had called Ridgley and advised him about Barens' job applications but that, by that time, Barens' applications had already been rejected. (*Id.* at PageID#s 1878-1879.)  Both Loretz (from CH-UH) and Mendizabal (from the Federal Reserve Bank) submitted Affidavits which are largely consistent with Ridgley's deposition testimony.  *See* Doc. Nos. 51-6 and 51-7.  Ridgley did admit, however, that he had spoken to a friend of his at the Euclid PD (Captain Roller) and provided negative information about Barens before the Euclid Police Department had made a hiring decision.[46] (*Id.* at PageID# 1879-1880.) *See also* Ridgley Depo. at Tr. 93-94.  This negative information included telling Captain Roller that Barens was "scary" and that they rarely speak. (*Id.*)  Lastly, Gilmore reported that Smialek and Hoy

---

[46] As noted *supra*, Ridgley's testimony conflicts with the Affidavit that Captain Roller submitted herein.  (Doc. No. 51-5.) Captain Roller avers that he had, in fact, already decided not to hire Barens before calling Ridgley and talking to him about Barens.  (Roller Aff. (Doc. No. 51-5) at ¶ 7-9.)  Captain Roller avers that, prior to speaking with Ridgley, he googled Barens and discovered that Barens had filed prior lawsuits.  (*Id.* at ¶ 7.)  From this, Captain Roller determined that "[i]t was apparent that Barens would be a troublesome or disruptive employee" and he decided not to hire him for that reason. (*Id.* at ¶¶ 7,8.)  Afterwards, Captain Roller called Ridgley to "verify Barens' resume and job responsibilities" at PCSD. (*Id.* at ¶ 9.)  During that call, Captain Roller learned from Ridgley that Barens' actual job responsibilities were allegedly not consistent with the job duties outlined in his resume. (*Id.*)  Captain Roller further avers that, in his conversation with Ridgley, they never discussed "Barens' character." (*Id.* at ¶ 10.)  It is not clear why Captain Roller would call Ridgley to "confirm his job duties and responsibilities" if he had already decided not to hire him.  In any event, the conflict between Olp's, Ridgley's, and Roller's testimony creates a fact issue for the jury.

both stated that they did not speak to anyone at CH-UH, the Federal Reserve Bank, or the Euclid PD about Barens. (*Id.* at PageID#s 1878, 1880.) Smialek testified that Gilmore's interview summary is accurate. (Smialek Depo. at Tr. 40.)

Based on the above, the Court finds that Barens has come forward with sufficient evidence to create a genuine issue of material fact that Ridgley spoke negatively about Barens' employment to other SSD employees and to outside individuals, including Captain Roller. The Court further finds, however, that Barens has not come forward with evidence that either Smialek or Hoy themselves spoke negatively about Barens' employment to SSD staff members and/or outside individuals, or that they had knowledge or involvement in Ridgley's negative speech about Barens.

In conclusion, and for all the reasons set forth above, the Court finds that Barens has come forward with sufficient evidence from which a reasonable jury could find that Ridgley took the following four (4) adverse actions against Barens after the May 13, 2020 effective date of the Release: (1) eliminating overtime opportunities; (2) tracking Barens' daily activities through GPS tracking; (3) encouraging SSD staff members not to speak to Barens and provide written reports on any conversations they had with him; and (4) misrepresenting Barens' employment and speaking negatively to other SSD employes as well as outside individuals about Barens. The Court, however, finds that Barens has not come forward with sufficient evidence from which a reasonable jury could conclude that either Smialek or Hoy participated or had any involvement in any of the above actions.[47] Because Barens cannot therefore demonstrate that Smialek and Hoy violated his First Amendment rights, Smialek and Hoy are entitled to qualified immunity with respect to Count One.

---

[47] In light of this holding, the Court need not (and will not) address Barens' argument that Smialek is individually liable under § 1983 because he constitutes an "influential recommender." (Doc. No. 65 at PageID#s 2314-2315.)

### cc.    Causation

Ridgley argues that he is nonetheless entitled to summary judgment in his favor on Count One because "Barens fails to establish that the alleged actions were taken because he engaged in First Amendment activity." (Doc. No. 51 at PageID# 1792.)  Ridgley asserts that "the record contains no evidence to support a finding that [any of] the [] alleged retaliatory actions were motivated by or taken to punish Barens for filing a lawsuit or internal complaints."  (*Id.*)  To the contrary, Ridgley maintains that the record shows that the alleged adverse actions "were unrelated to Defendant Ridgley or Barens, or any protected activity."  (*Id.*)  Barens argues that "testimonial evidence of record … and Ridgley's deposition testimony establish that Ridgley was motivated by Barens' protected conduct." (Doc. No. 65 at PageID# 2300.)  In particular, Barens relies on Olp's Affidavit as evidence that Ridgley harbored a deep seated animus towards him and specifically took adverse action against him to punish him for filing *Barens I.*  (*Id.* at PageID#s 2301, 2303.)

In his Reply Brief, Ridgley argues that, even construing the evidence in Barens' favor, "there is insufficient evidence to suggest that the actions were motivated by or taken to punish [Barens] because he previously filed a lawsuit or internal complaints."  (Doc. No. 68 at PageID# 2578.) Ridgley argues that the alleged elimination of overtime work was unrelated to Barens' protected speech and occurred only because "new officers were hired and were able to help with overtime duties."  (*Id.*)  Regarding the GPS tracking, Ridgley argues that the use of GPS devices on SSD vehicles was implemented purely as a security measure and not because Barens filed *Barens I.*  (*Id.* at PageID# 2579.)  Ridgley further notes that the GPS tracking devices were installed on all of the PCSD school buses and SSD officer vehicles, not just Barens' vehicles.  (*Id.*)  In sum, Ridgley asserts,

110

"the record contains no evidence to substantiate that any of the alleged actions were retaliatory" or motivated by Barens' First Amendment activity.  (*Id.*)

For a First Amendment plaintiff to recover under § 1983, protected speech "must be a 'but-for' cause of a harmful action.  *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).  This test is met if a plaintiff would not have suffered the harm "but for" the speech.  *Id.*  *See also Lemaster v. Lawrence County, Kentucky*, 65 F.4th 302, 309 (6th Cir. 2023).  "It is not met if the plaintiff would have suffered the harm even if the plaintiff had stayed silent."  *Lemaster*, 65 F.4th at 309.

When public employees or contractors allege that the government has retaliated against them because of their speech, federal courts implement the required but-for test using a burden-shifting approach.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977); *Lemaster*, 65 F.4th at 309.  Under this approach, a plaintiff must first show that "speech was 'a substantial or motivating factor' of" a harmful action.  *See Anders v. Cuevas*, 984 F.3d 1166, 1177 (6th Cir. 2021) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)).  As the Sixth Circuit recently clarified, "[s]ome statements in our cases have (wrongly) equated this motivating-factor test with but-for causation."  *Lemaster*, 65 F.4th at 309.  However, "this test does not require a but-for relationship."  *Id.*  "After all, speech sometimes may motivate a defendant's harmful action even if the defendant would have taken the same action for another reason without the speech."  *Id.*

If the plaintiff meets this lower causation standard, the burden shifts to the defendant.  *See Nieves*, 587 U.S. at 399; *Lemaster,* 65 F.4th at 309.  A defendant can then avoid liability by proving that it would have taken the same action even if the plaintiff had not spoken. *See Mt. Healthy*, 429

111

U.S. at 287.  "In other words, they must prove the absence of but-for causation." *Lemaster,* 65 F.4th

at 309 (citing *Massey v. Johnson*, 457 F.3d 711, 717 & n.2 (7th Cir. 2006) and *Wagner v. Wheeler*,

13 F.3d 86, 90 (4th Cir. 1993)).  As the Sixth Circuit recently explained:

> The Court's burden-shifting approach adds complexity to our usual summary-judgment rules. When a defendant moves for summary judgment on an issue, the standard that the defendant must meet depends on who will bear the burden of proof at trial. *See Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020). If the plaintiff will bear this burden, the defendant's summary-judgment briefing need only show that the record lacks evidence from which "a rational trier of fact" could find for the plaintiff on the issue. *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Since a free-speech plaintiff must prove the motivating-factor test, *see Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568, this standard applies to the defendant's claim that speech did not even motivate a harmful action.
>
> If, by contrast, the defendant will bear the burden of proof (as when it seeks summary judgment on an affirmative defense), "its burden of production is greater" at the summary-judgment stage. 10A Charles A. Wright et al., Federal Practice and Procedure § 2727.1, at 492 (4th ed. 2016). The defendant must affirmatively introduce evidence of such weight that no rational jury could disagree with it. *See Surles v. Andison,* 678 F.3d 452, 455–56 (6th Cir. 2012); *see also Leone v. Owsley*, 810 F.3d 1149, 1153–54 (10th Cir. 2015) (citing cases). Since a free-speech defendant must prove the lack of but-for causation, *see Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568, this standard applies to any claim that it would have taken the same harmful action even if the plaintiff had not spoken, *see Cockrel v. Shelby Cnty. Sch. Dist*., 270 F.3d 1036, 1056–57 (6th Cir. 2001).

*Lemaster*, 65 F.4th at 309-310.

In other words, where a defendant argues that a plaintiff's protected speech did not motivate

an adverse action in any way, the plaintiff bears the burden of showing that a rational trier of fact

could find to the contrary.  *Id*.  However, where a defendant argues that speech may have been a

factor but that it would have taken the same action even if the plaintiff had not spoken, the defendant

bears the heavier burden of showing that no rational jury could find otherwise.  *Id*.  Here, Ridgley

argues that Barens' protected speech did not even partially motivate any of the alleged adverse

112

actions. (Doc. No. 51 at PageID#s 1792-1799.) Thus, the Court considers whether Barens has met his burden of showing that a rational trier of fact could find to the contrary. *See Lemaster*, 65 F.4th at 310.

To answer this question in the free-speech context, federal courts typically start by looking at the time gap between the protected speech and the harmful action. *See, e.g., Lemaster*, 65 F.4th at 310; *Anders*, 984 F.3d at 1177; *Vereecke*, 609 F.3d at 400. The Sixth Circuit has noted that "a total 'lack of temporal proximity alone can' doom a claim that a plaintiff's speech motivated a defendant's act unless the plaintiff uncovers smoking-gun evidence of this motivation." *Lemaster*, 65 F.4th at 310 (citing *Anders*, 984 F.3d at 1177).[48] On the other hand, "if the act occurs within 'days or weeks' of the speech, the close proximity can sometimes (if rarely) permit an inference that the one motivated the other." *Id.* (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020)). "In most cases, though, a plaintiff will show some moderate time gap—say, a matter of months." *Id. See also Anders*, 984 F.3d at 1177–78; *Benison*, 765 F.3d at 661–63 (6th Cir. 2014).

In this latter situation, the Sixth Circuit directs district courts to consider "whether the plaintiff has offered enough 'other evidence of retaliatory conduct' apart from this temporal proximity." *Lemaster*, 65 F.4th at 310 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). In some circumstances, the Sixth Circuit has found that a reasonable jury could find retaliatory conduct based on evidence of a continuing pattern of adverse actions over time. *See, e.g., Josephson*, 115 F.4th at 787-788 (finding that defendants were motivated by plaintiff's protected

---

[48] The Sixth Circuit recently noted, however, that "[o]ur case law does not make clear exactly when, and under what circumstances, a temporal gap is so long that it entirely fails as proof of causation." *Davis v. Delta College*, 2025 WL 474971 at fn 6 (6th Cir. Feb. 12, 2025). Rather, Sixth Circuit authority has counselled against "attempt[ing] to draw bright line rules where rightfully there are none." *George*, 966 F.3d at 461.

113

speech where speech occurred in October 2017 and defendants began "tracking his behavior" in February 2018, engaged in further adverse actions in March and July 2018, and then terminated plaintiff's contract in February 2019).

Here, the Court's causation inquiry is somewhat complicated by the May 2020 Release. As noted above, the Court has determined that a reasonable jury could find that Ridgley took four (4) adverse actions against Barens, several of which occurred both before and after the effective date of the Release. Specifically, Barens has come forward with evidence that, beginning in March 2019 and continuing thereafter until his resignation in October 2021, Ridgley denied Barens overtime opportunities, and tracked his daily location via GPS devices on SSD vehicles. Additionally, Barens has come forward with evidence from which a reasonable jury could conclude that, beginning in December 2019 and continuing thereafter, Ridgley instructed Olp not to speak to Barens. The question then becomes, when considering the temporal proximity of these adverse actions to the filing of *Barens I* on February 28, 2019, is the Court limited to considering these actions only to the extent that they occurred after the May 13, 2020 effective date of the Release? Or may the Court consider the fact that Barens has introduced evidence that these actions occurred prior to May 13, 2020 and, therefore, closer in time to *Barens I*?

Although the Court has not been able to find binding authority directly on point, the Court concludes that Sixth Circuit authority suggests that it may (and, indeed, should) consider evidence of Ridgley's alleged adverse actions occurring prior to the Release for the limited purpose of evaluating whether Barens has come forward with sufficient evidence of retaliatory motive to withstand summary judgment. In several recent decisions, the Sixth Circuit has found sufficient evidence of causation where plaintiffs demonstrate a "pattern of retaliatory mistreatment" over a period of many

114

months, even when the some of the conduct forming that pattern occurs well after the protected speech or does not itself qualify as an "adverse action" under the First Amendment.

For example, in *Josephson, supra*, plaintiff was a psychiatry professor at the University of Louisville School of Medicine, and Chief of its Division of Child and Adolescent Psychiatry. *Josephson*, 115 F.4th at 777.  In October 2017, plaintiff participated in a panel discussion at a Heritage Foundation event regarding childhood gender dysphoria.  *Id*.  In late November 2017, the Medical School demoted him from his position as Division Chief.  *Id*. at 780.  Over the course of the next several months, defendants changed plaintiff's work assignments, "monitored his behavior," closely tracked his conduct, issued a formal "productivity warning" to him, and recorded complaints about him.  *Id*. at 780-781.  In February 2019 (approximately sixteen months after his remarks at the panel discussion), the Medical School decided not to renew plaintiff's contract.  *Id*. at 781.  Plaintiff then filed suit under § 1983, alleging that defendants retaliated against him in violation of his First Amendment rights.  *Id*. at 782.  The district court denied defendants' motions for summary judgment on the basis of qualified immunity.  *Id*.

The Sixth Circuit affirmed.  The court first found that plaintiff engaged in protected speech when he participated in the Heritage Foundation panel.  *Id*. at 784.  The court then concluded that each of the named defendants took various adverse actions against plaintiff, including tracking his behavior, monitoring his work performance, giving him a "productivity warning," and deciding not to renew his contract.  *Id*. at 787-788.  Although these actions took place over a span of sixteen months after plaintiff's protected speech, the court considered them as a whole and found that a reasonable jury could conclude that each defendant was motivated to act, at least in part, by plaintiff's protected speech.  *Id*. at 788-789.

Likewise, in *Lemaster*, *supra*, the Sixth Circuit found sufficient evidence of causation where plaintiffs offered evidence that defendant engaged in "pattern of retaliatory mistreatment" over the course of several months after plaintiff engaged in protected speech. *Lemaster*, 65 F. 4th at 311. In so finding, the court relied, in part, on evidence of mistreatment that did not necessarily rise to the level of an "adverse action" under the First Amendment, noting that "[e]ven if this conduct does not itself qualify as an 'adverse action' …, it bolsters the Lemasters' claim that the April [2019] criticisms of [defendant] had turned him against them." *Id.* *See also Benison*, 765 F.3d at 661-662 ("Although these types of incidents are not themselves adverse actions, we may consider them in combination to assess whether they demonstrate a pattern of retaliatory mistreatment, which could support a causal inference.")

In light of the above, the Court will consider evidence of Ridgley's actions against Barens prior to the May 13, 2020 effective date of the Release for the limited purpose of determining whether Barens has come forward with sufficient evidence of causation. As discussed in more detail below, the Court finds that Barens has come forward with evidence that Ridgley engaged in "a pattern of retaliatory mistreatment," *LeMaster*, 65 F.4th at 311, beginning in March 2019 and continuing, unabated, until Barens resigned in October 2021. Although the Release bars Barens from recovering damages relating to adverse actions occurring prior to May 13, 2020, the Court finds that the Release does not preclude him from relying on evidence of Ridgley's conduct prior to May 13, 2020 to bolster his claim that *Barens I* was a substantial and motivating factor for Ridgley's adverse actions.

Considering the evidence of Ridgley's pre- and post-Release conduct in this vein, the Court finds that Barens has satisfied his burden of showing that *Barens I* was a substantial and motivating factor for Ridgley's adverse actions. Barens filed *Barens I* on February 28, 2019. The following day,

116

PCSD hired Ridgley as Supervisor of the SSD. (Ridgley Depo. at Tr. 22.) Ridgley was aware, when he accepted the Supervision position, that Barens had filed *Barens I* and sought to prevent Ridgley from being hired. (*Id.* at Tr. 26.) Indeed, Smialek told Ridgley about Barens' Motion for TRO when it was filed. (Smialek Depo. at Tr. 14-15.) After Ridgley assumed the Supervisor position on March 11, 2019, he told Smialek that Barens was clearly "frustrated [and] upset that he hadn't been named to the role." (*Id.* at Tr. 23-24.)

Barens testified that, immediately after Ridgley became Supervisor, Ridgley began denying Barens the opportunity to work overtime and, further, that he continued to do so until Barens resigned in October 2021. (Barens Depo. Vol. I at Tr. 75-76, 99, 101-102.) Barens also stated that, as of March 2019 or shortly thereafter, Ridgley installed GPS tracking devices on SSD vehicles for the express purpose of monitoring Barens' daily activities. (*Id.* at Tr. 124-125.) Olp avers that, prior to starting with the SSD in May 2019, Ridgley called her and "began explaining the issues he had" with Barens. (Doc. No. 47-3 at PageID# 1329; Olp Aff. at ¶ 2.) She avers that Ridgley told her that he "wanted to fire the entire [PCSD] just so he could get rid of" Barens and two other officers. (Olp Aff. at ¶ 4.) Olp also avers that Ridgley "strongly recommended that [she] not speak to [Barens] and to report to him immediately if [Barens] ever spoke to [her]." (*Id.* at ¶ 9.) Olp confirms Barens' suspicion that Ridgley was using the GPS devices to specifically track Barens, averring that Ridgley expressly told her that he used the devices to "track Barens' movements" and showed her a thick file that contained documentation "tracking Barens' work vehicle." (*Id.* at ¶¶ 16, 17.) In October 2019, Barens was placed on administrative leave for alleged "employee misconduct." (Doc. No. 65-7 at

117

PageID#s 2404-2406.)  He was then summoned to an investigative hearing in January 2020 for additional misconduct charges relating to "interactions with staff members."[49] (*Id*. at PageID# 2407.)

Barens testified that, although he previously worked for PCSD during the summer months, Ridgley did not allow him to work for PCSD during the summer of 2020.  (Barens Depo. Vol. I at Tr. 74-76.)  He began to look for work elsewhere, applying for a positions at CH-UH, the Federal Reserve Bank, and the Euclid PD in the spring and summer of 2020.  (*Id*. at Tr.  153, 174, 183.)  Olp avers that, in the fall of 2020, Ridgley informed her that Barens was applying for jobs where Ridgley "had friends who called him to inquire about Barens."  (Olp Aff. at ¶ 22.)  She avers that Ridgley told her that his "buddies stated that they would not even interview Barens because of" information that Ridgley told them.  (*Id*. at ¶ 23.)  Ridgley himself acknowledged that he made negative comments about Barens to Captain Roller at the Euclid PD, including that Barens was "scary."  (Doc. No. 51-1 at PageID# 1879-1880; Ridgley Depo. at Tr. 65-66, 93-94.) Barens testified that Ridgley continued to deny him overtime, and continued to track his daily movements through GPS tracking, throughout the 2019-2020 and 2020-2021 school years.  (Barens Depo. Vol. I at Tr. Tr. 76, 99, 101-102, 124-125.)  He resigned on October 15, 2021, effective October 25, 2021.  ((Barens Depo. Vol. I at Tr. 52; Doc. No. 47-1 at PageID# 814.)

Upon careful consideration, the Court finds that evidence that Ridgley began taking adverse actions against Barens in March 2019 (i.e., less than one month after Barens' protected speech) strongly supports the inference that *Barens I* was a substantial and motivating factor for Ridgley's actions.  *See LeMaster*, 65 F.4th at 310 (noting that "if the act occurs within 'days or weeks' of the

---

[49] Defendants have not directed this Court's attention to any evidence that, prior to Ridgley's hire in March 2019, Barens was ever disciplined or placed on administrative leave.

speech, the close proximity can sometimes" permit the inference that the one motivated the other.")
But the Court does not rely on this evidence of temporal proximity alone.  Rather, the Court finds
that Barens has offered evidence of other retaliatory conduct in the form of a continuing pattern of
ongoing harmful actions, including (but not limited to) continuing to deny Barens overtime from
March 2019 until October 2021; continuing to track Barens' daily movements through the use of the
GPS trackers from March 2019 until October 2021; ostracizing and isolating Barens by instructing
Olp and other staff members to not speak to him from May 2019 until October 2021; and making
negative comments about Barens to his coworkers potential employers.  Viewing this evidence in
context and as a whole, the Court concludes that a rational jury could find that Ridgley was motivated
to act, at least in part, by the fact that Barens filed *Barens I.  See Lemaster,* 65 F.4th at 310.

Having so found, the burden then shifts to Ridgley to prove that he would have taken the same
actions for reasons unrelated to Barens' speech.  The Court finds that Ridgley has failed to do so.
Ridgley offers no valid reason for denying Barens overtime, instructing Olp and other SSD staff
members not to speak to Barens, and/or making negative comments about Barens to his co-workers
and potential employers.  Regarding the GPS tracking, Ridgley asserts that he had valid safety reasons
for installing these devices on all SSD vehicles that had nothing to do with Barens' protected speech.
Olp, however, avers that Ridgley expressly told her that he was using the devices to track Barens'
movements and that he showed her a file containing documentation of his tracking of Barens' work
vehicle.  Olp further avers that Ridgley told her he was using this information to "build[] his case
against Barens." (Olp Aff. at ¶ 16, 17.)  It is for a jury to resolve this conflicting evidence.

119

Accordingly, the Court finds that a reasonable jury could find that Ridgley retaliated against Barens in violation of his First Amendment rights.[50]  The Court therefore proceeds to the second step of the qualified immunity analysis, i.e., whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right.

### ii.        Clearly Established Right

Ridgley argues, summarily and without further explanation, that he is entitled to qualified immunity because "there is no clearly established precedent that Barens is entitled to as much overtime as desired, immune from changes in pay because of agency mistakes, entitled to particular job duties, etc."  (Doc. No. 51 at PageID# 1800.)

The Court finds that Ridgley's half-hearted argument misses the central point and is without merit.  The Sixth Circuit has "'long recognized that a public employer may not retaliate against an employee for [his] exercise of constitutionally protected speech.'"  *Myers,* 41 F.4th at 766 (quoting *Buddenberg*, 939 F.3d at 741).  *See also Josephson*, 115 F.4th at 789-790.  Additionally, by 2019, the Sixth Circuit had established that campaigns of harassment, when considered as a whole, may amount to adverse actions.  *See Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010); *Thaddeus-X,* 175 F.3d at 398.  Moreover, the Sixth Circuit had "repeatedly held that '[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'"  *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (emphasis omitted) (quoting *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir.

---

[50] In light of this conclusion, the Court need not address Barens' argument (which is raised summarily and without sufficient explanation) that Ridgley is individually liable under § 1983 under the theory that he was an "influential recommender." (Doc. No. 65 at PageID#s 2314-2315.)

1998)).  Thus, a reasonable official in Ridgley's position during the relevant period would have understood that he could not lawfully retaliate against an employee because of his protected speech.

### iii.    Conclusion as to Count One

For the reasons set forth above, the Court finds that Ridgley is not entitled to qualified immunity with respect to Barens' First Amendment retaliation claim.  Ridgley's Motion for Summary Judgment with respect to Count One is, therefore, denied.  However, because Barens failed to come forward with sufficient evidence that Smialek or Hoy took any adverse action against him in retaliation for his protected speech, the Court finds that Smialek and Hoy are entitled to qualified immunity.  Smialek and Hoy's Motion for Summary Judgment with respect to Count One is granted.

### b.    *Monell* Claim against Defendant PCSD

Barens also asserts a First Amendment claim against Defendant PCSD.  (Doc. No. 8.)  Although Barens has come forward with sufficient evidence to create a jury question regarding whether Ridgley violated his First Amendment rights, that fact alone does not sufficient to seek damages from PCSD.  *See Lemaster*, 65 F.4th at 312.

A plaintiff may not sue a local government entity, such as PCSD, for injuries inflicted solely by its employees or agents under § 1983.  *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012).  Rather, a plaintiff may only hold a government entity liable under § 1983 for that entity's own wrongdoing.  *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*.")  Or, as the Sixth Circuit has explained, a government entity " is liable under § 1983 only where, 'through its deliberate

121

conduct,' it was 'the "moving force" behind the injury alleged.'" *D'Ambrosio*, 747 F.3d at 388-89 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A plaintiff may hold a government entity liable under four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also D'Ambrosio*, 747 F.3d at 386.

PCSD argues that it cannot be held liable under *Monell* for several reasons.  (Doc. No. 50 at PageID#s 1745-1747.)  First, PCSD argues that it is entitled to judgment on this claim because Barens admits, in his Amended Complaint, that the alleged "communications by [] Ridgley were, at the time undertaken, *not authorized by* [PCSD] or Board policy" and "*not authorized by* any written policy of [PCSD]." (*Id*.) (quoting Doc. No. 8 at ¶¶ 132, 146) (emphasis added)).  PCSD emphasizes that both Smialek and Hoy testified that PCSD did not have a policy with respect to employee references.  (*Id*.) Next, PCSD argues that Barens has provided "no evidence that PCSD had a policy or custom of retaliation that created a constitutional violation of his rights or that the [Gilmore] Report was prepared to 'justify retaliation' or was otherwise improper."  (*Id*.)  Lastly, PCSD argues that "this Court has already found Plaintiff's claim that the School Board's review and acceptance of the Gilmore report's finding that Plaintiff's claims were unsubstantiated was insufficient to plausibly allege that the School Board took any adverse action." (*Id*.)(citing Doc. No. 35.)

122

Barens fails to acknowledge or address PCSD's arguments on this issue at any point in his Brief in Opposition. (Doc. No. 65.)

In light of Barens' lack of opposition, the Court finds that Barens has abandoned his *Monell* claim against PCSD under Count One. *See Nathan v. Great Lakes Water Auth.,* 992 F.3d 557, 564 n.1 (6th Cir. 2021) (plaintiff abandoned Title VII claims not discussed in opposition to motion for summary judgment or on appeal); *Dulaney v. Flex Films (USA), Inc*., 2021 WL 3719358 at * 5 (6th Cir. Aug. 23, 2021); *Brown v. VHS of Mich., Inc*., 545 Fed. Appx 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Lisan v. Wilkie*, 835 Fed. Appx 831, 834–35 (6th Cir. 2020); *Alexander v. Carter ex rel. Byrd*, 733 Fed. Appx 256, 261 (6th Cir. 2018); *Nowlin v. Nova Nordisk Inc*., 2018 WL 1805141 at *3 (6th Cir. Feb. 28, 2018); *Haddad v. Sec'y, U.S. Dep't of Homeland Sec*., 610 Fed. Appx 567, 568 (6th Cir. 2015); *Hicks v. Concorde Career Coll*., 449 Fed. Appx 484, 487 (6th Cir. 2011). Accordingly, PCSD's Motion for Summary Judgment on Count One is granted.

### 3.      Count Two—Due Process

In Count Two, Barens alleges that "Defendants' adoption and acceptance of Joe Ridgley's constitutionally impermissible conduct was motivated by the content of Barens' complaints, reports of public concern, and lawful criticisms." (Doc. No. 8 at ¶ 210.) Barens further alleges that "Defendants' adverse actions violated [his] First and Fourteenth Amendment rights to be free from retaliation for complaints and a public hearing in the taking of Barens' property by depriving him of his liberty under the Fourteenth Amendment." (*Id*. at ¶ 211.)

123

The PCSD Defendants argue that they are entitled to summary judgment in their favor with respect to this claim because Barens has failed to sufficiently establish a protected property or liberty interest that would entitle him to any due process protections.  (Doc. No. 50 at PageID# 1748.)  Specifically, the PCSD Defendants assert that "with respect to the three prospective opportunities that Plaintiff refers to, there is no evidence to establish that Plaintiff had anything more than an abstract need, desire or unilateral expectation for those prospective job opportunities." (*Id*.)  Defendants maintain that Barens "had no legitimate claim of entitlement to any of those positions based on an online application and as a result, Plaintiff's Due Process claim must fail." (*Id*.)  The PCSD Defendants further assert that, even if Barens did have a protected property interest with respect to any of his prospective job positions, his due process claim nonetheless fails because he was given a full and fair opportunity to be heard regarding Ridgley's alleged misconduct. (*Id*. at PageID# 1749.)  Ridgley argues that he is entitled to judgment on this claim because "Barens failed to establish—or even allege—that Ridgley personally violated his due process rights." (Doc. No. 51 at PageID# 1799.)

Barens fails to acknowledge or address his Due Process claim at any point in his Brief in Opposition.[51]  (Doc. No. 65.)

In light of Barens' lack of opposition, the Court finds that Barens has abandoned his Due Process claim.  *See Nathan,* 992 F.3d at 564 n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin*, 2018 WL

---

[51] The Table of Contents to Baren's Brief in Opposition refers to a section entitled "Defendants are not entitled to Summary Judgment on Barens' Fourteenth Amendment Claim."  (Doc. No. 65 at PageID# 2273.)  However, a close review of Barens' Brief in Opposition reveals that there is not, in fact, any section or discussion anywhere therein regarding Defendants' arguments they are entitled to summary judgment in their favor with respect to this claim.

1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487. Accordingly, the PCSD Defendants' and Ridgley's Motions for Summary Judgment on Count Two are granted.

### 4. Count Three—Tortious Interference

In Count Three, Barens alleges that Ridgley was aware of the existence of Barens' employment applications with CH-UH, the Federal Reserve Bank, and the City of Euclid; intentionally interfered with Barens' prospective employment relations with these three entities, and that he admitted to doing so in his communications with Olp and Bartko. (Doc. No. 8 at ¶¶ 218, 219, 220.) Barens further alleges that he was injured as a proximate result of Ridgley's unlawful conduct because the starting salary of each job that he applied for was at least $18,000 more than his position at PCSD and provided more benefits. (*Id.* at ¶ 217, 224.) Lastly, Barens alleges that Ridgley's acts were willful, egregious, malicious and "worthy of substantial sanction by this Court."[52] (*Id.* at ¶ 225.)

Ridgley argues that he is entitled to judgment in his favor on this claim because Barens cannot show the existence of a "valid business expectancy" with respect to his job applications at either CH-UH, the Federal Reserve Bank, or the Euclid PD. (Doc. No. 51 at PageID# 1802.) He maintains that "Barens cannot establish that he was offered or would have been offered the positions but for the alleged interference" by Ridgley. (*Id.*) To the contrary, Ridgley asserts that "the record contains testimony that these positions had numerous qualified applicants and internal processes that determined whether a candidate proceeded through the hiring process." (*Id.*) Ridgley further argues the Roller, Loretz, and Mendizabal Affidavits also confirm that Ridgley was not involved in the

---

[52] In connection with the PCSD Defendants' Motion for Judgment on the Pleadings, Barens clarified that Count Three is not asserted against Defendants Schweitzer, Vaughn, Bratz, Karpus, and Krise, Jr. *See* Doc. No. 35 at p. 44. Thus, to the extent Count Three could be interpreted as asserting claims against those Defendants, the Court granted judgment in their favor with respect to that claim. (*Id.* at pp. 45-45.)

decisions not to hire Barens. (*Id.*)  Ridgley then discusses, at some length, the evidence relating to Barens' applications at each of these employers to demonstrate that Barens did not have a valid business expectancy with any of them and, further, that Ridgley did not interfere with any of Barens' applications.  (*Id.* at PageID#s 1802-1804.)

Ridgley next argues that Barens' tortious interference claim fails because there is no evidence that Ridgley had knowledge of Barens' expectancy with any of the three potential employers.  (*Id.* at PageID#s 1804-1805.)  Rather, Ridgley notes that Loretz, Roller, and Mendizabal each aver that he was not made aware of Barens' applications until *after* CH-UH, the Federal Reserve, and Euclid decided not to hire him.  (*Id.*) Lastly, Ridgley argues that the record contains no evidence that he intentionally interfered without justification.  (*Id.* at PageID# 1805.)  In this regard, Ridgley argues that "simply providing a good faith opinion does not rise to the level of tortious interference."  (*Id.*)

Barens argues that he satisfies the first element of this claim because "he was in the application and interview process with prospective employers."  (Doc. No. 65 at PageID# 2305.)  Citing Olp's Affidavit, he then asserts that the second element is also met because the record establishes that Ridgley "had knowledge of Barens' business expectancy with three potential employers." (*Id.*) Lastly, Barens argues that each remaining element of this claim is met because Ridgley "provided more than a good faith opinion" when he made negative comments about Barens to Captain Roller and that Ridgley made these comments before the decision had been made not to hire him by the Euclid PD.[53]  (*Id.* at PageID# 2306.)

---

[53] Barens devotes considerable time in his Brief in Opposition to arguing that his tortious interference claim is not time-barred because it is governed by a four year limitations period.  (Doc. No. 65 at PageID#s 2310-2311.)  Ridgley does not, however, argue that Barens' tortious interference claim is time-barred.  (Doc. No. 51.)  Thus, the Court need not address this issue.

In his Reply Brief, Ridgley argues that "merely submitting an application is insufficient" to satisfy the first element of this claim.  (Doc. No. 68 at PageID# 2580.)  He asserts that "[t]here was no prospective contractual relation because [Barens] was not guaranteed an interview, let alone offered the positions," particularly since "he was not the only individual to apply for these positions." (*Id*.)  Even if Barens satisfied the first element, Ridgley argues that he failed to produce credible evidence that Ridgley intentionally interfered without justification or that he provided anything other than a good faith opinion to any of the three potential employers.  (*Id*. at PageID# 2581.)

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995).  *See also Franklin Tractor Sales v. New Holland North America, Inc.,* 106 Fed. Appx. 342, 344 (6th Cir. 2004).  Under Ohio law, to prevail on a claim for tortious interference with a prospective business relationship, "a plaintiff must demonstrate: (1) the existence of the prospect of a business relationship; [54]  (2) that defendant knew of the plaintiff's prospective relationship; (3) that defendant intentionally and materially interfered with the plaintiff's prospective relationship; (4) without justification;[55] and (5) caused plaintiff to suffer damages." *Chrvala v. Borden, Inc*., 14

---

[54] In his briefing, Ridgley states that the first element of this claim is "the existence of a valid business expectancy."  (Doc. No. 51.) "[C]ourts in Ohio use the term 'tortious interference with a business expectancy' and the term 'tortious interference with a business relationship' interchangeably." *Coventry Group, Inc. v. Gottlieb*, 7 N.E.3d 611, 613 (Ohio App. 8th Dist. 2014). "Ohio does not recognize the tort of wrongful interference with a business expectancy that is separate from tortious interference with a business relationship." *Id.* (citing *EJS Properties, LLC v. Toledo*, 651 F.Supp.2d 743, fn. 1 (N.D. Ohio 2009)).

[55] "'One of the key elements in a tortious interference claim is the question of whether a defendant's actions were privileged.'" *Franklin Tractor Sales,* 106 Fed. Appx. at 344 (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n,* 174 F.3d 733, 742 (6th Cir. 1999). In deciding whether conduct was privileged, or instead constituted "improper interference"

F.Supp. 2d 1013, 1023 (S.D. Ohio 1998).  *See also Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015); *Kenty v. Transamerica Premium Ins. Co*., 650 N.E.2d 863 (Ohio 1995); *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc*. 611 N.E.2d 955 (Ohio App. 9th Dist. 1992).

As one Ohio appellate court recently explained, in order to substantiate a claim for tortious interference with a prospective business relationship, a plaintiff must demonstrate "the existence of 'an actual prospective contractual relation' that but for the interference, would have been consummated." *Weiler v. DLR Group*, 2023 WL 2926417 at * 4 (Ohio App. 8th Dist. April 13, 2023) (quoting *One Energy Ents., LLC v. Ohio DOT*, 2019 WL 453690 at * 15 (Ohio App. 10th Dist. Feb. 5, 2019)).  *See also Chrvala*, 14 F.Supp.2d at 1023 ("In terms of causation, a plaintiff must show that 'but for' the alleged interference the prospective relationship would have been consummated.") (citing *Leibovitz v. Central Nat'l. Bank, et al.,* 60 N.E.2d 727 (Ohio App. 8th Dist. 1944)).

The Court will address Barens' tortious interference claim with respect to each of his three employment opportunities separately, below.

<u>Application to CH-UH</u>.  Barens testified that he applied for the position of Coordinator of Safety and Security at CH-UH in April or May 2020.  (Barens Depo. Vol. I at Tr. 153.)  He was interviewed for the position and was told by the panel that interviewed him did a "great job."  (*Id*. at

---

under Ohio law, the Sixth Circuit has applied the factors contained in the comments to § 767 of the Restatement (Second) of Torts and recounted in *Kand Medical v. Freund Medical Products*, 963 F.2d 125, 128 (6th Cir. 1992).  *Id. See also Super Sulky*, 174 F.3d at 742.  These factors are: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to the interference; (6) the social interests in protecting the freedom of contract and the interference with such; and (7) the relations between the parties. *Kand,* 963 F.2d at 128.  Ohio law imposes the burden of proving "lack of privilege" or "improper interference" on the plaintiff.  *Super Sulky*, 174 F.3d at 742; *Doyle v. Fairfield Mach. Co.,* 697 N.E.2d 667, 683 (Ohio App. 1997).  Here, Ridgley does not argue that his actions were privileged. Thus, the Court does not address this issue, or the factors set forth above.

Tr. 157.) Subsequently, a contact of his at CH-UH, Ms. Pronty, advised him that "somebody from Parma talked to somebody from Cleveland Heights, and they eliminated [him]." (*Id*. at Tr. 159-160.) Barens testified that he did not know who was involved in this conversation, either from Parma or from Cleveland Heights. (*Id*.) On July 13, 2020, Barens received an email advising him that CH-UH had offered the position to another candidate. (*Id*. at Tr. 161; Doc. No. 47-1 at PageID# 856.)

In her Affidavit, Olp avers, in relevant part, that, in the fall of 2020, Ridgley told her that a "buddy" of his at Cleveland Heights called and asked him "Isn't this the guy you've been bitching about?" (Olp Aff. at ¶ 23.) Olp further avers that Ridgley advised that his "buddy" said "they would not even interview Barens because of this." (*Id*.)

Ridgley denied that he said these things to Olp. (Ridgley Depo. at Tr. 87-89.) He acknowledged that Bryan Loretz from CH-UH was a "professional friend" and colleague, and that Loretz called him in July or August 2020 to inform him that he had resigned from CH-UH and that Barens had applied for the position that Loretz was vacating. (*Id*. at Tr. 51-52, 56, 87.) However, Ridgley stated that Loretz told him that he was no longer employed by CH-UH and, therefore, not involved in the hiring process. (*Id*. at Tr. 63, 104-105.) Ridgley insisted that Loretz called him "after the fact" (i.e., after Barens had been rejected from the position) and did not ask any questions about Barens. (*Id*. at Tr. 104-105.) Ridgley reported the same information during his interview with Attorney Gilmore. (Doc. No. 51-1 at PageID#s 1878-1879.) Ridgley also advised Attorney Gilmore that "it was his understanding that Mr. Barens did not get the CH-UH job in part because people at CH-UH had googled his name and saw two lawsuits that he had filed against his employers, including one against PCSD." (*Id*. at PageID# 1879.)

Lastly, Loretz provided an Affidavit herein in which he avers as follows:

129

7.      I became aware on my own that Mr. Barens applied for the Safety Director position at Cleveland Heights. Neither Mr. Barens nor Mr. Ridgley told me that Mr. Barens was applying or had applied for the position.  Additionally, Mr. Ridgley never called me to inquire about Mr. Barens' initial application, his application details, the application process, his application rating, his interview details, his interview ratings, or any other applicant information.

8.      The extent of my knowledge regarding Mr. Barens' application is that he applied for the Safety Director position and was in the running for the position, but ultimately did not get the job. I was not involved in the application or interview processes of Mr. Barens for this position.

9.      Any conversations I had with Mr. Ridgley did not impact Mr. Barens' job opportunity because I was not involved in the process. Mr. Ridgley never told me not to hire Mr. Barens. He did not inform me about Mr. Barens' former lawsuit. He did not speak negatively about Mr. Barens or try to undermine Mr. Barens' employment opportunities. I also never assured Mr. Ridgley that Cleveland Heights would not hire Mr. Barens.

(Loretz Aff. (Doc. No. 51-6) at ¶¶ 7-9.)[56]

The Court finds that Barens has failed to come forward with sufficient evidence to create a genuine issue of material fact that Ridgley interfered with his prospective employment relationship with CH-UH.  Barens has not directed this Court's attention to any evidence that he has personal knowledge that it was Ridgley that interfered with this job application.  The only evidence that Barens has in support of this claim is Olp's Affidavit.  However, Olp's statement that Ridgley told her that Loretz told him "they would not even interview Barens because of this" is, at a minimum, double hearsay, particularly in light of the fact that it is undisputed that Loretz himself was not involved in the hiring process at CH-UH. Accordingly, Olp's averment cannot be considered on a motion for summary judgment.  *Wiley,* 20 F.3d at 225-26.  That leaves the Court with Loretz's sworn Affidavit

---

[56] Gilmore also interviewed Loretz.  (Doc. No. 51-1 at PageID# 1884-1885.)  Loretz stated that he was not involved in the hiring process for his replacement but that he was "kept in the loop" by others at CH-UH who were.  (*Id.*)  Loretz further told Gilmore that CH-UH was considering bringing in three candidates for interviews but that, when they googled Barens and saw that he had sued two of his employers, CH-UH was "no longer interested in interviewing him." (*Id.*)

that he was not involved in the hiring process and that any conversations he had with Ridgley did not impact Barens' job opportunity.  Loretz's sworn statement is consistent with Ridgley's deposition testimony, as well as Ridgley's interview with Gilmore.

In light of the above, the Court finds that Barens has failed to direct this Court's attention to sufficient evidence from which a reasonable juror could find that Ridgley "interfered with" his prospective relationship with CH-UH.

<u>Application to the Federal Reserve</u>.  Barens testified that he applied for a law enforcement position at the Federal Reserve Bank in July 2020.  (Barens Depo. Vol. I at Tr. 174.)  He was not selected for an interview and learned from the Bank's online hiring portal that he was no longer being considered for the position.  (*Id*. at Tr. 175-176.)  Olp avers that, in the fall of 2020, Ridgley told her that a "good buddy" of his at the Federal Reserve Bank called and asked him questions about Barens. (Olp Aff. at ¶ 23.)  Olp avers that Ridgley told her that his "good buddy" said "they would not even interview Barens because of " what Ridgley told them.  (*Id*.)

Ridgley testified that Enrique Mendizabal from the Federal Reserve Bank is a professional and personal friend.  (Ridgley Depo. at Tr. 49-50.)  He testified that Mendizabal called him to "give [him] the professional courtesy to let [him] know that one of [Ridgley's] staff applied down at the Federal Reserve Bank where he was working."  (*Id*. at Tr. 57.)  Ridgley testified that he asked if the Federal Reserve Bank was going to hire Barens, and Mendizabal said "No.  He's already been removed from the list."  (*Id*.)

In his Affidavit, Mendizabal averred that he "learned of Mr. Barens' application when Human Resources sent the applications of those that applied to the open position."  (Mendizabal Aff. (Doc. No. 51-7) at ¶ 5.)  He avers that "[n]either Mr. Barens nor Mr. Ridgley told me that Mr. Barens was

applying for or had applied for the position prior to me receiving his application," and that "Mr. Ridgley never called me to inquire about Mr. Barens' initial application, his application details, the application process, his application rating, his interview details, his interview ratings, or any other applicant information." (*Id*.)  Mendizabal states that he reviewed Barens' application amongst approximately fifteen (15) other applicants.  (*Id*. at ¶ 6.)  He recommended that Barens move forward in "Group C."  (*Id*.)  Ultimately, however, "Mr. Barens did not advance to the interview process for the Law Enforcement Unit position because of other strong applicants."  (*Id*. at ¶ 7.)  Mendizabal avers that, after Barens had been eliminated from consideration, he spoke to Ridgley to inform him that Barens had applied for the position.  (*Id*. at ¶ 8.)  He avers that "[a]t no point did Mr. Ridgley tell me not to hire Mr. Barens." (*Id*. at ¶ 9.)

The Court finds that Barens has failed to come forward with sufficient evidence to create a genuine issue of material fact that Ridgley interfered with his prospective employment relationship with the Federal Reserve Bank.  Again, Barens has not directed this Court's attention to any evidence that he has personal knowledge that it was Ridgley that interfered with this job application.  Rather, the only evidence that Barens has in support of this claim is Olp's statement that Ridgley told her that Mendizabal told him "they would not even interview Barens because of this."  As noted *supra,* Olp's averment constitutes double hearsay and, therefore, cannot be considered on a motion for summary judgment.  *Wiley,* 20 F.3d at 225-26.  That leaves the Court with Mendizabal's sworn Affidavit that (1) Barens did not advance in the interview process because of "other strong applicants;" and (2) he did not speak to Ridgley until after he had already decided not to hire Barens.

In light of the above, the Court finds that Barens has failed to direct this Court's attention to sufficient evidence from which a reasonable juror could find that Ridgley "interfered with" his

132

prospective relationship with the Federal Reserve Bank.  Moreover, even assuming *arguendo* that Olp's averment was sufficient to create a fact issue that Ridgley interfered with this application, the Court finds that Barens' claim nonetheless fails because he has not come forward with sufficient evidence that, but for such interference, his employment relationship with the Federal Reserve Bank "would have been consummated."  *Weiler*, 2023 WL 2926417 at * 4.  As noted above, Mendizabal avers that Barens was one of fifteen applicants and that he did not advance in the process because other applicants were stronger.  Barens has not come forward with any evidence to dispute this. Accordingly, and for all the reasons set forth above, the Court finds that Barens has failed to establish a genuine issue of material fact that Ridgley tortiously interfered with his prospective relationship with the Federal Reserve Bank.

      <u>Application to Euclid Police Department</u>.  Barens applied for a law enforcement position at the Euclid PD in August 2020.  (Barens Depo. Vol. I at Tr. 183.)  On October 5, 2020, Barens received an email from Captain Roller of the Euclid PD advising him that he would not be considered for the position.  (Doc. No. 47-1 at PageID# 857; Barens Depo. Vol. I at Tr. 176, 190.)  In her Affidavit, Olp avers that, in October 2020, Ridgley informed her that a "supervisor" at Euclid called him.  (Olp Aff. at ¶ 25.)  She further avers that Ridgley then said "That's three jobs he [Barens] could have had because of Joseph Ridgley:  Cleveland Heights, Federal Reserve, and Euclid." (*Id*. at ¶ 26.)

      Ridgley testified that Captain Roller was a professional friend, and that he had known him since around 2009.  (Ridgley Depo. at Tr. 51-52.)  Ridgley testified that, in around September 2020, Roller called him and asked him if he knew Barens.  (*Id*. at Tr. 53-54, 63-64.)  Ridgley testified that Roller "wanted to go over Barens' … resume or application."  (*Id*. at Tr. 55.)  Captain Roller asked whether Barens was a "school resource officer," to which Ridgley replied that he was not.  (*Id*. at Tr.

133

64.) Ridgley also testified that he told Captain Roller that Barens scared him. (*Id.* at Tr. 65, 91-92.) Lastly, Ridgley acknowledged that he told Olp that "that's three jobs that [Barens] could have had because of Joseph Ridgley" but explained that what he meant was that "if [he] would have known ahead of time, [he] probably could have put a word in for him." (*Id*. at Tr. 93.)

In his Affidavit, Captain Roller avers that Barens applied twice to the Euclid PD, both times for the position of police officer. (Roller Aff. (Doc. No. 51-5) at ¶ 6.) Roller avers that, in August 2020, he received Barens' most recent application. (*Id*.) Because he remembered Barens' name from his previous application, Roller retrieved Barens' prior application and reviewed it. (*Id*. at ¶ 7.) Roller avers that Barens was not hired previously because there were stronger candidates at the time. (*Id*.) He further avers that "[s]ince [Barens] was not a strong candidate in the past, I suspected that he was unlikely to be a strong candidate in 2020." (*Id*.) Captain Roller further states that he "also googled Mr. Barens' name" and that "[t]he Google results showed summaries of prior lawsuits Mr. Barens filed." (*Id*.) Roller states that "[i]t was apparent that Mr. Barens would be a troublesome or disruptive employee." (*Id*.) Because he had received "multiple other strong applications," Roller "was not interested in hiring Mr. Barens based on the information discovered through the internet." (*Id*.) Captain Roller states that he sent Barens an email on October 5, 2020, informing him that his candidacy for the position would not be further considered. (*Id.* at ¶ 8.) Captain Roller then avers as follows:

> 9. After I determined not to hire Mr. Barens, I called Mr. Ridgley to verify Mr. Barens' resume and job responsibilities at Parma City School District. Mr. Ridgley informed me of Mr. Barens' actual ,job responsibilities. Because the duties that Mr. Ridgley informed me were not consistent with the job duties outlined on Mr. Barens' resume, I concluded that Mr. Barens falsified his resume. This conclusion solidified my prior decision not to hire Mr. Barens.

134

10. In my conversation with Mr. Ridgley, we never discussed Mr. Barens' character, I told Mr. Ridgley that Mr. Barens' prior lawsuits was freely available upon searching the Internet. Mr. Ridgley's comments did not negatively impact Mr. Barens' chances of obtaining employment with the Euclid Police Department because I had already decided not to proceed with the hiring process for Mr. Barens before I spoke to Mr. Ridgley.

11. The conversation with Mr. Ridgley did not impact Mr. Barens' job opportunity to be a police officer for the Euclid Police Department. Mr. Ridgley's comments did not undermine Mr. Barens' employment opportunities nor impugn Mr. Barens' professional reputation.

(*Id.* at ¶¶ 9-11.)

The Court finds as follows. Barens has come forward with sufficient evidence from which a reasonable jury could conclude that he had a prospective relationship with Euclid PD; that Ridgley was aware of this prospective relationship; and that Ridgley intentionally interfered with it. Although Captain Roller avers that he did not speak to Ridgley about Barens' application until after he had already decided not to hire Barens, Ridgley himself testified in deposition (and confirmed to Attorney Gilmore) that he spoke with Roller *before* Roller decided not to hire Barens. (Ridgley Depo. at Tr. 93-94.) Ridgley also acknowledged that he made negative comments about Barens to Roller, including that Barens was "scary." This evidence, combined with Olp's Affidavit, is sufficient to create a fact issue regarding the first three elements of Barens' tortious interference claim with respect to his Euclid PD application.

However, the Court concludes that Barens has failed to come forward with sufficient evidence to create a genuine issue of material fact that "'but for' the alleged interference the prospective relationship would have been consummated." *Chrvala*, 14 F.Supp.2d at 1023 (citing *Leibovitz,* 60 N.E.2d at 727). *See also Weiler*, 2023 WL 2926417 at * 4; *One Energy Ents.,* 2019 WL 453690 at * 15. Captain Roller offers several reasons why he decided not to hire Barens, each of which are

135

unrelated to his conversation with Ridgley about Barens' application.  First, Roller avers that he recalled Barens from a previous application and remembered that Barens had not been hired in the past because "there were stronger candidates at that time."  (Roller Aff. at ¶ 7.)  Based on this, Roller "suspected that he was unlikely to be a strong candidate in 2020."  (*Id*.)  Second, Roller avers that he decided not to hire Barens because, based on a Google search, he learned that Barens had filed prior lawsuits and reviewed summaries of those lawsuits.  (*Id*.)  Roller then decided that "it was apparent that Mr. Barens would be a troublesome and disruptive employee."  (*Id*.) Finally, Roller avers that he had received multiple other strong applications for the position.  (*Id*.)

Barens does not argue, or direct this Court's attention to any evidence, that the reasons provided by Captain Roller are inaccurate or pretextual.[57]  Indeed, Barens does not acknowledge or address Captain Roller's Affidavit at any point in his Brief in Opposition.  Nor does Barens cite any analogous cases or authority in support of his claim that, under the circumstances presented, Ridgley is not entitled to summary judgment with respect to this claim.

In light of any meaningful opposition regarding the issue of but for causation, the Court finds that Ridgley is entitled to summary judgment in his favor with respect to Barens' claim that he tortiously interfered with Barens' prospective employment relationship with the Euclid PD. Accordingly, and for all the reasons set forth above, the Court finds that Ridgley is entitled to summary judgment in his favor on Count Three.

### 5.    Counts Four, Five, and Six—Civil Liability for Criminal Acts

---

[57] The Court notes that, based on the record before it, it does not appear that Barens deposed Captain Roller in this action.

136

In Counts Four, Five, and Six, Barens alleges that the PCSD Defendants and Ridgley are civilly liable for criminal acts under Ohio Rev. Code § 2307.60.  That statute provides, in relevant part, that:

> (A)(1) Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

Ohio Rev. Code § 2307.60(A)(1).  Pursuant to this statute, Barens alleges that Defendants are civilly liable for violating Ohio Rev. Code § 2921.45 (Count Four); Ohio Rev. Code § 2923.03 (Count Five); and Ohio Rev. Code § 2921.05 (Count Six).  (Doc. No. 8 at ¶¶ 226-245.)  Specifically, in Count Four, Barens alleges that Ridgley, Smialek, Hoy, and the individual PCSD Board Members "knowingly deprived [Barens] of his constitutional and statutory rights as detailed above, including his right to be free from retaliation for reporting matters of public concern and his constitutional rights to freedom of speech, petition, and due process." (*Id*. at ¶ 229.)  In Count Five, Barens alleges that "Defendants aided and abetted [Ridgley's] interference with [his] civil and statutory rights."  (*Id*. at ¶ 236.)

And, in Count Six, Barens alleges that "[s]hould the Court determine that [his] speech was in the course of discharging his duties and not speaking as a private citizen on matters of public concern, then Defendants retaliated against [him] for discharging his duties."  (*Id.* at ¶ 242.)  Barens further alleges that "Defendants' retaliation … included ratifying [] Ridgley's harassment and scrutiny of Barens, threatening disciplinary action, denial of overtime, ordering co-worker and private surveillance of Paul Barens, and constructively terminating Paul Barens until he resigned."  (*Id*. at ¶ 243.)  Lastly, in both Counts Four, Five and Six, Barens alleges that "Defendants' acts were wanton, willful, malicious, egregious, and invite substantial sanction by this Court to punish and deter them

137

and other Parma City School District employees from engaging in this type of unlawful conduct." (*Id*. at ¶¶ 231, 238, 245.)

Ohio Rev. Code § 2921.45 provides that "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."  Ohio Rev. Code § 2923.03 provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: ** (2) aid or abet another in committing the offense."  And, finally, Ohio Rev. Code § 2921.05 provides that "[n]o person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness."

The PCSD Defendants and Ridgley first argue that Ohio Rev. Code § 2307.60 is subject to a one-year statute of limitations and, therefore, Barens is barred from relying on any facts or evidence relating to conduct prior to January 18, 2021 (i.e., one year prior to the filing of the Complaint) in support of Counts Four through Six.  (Doc. No. 50 at PageID#s 1751-1754; Doc. No. 51 at PageID#s 1805-1808.)  Defendants next argue, at some length, that they are entitled to judgment in their favor regarding Counts Four, Five, and Six because Barens has failed to come forward with sufficient evidence to create a genuine issue of material fact that any of these Defendants violated Ohio Rev. Code §§ 2921.45, 2923.03, and/or 2921.05.  (Doc. No. 50 at PageID#s 1722, 1754-1756; Doc. No. 51 at PageID#s 1808-1810.)

138

In response, Barens argues that Counts Four, Five and Six[58] are timely because Ohio Rev. Code § 2307.60 "provides a 'remedy,' not a 'penalty or forfeiture,' so the six-year statute of limitations of Ohio Rev. Code § 2307.50 applies." (Doc. No. 65 at PageID# 2312.) He further asserts that, under the discovery rule, his claims accrued when he knew or had reason to know that the Defendants injured him. (*Id*. at PageID#s 2309-2310.) Barens argues that, although he learned of Ridgley's statements in September 2020, he did not become aware of who caused his injury until he received the Gilmore Report on January 19, 2021. (*Id*.) Notably, Barens does not acknowledge or address Defendants' arguments that the record fails to contain any evidence that either the PCSD Defendants or Ridgley are actually liable under any of the predicate statutes enumerated in Counts Four, Five, and Six, i.e., Ohio Rev. Code §§ 2921.45, 2923.03, or 2921.05.

For the following reasons, the Court finds that the PCSD Defendants and Ridgley are entitled to summary judgment in their favor with respect to Counts Four, Five, and Six. Even assuming *arguendo* that the six year statute of limitations applies to Barens' claims, Barens has failed, entirely, to respond to the PCSD Defendants' and Ridgley's arguments that the record does not contain sufficient evidence from which a reasonable jury could conclude that any of these Defendants violated Ohio Rev. Code §§ 2921.45, 2923.03, or 2921.05.

---

[58] Barens' briefing on this issue is confusing, at best. In the specific Section of his Brief addressing Defendants' arguments that Counts Four, Five, and Six are time barred ("Section K"), Barens argues that "Count 6 of Plaintiff's Second Amended Complaint" is timely. (Doc. No. 65 at PageID#s 2312-2314.) He does not refer to, acknowledge, or address Counts Four and Five. (*Id*.) Moreover, there is no "Second Amended Complaint" in this action—there is only Barens' First Amended Complaint. Earlier in his Brief, however, he does argue generally that Counts Four and Five are subject to the discovery rule. (*Id*. at PageID#s 2309-2310.) The Court agrees with the PCSD Defendants that Barens' briefing on his issue is "disjointed." (Doc. No. 66 at PageID# 2536.) Nonetheless, the Court will construe Barens' argument in Section K of his Brief in Opposition that Ohio Rev. § 2307. 60 is subject to a six year limitations period, as applying to Counts Four, Five, and Six of his Amended Complaint.

Specifically, regarding Count Four, the PCSD Defendants argue that Barens failed to come forward with any evidence that the individual Board Members knowingly deprived, or conspired or attempted to deprive, him of any constitutional or statutory right.  (Doc. No. 50 at PageID# 1754-1755.)  The PCSD Defendants further argue that the only evidence that either Smialek or Hoy knowingly deprived, or conspired or attempted to deprive, Barens of any constitutional or statutory right, is Barens' unsupported and speculative testimony that Smialek "was the orchestrator of it all" and Hoy "was basically their puppet."  (*Id*. at PageID# 1755.)  Likewise, Ridgley asserts there is no evidence that he knowingly deprived or attempted to deprive Barens of his First and Fourteenth Amendment Rights, arguing that "any of the eleven alleged retaliatory actions that were actually taken by Ridgley were made — in accordance to the legislative intent -- with the honest belief that they were authorized under the Safety Director's power to do so."  (Doc. No. 51 at PageID# 1808.)  Barens fails to acknowledge or address any of Defendants' arguments in his Brief in Opposition. (Doc. No. 65.)

Regarding Count Five, the PCSD Defendants argue that Barens' evidence that Smialek, Hoy and the Board Members "aided and abetted" Ridgley is "nothing more than a fictional, manufactured conspiracy completely void of any real, supporting evidence."  (Doc. No. 50 at PageID# 1756.)  In this regard, the PCSD Defendants note that, when asked to explain how the individual PCSD Defendants aided and abetted each other, Barens testified only that (1) Smialek was "in charge of the district," (2) Hoy "was just a prod in there, he was doing what they told him to do;" and (3) the individual Board Members "adopted everything that Smialek told them to do."  (*Id*.)  The PCSD Defendants argue that Barens' speculative testimony is not sufficient to create a genuine issue of material fact that any of the individual PCSD Defendants "aided and abetted another in committing

140

an offense" under Ohio Rev. Code § 2923.03.  (*Id*.)  For his part, Ridgley notes that "this claim alleges that the other Defendants helped [] Ridgley violate R.C. 2921.45" and argues that "Ridgley cannot be both the principal and the accomplice, nor can he aid or abet himself in committing the alleged offense."  (Doc. No. 51 at PageID# 1809.)  Thus, Ridgley argues, he is entitled to summary judgment in his favor on Count Five.  (*Id*.)  Once again, Barens fails to acknowledge or address any of Defendants' arguments in his Brief in Opposition.  (Doc. No. 65.)

Lastly, regarding Count Six, the PCSD Defendants argue that Barens "presented absolutely no evidence regarding the individual board members and as discussed throughout this brief, failed to provide any evidence that [] Smialek and Hoy "purposely and by force or by unlawful threat of harm" engaged in any retaliatory behavior."  (Doc. No. 50 at PageID# 1756.)  Ridgley argues that any "threats" and/or "threatened conduct" that Ridgley allegedly made or engaged in are not themselves unlawful under Ohio law.  (Doc. No. 51 at PageID# 1810.)  Citing Ohio Supreme Court authority, Ridgley asserts the alleged threats herein "do not violate established criminal or civil law nor does it violate a predicate offense."  (*Id*.)  Barens again fails to acknowledge or address any of Defendants' arguments in his Brief in Opposition.  (Doc. No. 65.)

In light of Barens' complete lack of opposition, the Court finds that Barens has abandoned his claims in Count Four, Five, and Six that Defendants are civilly liable under Ohio Rev. Code § 2307.60 for violating Ohio Rev. Code §§ 2921.45, 2923.03, or 2921.05.  *See Nathan,* 992 F.3d at 564 n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown,* 545 Fed. Appx at 372; *Lisan,* 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin,* 2018 WL 1805141 at *3; *Haddad,* 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487. Accordingly, the PCSD Defendants' and Ridgley's Motions for Summary Judgment on Counts Four, Five, and Six are granted.

141

### 6.        Failure to Mitigate

Lastly, Ridgley argues that "some of Barens' claims for damages are barred because he failed to mitigate his damages."  (Doc. No. 51 at PageID# 1787.)  Ridgley maintains that Barens has failed to produce any information relating to his earnings and/or any and all job applications or searches conducted after he resigned from PCSD in October 2021.  (*Id.* at PageID#s 1788-1789.)  Specifically, Ridgley argues that Barens failed to produce documentation of (1) the income he received while working at Out of Door Academy in Florida; or (2) sales, employees, inventory, or earnings from the mattress store he opened in Florida.  (*Id.*)  Thus, Ridgley argues that "the record contains no evidence that Barens mitigated his damages or that he suffered any damages."  (*Id.* at PageID# 1789.)

In response, Barens argues (summarily and without citation to authority) that his claims are not barred because "subsequent employment mitigation is not appropriate to circumscribe a violation of the U.S. Constitution."  (Doc. No. 65 at PageID# 2295.)  He further asserts that he has "presented Defendants with evidence of the reasonable steps he took to mitigate, his job search, offer letters, approximate pay, including documentation of counselling."  (*Id.*) (citing Barens' Answers to Interrogatories (Doc. No. 65-6) and Barens Depo. at Tr. 53, 196-202.)

In his Reply Brief, Ridgley argues that the interrogatory responses and deposition testimony cited by Barens do not, in fact, include any information relevant to mitigation of damages.  (Doc. No. 68 at PageID#s 2574-2575.)  Ridgley further assert that the Sixth Circuit has expressly held that "in a § 1983 case the plaintiff has a duty to mitigate damages."  (*Id.*) (quoting *Grace v. City of Detroit*, 216 Fed. Appx. 485 (6th Cir. 2007)).

The Supreme Court has made clear that "compensation for actual injuries suffered is the basis for compensatory damages under § 1983; without actual injury, nominal damages may be awarded."

142

*Grace v. City of Detroit*, 216 Fed. Appx. 485, 492 (6th Cir. 2007) (citing *Carey v. Piphus*, 435 U.S. 247 (1978)).  The Sixth Circuit further explained that "plaintiffs seeking damages under § 1983 have a duty to mitigate" and stated that it "imported mitigation doctrine from this circuit's seminal Title VII mitigation case, *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614 (6th Cir. 1983)."  *Grace*, 216 Fed. Appx. at 492.  *See also Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994).  "*Rasimas* unequivocally establishes that once the plaintiff has presented evidence of damages, the defendant has the burden of establishing a failure to properly mitigate damages." *Meyers,* 14 F.3d at 1119 (citing *Rasimas,* 714 F.2d at 623–24).  *See also Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 800 (6th Cir. 2018).  "To satisfy this burden the defendant must establish that substantially equivalent positions were available and that the plaintiff failed to exercise reasonable care and diligence in seeking those positions."  *Meyers*, 14 F.3d at 1119. *See also Pittington*, 880 F.3d at 800.

Here, Ridgley misapplies the burden of proof.  The Sixth Circuit has made clear that, while a plaintiff has a duty to mitigate damages, "'the burden of producing sufficient evidence to establish the amount of interim earnings or a lack of diligence' in mitigating damages rests with the defendant." *Pittington*, 880 F.3d at 800 (quoting *Wooldridge v. Marlene Industries Corp*., 875 F.2d 540, 548 (6th Cir. 1989)).  In the instant case, Ridgley has not satisfied his burden of demonstrating Barens' failure to mitigate because he (i.e., Ridgley) has not argued, or come forward with any evidence, that "substantially equivalent positions were available" and that Barens "failed to exercise reasonable care and diligence in seeking those positions."  *Meyers*, 14 F.3d at 1119.  *See also Pittington*, 880 F.3d at 800.  Rather, Ridgley appears to argue that Barens' failure to mitigate should be inferred from his

failure to produce documentation regarding his income at Out of Door Academy and/or the Mattress store that Barens briefly owned in Florida.

The Court rejects this argument.  While the Court does not disagree that post-employment records and documents may be relevant to the issue of mitigation, Ridgley cites no authority that the absence of such documentation demonstrates a failure to mitigate and/or warrants dismissal of some or all of a plaintiff's claims.[59]  To the contrary, in discussing mitigation of damages, the Sixth Circuit has expressly noted that "a litigant is not required to introduce documentary evidence where testimony would suffice."  *Pittington*, 880 F.3d at fn 10.  And, here, Barens testified extensively regarding his employment after resigning from PCSD in October 2021.  Specifically, Barens testified that he and his family moved to Florida in November 2021, and that he began working as a school resource officer at Out of Door Academy in Sarasota in December 2021 or January 2022.  (Barens Depo. at Tr. 35-36, 361-362.)  Barens' offer letter from Out of Door Academy was marked as an exhibit during his deposition, and provides for an annual salary of $55,000 prorated to $34,375 for the 2021-2022 school year.  (Doc. No. 47-2 at PageID# 1102; Barens Depo. at Tr. 361-362.)  Barens testified that he worked at Out of Door Academy until May 2022, when he resigned because it "wasn't a good fit."  (Barens Depo. at Tr. 362.)  He testified that he then opened a mattress store in Florida.  (*Id*. at Tr. 37.)  However, he stated that he only made $50 in profits because shortly after he opened this new business, two hurricanes "shut him down."  (*Id*.)  Barens explained that he searched for jobs in June and July 2022 and ultimately returned to Ohio and began working as a police officer for Case

---

[59] Ridgley complains that he requested documentation regarding Barens' post-PCSD resignation employment and job searches but that Barens failed to produce it in discovery.  The Court notes that, although he could have done so, Ridgley did not file a Position Paper regarding this issue under Local Rule 37.1.  Had Ridgley done so, the Court could have assisted in resolving this issue prior to summary judgment proceedings.

Western Reserve University in February 2023.  (*Id*. at Tr. 20, 30, 67.)  Barens testified that, at the time of his deposition, his salary at CWRU was $70,800.  (*Id*. at Tr. 31.)

Based on the above, the Court finds that Ridgley has failed to demonstrate that he is entitled to summary judgment in his favor because Barens did not produce documentation regarding the income he received while working at Out of Door Academy in Florida; sales, employees, inventory, or earnings from the mattress store he opened in Florida; and/or all of his specific job searches or applications after leaving PCSD.  Accordingly, Rigley's argument is without merit and rejected.

## V.     Conclusion

Accordingly, and for all the reasons set forth above, Plaintiff's Motion for Leave to File a Legible Copy of Plaintiff's Exhibit 12" (Doc. No. 69) is DENIED.  The PCSD Defendants' and Defendant Ridgley's "Joint Objections and Motion to Strike" (Doc. No. 67) is GRANTED IN PART and DENIED IN PART, as set forth herein.   The PCSD Defendants' Motion for Summary Judgment (Doc. No. 50) is GRANTED.  Defendant Ridgley's Motion for Summary Judgment (Doc. No. 51) is GRANTED IN PART and DENIED IN PART, as set forth herein.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  March 17, 2025                     U. S. DISTRICT JUDGE

145